UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
MUCHMORE'S CAFE, LLC,                     Civil Action No. 14-cv-5668 RRM-RER

              Plaintiff,

    -against-

CITY OF NEW YORK,

              Defendant.
-------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS

Background of Case                                                                1

Standard of Review                                                                1

Point I - The Cabaret Law Violates the First Amendment                            2

    A. Application of First Amendment to Expressive Conduct    2

    B. Application of First Amendment to Dance Performance      3

    C. Applicability of the Cabaret Law to "Musical Entertainment,
       Singing, [Social] Dancing and Other Form[s] of Amusement"    4

    D. Dallas v. Stanglin does not Address the Rights of Adults to
       Musical Entertainment, Singing, Dancing and Other Forms
       of Amusement, and Must be Differentiated                      5

    E. The Intended and Actual Effect of the Cabaret Law is to
       Inhibit Protected Expression                                  10

    F. The Cabaret Law Inhibits Freedom of Association             14

    G. The Cabaret Law Represents an Impermissible Prior
       Restraint Under the First Amendment                           15

    H. The Cabaret Law is Unconstitutionally Vague                 16

    I. The Cabaret Law is Unconstitutionally Overbroad             17

Point II - The Cabaret Law Violates the Equal Protection Clause                   19

    A. The Cabaret Law was Motivated by a Discriminatory
       Intent and has a Disparate Impact                             19

    B. The Distinctions Drawn by the Cabaret Law Do Not
       Serve a Compelling State Interest                             21

Point II - The Cabaret Law Should be Found Unconstitutional Under the
       Doctrine of Substantive Due Process                           22

Conclusion                                                                        25

# TABLE OF AUTHORITIES

## Statutes

N.Y.C. Administrative Code 20-359, *et seq.*                                                1, 2, 4

Fed. R. Civ. P. 12(c)                                                                        1

Town of Pound Ordinance, §§ 127-138                                                          8

Hillsborough County Rave/Dance Hall Permitting Ordinance                                     8, 9

New York City Noise Code
    N.Y.C. Admin. Code, Title 24, Chapter 2, Sec. 24-202, *et seq.*      13

New York City Places of Assembly Law
    N.Y.C. Admin. Code, Title 28, Chapter 1, Article 117, Sec. 28-117.1, *et seq.*    13

## Cases

*Abusaid v. Hillsborough County Bd.*
    637 F. Supp. 2d 1002 (M.D. Fla., 2007)                                  8

*Alexander v. United States*
    509 U.S. 444 (1993)                                                     15

*Arcara v. Cloud Books*
    478 U.S. 697 (1986)                                                     5, 11

*Ass'n of Home Appliance Manufacturers v. the City of New York*
    *13 Civ. 07888 (S.D.N.Y. 2014)*                                          1

*Barnes v. Glen Theater*
    *501 U.S. 560 (1991)*                                                    *3, 7*

*Bd. of Airport Comm. v. Jews for Jesus*
    482 U.S. 569 (1987)                                                     12, 18

*Boos v. Barry*
    485 U.S. 312 (1988)                                                     12

*Bowers v. Hardwick*
    478 U.S. 186 (1986)                                                     24

*Calder v. Bull*
    3 U.S. 386 (1798)                                                       23

*Castellano v. Bd. Of Trustees of Police Officers' Variable Supplements Fund*
    937 F. 2d 752 (2d Cir. 1991)                       2

*Chase v. Davelaar*
    645 F.2d 735, 739-40 (9th Cir. 1981)           3

*Chiasson v. New York City Dept. of Consumer Affairs*
    505 N.Y.S.2d 499 (Sup. Ct. N.Y. Co. 1986)     4, 5

*Chiasson v. New York City Dept. of Consumer Affairs*
    524 N.Y.S.2d 649 (Sup. Ct. N.Y. Co. 1988)     4, 5, 10

*Church of Lukumi Babalu Aye v. City of Hialeah*
    508 U.S 520 (1993)                          12

*City of Baxter Springs v. Bryant*
    226 Kan. 383 (Kan.1979)                  11

*City of Cleburne v. Cleburne Living Center*
    473 U.S. 432 (1985)                        23

*Coates v. Cincinnati*
    402 U.S. 611 (1971)                      16, 17

*Dallas v. Stanglin*
    488 U.S. 815 (1989)                      6, 7

*Dredd Scott v. Sandford*
    60 U.S. 393 (1857)                         24

*Elam v. Bolling*
    53 F. Supp. 2d 854 (W.D. Va. 1999)        8

*Federal Election Commission v. Massachusetts Citizens For Life, Inc.*
    479 U.S. 238 (1986)                        11

*Festa v. City of New York*
    2006 NY Slip Op 26125 (Sup. Ct. N.Y. Co. 2006)     4, 6

*Freedman v. Maryland*
    380 U.S. 51 (1965)                        11, 15

*FW/PBS, Inc. v. City of Dallas*
    493 U.S. 215, 226 (1990)                  9

*Giovani Carandola, Ltd. v. Bason*
    303 F. 3d 507 (4th Cir. 2002)            3

*Griswold v. Connecticut*
381 U.S. 479 (1965)     24

*Harper v. Virginia*
383 U.S. 663 (1966)     20

*Healy v. James*
408 U.S. 169, 183 (1972)     11

*Huber v. Wilcher*
488 F. Supp. 2d 592 (W.D. Ky. 2006)     2

*Hunter v. Underwood*
471 U.S. 222 (1985)     20

*Kemo, Inc. v. City of Long Beach*
261 N.Y.S.2d 922 (N.Y. Sup. Ct., 1965)     22

*L-7 Designs, Inc. v. Old Navy, LLC*
647 F.3d 419 (2d Cir. 2011)     2

*Lawrence v. Texas*
539 U.S. 558 (2003)     24

*Loving v. Virginia*
388 U.S. 1 (1967)     24

*McCullen v. Coakley*
573 U.S. ___ (2014)     2, 5

*Mt. Healthy City Bd. of Ed. v. Doyle*
429 U.S. 274 (1977)     21

*NAACP v. Alabama*
357 U.S. 449 (1958)     14

*Near v. Minnesota*
283 U.S. 697 (1931)     11

*Nebraska Press Assoc. v. Stuart*
427 U.S. 539 (1976)     15

*N.Y. Times v. United States*
403 U.S. 713 (1971)     15

*Papchristou v. Jacksonville*
405 U.S. 156 (1972)     16

*Perry Education Assn. v. Perry Local Educators' Assn.*
  460 U.S. 37 (1983)                                          12

*Planned Parenthood v. Danforth*
  428 U.S. 52 (1976)                                          6

*Prince v. Massachusetts*
  321 U.S. 158 (1944)                                         6

*R. A. V. v. St. Paul*
  505 U.S. 377 (1992)                                         12

*Redner v. Dean*
  29 F.3d 1495 (11th Cir. 1994)                               9

*Republican Party of Minnesota v. White*
  536 U.S. 765 (2002)                                         2

*Romer v. Evans*
  517 U.S. 620 (1996)                                         23

*Salem Inn v. Frank*
  381 F. Supp 859 (E.D.N.Y. 1974)                             3, 21

*Renton v. Playtime Theatres*
  475 U.S. 41 (1986)                                          3

*Schad v. Mount Ephraim,*
  452 U.S. 61 (1981)                                          3, 11, 18

*Shuttlesworth v. City of Birmingham, Ala.*
  394 U.S. 147 (1969)                                         15

*Southeastern Promotions v. Conrad*
  420 U.S. 546 (1975)                                         15

*Speiser v. Randall*
  357 U.S. 513 (1958)                                         11

*Stanglin v. City of Dallas*
  744 S.W.2d 165 (Tex. App. Dallas, 1987)                     7

*Turner Broadcasting v. FCC*
  520 U.S. 180 (1997)                                         2

*Univeral v. Corley*
  273 F. 3d 429 (2nd Cir. 2001)                               12

*Texas v. Johnson*
    491 U.S. 397 (1989)         3

*U.S. Dept. of Agriculture v. Moreno*
    413 U.S. 528 (1973)         23

*United States v. O'Brien*
    391 U.S. 367, 376 (1968)         2, 3, 7, 13

*U.S. v. Playboy*
    529 U.S. 803 (2000)         12

*U.S. v. Stevens*
    559 U.S. 460 (2010)         3

*Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*
    429 U.S. 252 (1977)         19

*Virginia v. Hicks*
    539  U.S. 113 (2002)         17

*Ward v. Rock  Against Racism*
    491 U.S. 781 (1989)         13

*Washington v. Davis*
    426 U.S. 229 (1976)         19

*Watchtower Bible and Tract Society v. Village of Stratton*
    536 U.S. 150 (2002)         16

*West Coast Hotels v. Parish*
    300 U.S. 379 (1937)         24

*Wisconsin Realtors Ass'n v. Ponto*
    233 F. Supp. 2d 1078 (W. D. Wis. 2002)         2

## BACKGROUND OF CASE

This action presents a facial and as-applied challenge to the constitutionality of the New York City Cabaret Law, N.Y.C. Administrative Code 20-359, *et seq.* (the "Cabaret Law") under the First and Fourteenth Amendments to the United States Constitution. With the exception of 118 designated locations [Answer at Para. "24"] in the City of New York ("the City"), the Cabaret Law renders dancing unlawful in any "room, place or space in the city.. to which the public may gain admission", and purports to render "musical entertainment, singing, dancing or other form[s] of amusement" unlawful in any eating or drinking establishment in the City.[1]

The Cabaret Law was passed in 1926, at the height of the Harlem Renaissance. History leaves no room for ambiguity as to its purpose: to clamp down on inter-racial dancing and inter-racial mingling in Harlem jazz clubs. To this day, it continues to have a disparate impact and to be enforced arbitrarily, chilling the expression of live music establishments, musicians and other entertainers. Plaintiff Muchmore's Cafe, LLC ("Muchmore's) is a café and bar located in Williamsburg, Brooklyn, which hosts entertainment and artistic events, including live music. In the present action, Muchmore's seeks judgment declaring the Cabaret Law to be unconstitutional and enjoining its further enforcement.

## STANDARD OF REVIEW

A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) may be brought by either party "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c).  New York courts and other federal courts have previously resolved constitutional cases such as the present matter on plaintiffs' Rule 12(c) motions, granting declaratory and injunctive relief. *See, e.g., Ass'n of Home Appliance Manufacturers v. the City of New York*, 13 Civ. 07888 (S.D.N.Y. 2014); *Wisconsin*

---

[1] Under the Cabaret Law, a "public dance hall" is defined as "[a]ny room, place or space in the city in which dancing is carried on and to which the public may gain admission", and is illegal unless specifically licensed by defendant City of New York. A "cabaret" is defined as "Any room, place or space in the city in which any musical entertainment, singing, dancing or other form of amusement is permitted in connection with the restaurant business or the business of directly or indirectly selling to the public food or drink, except eating or drinking places, which provide incidental musical entertainment, without dancing, either by mechanical devices, or by not more than three persons." N.Y.C. Admin Code. 20-359.

*Realtors Ass'n v. Ponto*, 233 F. Supp. 2d 1078 (W. D. Wis. 2002); *Huber v. Wilcher*, 488 F. Supp. 2d 592 (W.D. Ky. 2006). In deciding a Rule 12(c) motion, the Court may consider "the complaint, the answer, any written documents attached to them… any matter of which the court can take judicial notice for the factual background of the case… materials incorporated by reference, and documents that, although not incorporated by reference, are integral" to the pleadings. *L-7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 422 (2d Cir. 2011). Judicial notice may be taken of material that is a matter of public record, such as legislative history. *Castellano v. Bd. Of Trustees of Police Officers' Variable Supplements Fund*, 937 F. 2d 752, 754 (2d Cir. 1991).

## POINT I

## THE CABARET LAW VIOLATES THE FIRST AMENDMENT

### A. Application of First Amendment to Expressive Conduct

Under the test announced by the Supreme Court in *United States v. O'Brien*, 391 U.S. 367, 376 (1968), "a government regulation is sufficiently justified if [1] it is within the constitutional power of the Government; [2] ... it furthers an important or substantial governmental interest; [3] ... the governmental interest is unrelated to the suppression of free expression; and [4] ... the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." Even content-neutral time, manner and place restrictions must be "narrowly tailored to serve a significant governmental interest". *See McCullen v. Coakley*, 573 U.S. ___ (2014); *see also Turner Broadcasting v. FCC*, 520 U.S. 180 (1997) ("A content-neutral regulation will be sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests"). In order for a law to be "narrowly tailored", it must not, "unnecessarily circumscribe protected expression." *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002). The *O'Brien* test applies where "'speech' and 'nonspeech' elements are combined in the same course of conduct", and the

government aims to regulate the "nonspeech" element. *O'Brien, supra.* If the challenged law is targeted at expression, the case falls "outside the *O'Brien* test" and the Court must apply "a more demanding standard". *Texas v. Johnson*, 491 U.S. 397 (1989) (applying strict scrutiny to law against flag burning).[2]

**B. Application of the First Amendment to Dance Performance**

The Amended Complaint is divided into two causes of action, the first addressing dance performance and the second addressing social dancing and the impact of the Cabaret Law's social dancing ban on musical performance. It is beyond dispute that the First Amendment encompasses dance performance. *See Barnes v. Glen Theater*, 501 U.S. 560 (1991); *Renton v. Playtime Theatres*, 475 U.S. 41 (1986). "Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works fall within the First Amendment guarantee." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61 (1981)*; Chase v. Davelaar,* 645 F.2d 735, 739-40 (9th Cir. 1981) (striking regulation preventing establishments from "presenting various plays, musicals, ballets, and other items ordinarily regarded as expressive"); *Giovani Carandola, Ltd. v. Bason*, 303 F. 3d 507, 511 (4th Cir. 2002) (characterizing ballet, jazz, and flamenco dance as falling within the "heartland of the First Amendment's protection"); *Salem Inn v. Frank*, 381 F. Supp 859 (E.D.N.Y. 1974) ("the Second Circuit has held that dancing, even nude dancing, may fall within the purview of First Amendment protections")

The City conceded at the pre-motion conference that the Cabaret Law would be unconstitutional as applied to dance performance, and argued solely that, in practice, it has not generally been applied to dance performance. However, the plaint text of the Cabaret Law encompasses all dancing, and the Supreme Court has made clear that it will not "uphold an unconstitutional statute merely because the Government promised to use it responsibly." *U.S. v. Stevens*, 559 U.S. 460 (2010). The Cabaret Law

---

[2]  It should be noted that, in *Texas v. Johnson*, the state argued that the law was targeted at "preventing breaches of the peace", rather than expression. However, the Court found that "no disturbance of the peace actually occurred or threatened to occur", and disposed of this purported justification. Similarly, if the City should attempt to support the Cabaret Law based upon hypothetical dangers that are not actually shown to result from dancing, the Court should look through such purported justification to the law's actual purpose of restricting expression and association.

sweepingly defines a "public dance hall" as "[a]ny room, place or space in the city in which dancing is carried on and to which the public may gain admission", and renders it "unlawful for any person to conduct, maintain or operate... a public dance hall". N.Y.C. Admin Code. 20-359 and 20-360. This definition could encompass anyything from a ballet to a Broadway musical. No regulations have been enacted by the City limiting the application of the Cabaret Law to social dancing, and a large proportion of licensees are adult establishments, which host only dance performance.

Moreover, it does not appear that the Cabaret Law has yet been challenged as applied to dance performance. As a result, the New York Courts have not adopted a narrowing interpretation to so limit its applicability. In *Festa v. City of New York,* 2006 NY Slip Op 26125 (Sup. Ct. N.Y. Co. 2006), the Court intimated that its holding with respect to social dancing would not apply to dance performance. However, the Court noted that, "this case concerns only uncompensated participatory social dancing by adults", so any intimations concerning dance performance are merely dicta. Similarly, in *Chiasson v. New York City Dept. of Consumer Affairs,* 505 N.Y.S.2d 499 (Sup. Ct. N.Y. Co. 1986) and 524 N.Y.S.2d 649 (Sup. Ct. N.Y. Co. 1988), the Court struck down aspects of the Cabaret Law limiting the number of simultaneous musical performers to three, and prohibiting the use of wind, brass and percussion instruments. However, that case did not address the application of the Cabaret Law to dance performance, or the extent of its continuing application to "musical entertainment, singing, dancing and other form[s] of amusement". Given that even the City concedes that the Cabaret Law could not be constitutionally applied to dance performance, yet by its plain language, it does, the Court should grant judgment on the pleadings declaring the Cabaret Law unconstitutional as applied to dance performance and enjoining its enforcement as applied to dance performance.

## C. Applicability of the Cabaret Law to "Musical Entertainment, Singing, [Social] Dancing and Other Form[s] of Amusement"

The breadth of expressive activity prohibited under the plain text of the Cabaret Law is nearly all-encompassing. Not only does it prohibit dancing in any "room, place or space in the city", but as

applied to "eating and drinking establishments", it prohibits any form of "musical entertainment, singing, dancing or other form of amusement". It is well-settled that musical entertainment is protected under the First Amendment. This was noted by the Court in the *Festa* case (stating "music is recognized as expression that is constitutionally protected under the First Amendment"), though neither musical performance nor dance performance were raised as issues by the social dancer plaintiffs. It was also recognized by the Court in *Chiasson v. New York City Dept. of Consumer Affairs,* 505 N.Y.S.2d 499 (Sup. Ct. N.Y. Co. 1986) and 524 N.Y.S.2d 649 (Sup. Ct., N.Y. Co. 1988).

In addition to live music, Muchmore's hosts, "stand up comedy, theater, art openings, debates, lectures and other forms of entertainment". [Amended Complaint at Para. 42] Under the plain text of the Cabaret Law, any of these might be considered an unlawful "other form of amusement". In fact, any activity, whether scheduled as a performance or engaged in by a patron, which tends to promote smiling, laughing or happiness, could be considered an unlawful "other form of amusement". The text of the law is so broad that it invites arbitrary application.

As a practical matter, the most problematic aspect of the Cabaret Law is that its prohibition of social dancing has the direct and intended effect of censoring the performance of musical genres that are conducive to dancing. While the law does not expressly bar the playing or performance of dance-oriented genres of music, as a practical matter, an establishment cannot host such performances without the inevitable effect of people dancing and the Cabaret Law being violated. *Compare to Arcara v. Cloud Books,* 478 U.S. 697 (1986) (strict scrutiny applicable "where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity"); *McCullen v. Coakley,* 573 U.S. _____, (2014) ("by limiting the buffer zones to abortion clinics, the Act has the inevitable effect of restricting abortion-related speech").

**D. Dallas v. Stanglin does not Address the Rights of Adults to Musical Entertainment, Singing, Dancing and Other Forms of Amusement, and Must be Differentiate d**

When the Cabaret Law was challenged by social dancers in *Festa v. City of New York*, 820

N.Y.S.2d 452 (Sup. Ct. N.Y. Co. 2006), the Court noted the absurdity of the law, but rejected that challenge on the basis of *Dallas v. Stanglin*, 488 U.S. 815 (1989). However, *Dallas v. Stanglin* did not address the rights of musicians or live music establishments, the rights of adults, a law targeted at expression, or a law as broad as the Cabaret Law.

In *Dallas v. Stanglin*, the U.S. Supreme Court granted certiorari in relation to the following question: does a "municipality unconstitutionally restrict minors' right of association by restricting entry to class E dancehalls to persons aged 14 through 18, their parents, and employees of hall?". The Court answered in the negative, holding that the City of Dallas had a legitimate interest in protecting children, and refused to extend First Amendment protection to the social dancers. Since *Festa* was also brought on behalf of social dancers, and relied on the alleged expressive content of social dancing, the Court felt itself bound by the *Stanglin* decision. Here, even if the continuing force of the *Stanglin* holding is not questioned[3], the facts presented here are substantially different.

First, the Court's decision in *Stanglin* was rooted in the government's interest in protecting children. It is well established that "[t]he state's authority over children's activities is broader than over like actions of adults...." *Stanglin* at FN 4; *Prince v. Massachusetts*, 321 U.S. 158, 170 (1944); *see also Planned Parenthood v. Danforth,* 428 U.S. 52 (1976). The City of Dallas' "interest in promoting the welfare of teenagers" and "ensuring the safety and welfare of children" was the sole interest cited by Court in upholding the law. That interest has no application here.

Second, the establishment involved in *Stanglin* was a rollerskating rink where patrons danced solely for their own pleasure. No live entertainment was involved, and the well established First Amendment rights of musicians and other entertainers were not implicated. Here, Muchmore's hosts

---

[3]   The Amended Complaint at Para. "57" requests that the Court reconsider *Dallas v. Stanglin* and other cases that "failed and/or refused to extend constitutional protections to social dancing... on the basis of... intervening changes in case law, intervening changes in social norms and customs, the applicability of other precedents concerning the First and Fourteenth Amendments." Among these are *McCullen v. Coakley*, 573 U.S. ___ (2014), which held that even a content-neutral time, manner and place restriction is unconstitutional if it "burden[s] substantially more speech than is necessary to further the government's legitimate interests";  and the Supreme Court's expansive interpretation of individual liberty and autonomy in the area of intimate personal relations in *Lawrence v. Texas,* 539 U.S. 558 (2003).

"live music, stand up comedy, theater, art openings, debates, lectures and other forms of entertainment". [Amended Complaint at Para. 42] Muchmore's has even hosted political debates, which strike at the core of First Amendment protection. The Amended Complaint does not rest solely on the alleged rights of social dancers, but on the right of Muchmore's to host performances and on the rights of those that perform there. [Amended Complaint, Para. 46-47] Thus, the First Amendment is clearly implicated.

Third, the Cabaret Law is vastly broader than the law that was upheld in *Stanglin*. The law challenged in *Stanglin* applied solely to "Class E" dance halls, which restricted admission to persons between the ages of 14 and 18. The City of Dallas characterized it as a "carefully tailored mechanism designed to protect minors from detrimental, corrupting influences." *Stanglin v. City of Dallas*, 744 S.W.2d 165 (Tex.App. Dallas, 1987). With the exception of this regulation of adult-child dancing, the plaintiff in *Stanglin* was "subject only to minimal regulation by the City." *Id.* The challenged law did not impact the rights of adults to dance with one another, or the rights of performers. It applied to only a very limited number of teen dance halls, rather than any "room, place or space in the city".

Fourth, unlike the law in *Stanglin*, which was enacted to protect children, it is well established that the Cabaret Law's purpose was to suppress the protected expression of black jazz musicians and the clubs that hosted them, as addressed at length below in Point II. The third prong of the *O'Brien* test requires that, "the governmental interest is unrelated to the suppression of free expression" *United States v. O'Brien*, 391 U.S. 367, 376 (1968). In short, *Dallas v. Stanglin* presented a very special case, and should not be extended to support a law which broadly tramples the First Amendment.

The Supreme Court has not directly addressed social dancing since its 1989 decision in *Stanglin*, except to differentiate *Stanglin* in *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991). Some courts have followed *Stanglin*'s holding without addressing how its logic might be impacted by differing factual scenarios, such as the elimination of the protection of minors as a statutory purpose, the presence of live musical performers, a broader statute, or a statutory intent to curb expression.

Others have recognized the unique factual scenario presented in *Stanglin*, and chosen not to extend its holding to situations where its logic would break down.

In *Elam v. Bolling*, 53 F. Supp. 2d 854 (W.D. Va. 1999), the Court confronted a statute almost identical to the Cabaret Law. "In a scene more than slightly reminiscent of the 1984 Academy Award-nominated movie *Footloose,* in which a small town outlaws dancing, the Town of Pound, Virginia, enacted Chapter 22 of the Town of Pound Ordinance, §§ 127-138, (hereinafter, "the Ordinance"), prohibiting the allowance of dancing in any place open to the general public without first obtaining a permit for the operation of such a place." *Id* at 855-856. The Plaintiff, a restaurateur, "alleg[ed] that the Ordinance was facially violative of the United States Constitution, and also unconstitutional as applied to him, and request[ed] a declaration of such, as well as an injunction against the enforcement of the ordinance." *Id* at 856. The Court held "that the Ordinance is facially violative of the United States Constitution and may not be enforced." The Court found the statute to be unconstitutionally overbroad, in that it did not merely regulate nude dancing or even recreational dancing, but "by its plain terms restricts all public dancing, whether a square dance, the lambada, pantomime or ballet." *Id.,* citing Town of Pound Ordinance § 127 (stating the applicability of the ordinance to "dancing," but leaving that term undefined). The Court also found that the law failed to satisfy the third and fourth prongs of the *O'Brien* test, in that "it is not an incidental restriction on First Amendment freedoms, and certainly is not a restriction which is 'no greater than is essential' to the Town's professed interest". *Id.* at 861. The Court differentiated *Stanglin*, accepting the plaintiff's argument that "the Court in *Stanglin* did not consider the matter of adults' right under the First Amendment to engage in recreational dancing", and that "*Stanglin* merely reaffirmed that the state possesses greater authority to regulate the activities of children than it does the activities of adults."

In *Abusaid v. Hillsborough County Bd*., 637 F. Supp. 2d 1002 (M.D. Fla., 2007), the Court struck down certain portions of the Hillsborough County Rave/Dance Hall Permitting Ordinance. The

Court found, citing *Stanglin*, that the rights of the recreational dancers at the plaintiff's establishment were not protected under the First Amendment. However, it found that, "in a light most favorable to the Plaintiff, his business also involves the promotion, production, and presentation of some measure of expressive dances or musical or other expressive performances sufficient to implicate First Amendment concerns. Further, the Ordinance, by its terms, has at least an incidental impact on this expressive activity." The Court recognized that, "[l]ike a censorship system, a licensing scheme creates the possibility that constitutionally protected speech will be suppressed where there are inadequate procedural safeguards to ensure prompt issuance of the license." *Id*., citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226 (1990). It found the Ordinance unconstitutional in two respects. First, while it purported to limit the County's time to deny a license to 30 days, "the time limit is illusory, as the Ordinance fails to address an applicant's right to begin operating the business in the event the Rave/Dance Hall Administrator fails to timely act on the application. Thus, the Ordinance, on its face, 'risks the suppression of protected expression for an indefinite time period'". *Id.;* citing *FW/PBS* 493 U.S. 215 (1990); *Redner v. Dean*, 29 F.3d 1495, 1501 (11th Cir. 1994). This same infirmity appears to apply to the Cabaret Law. Second, the Court found that the law was not narrowly tailored in that, "the blanket exclusion at subsection 5(b)(6)(A)(i) of one convicted of 'any felony' reaches too far and is not narrowly tailored to meet the stated purposes". The Cabaret Law imposes even stricter character requirements, including denial of a license based on misdemeanor.[4] As a result, the Court held that, "the permitting provisions of the Ordinance are declared facially unconstitutional for failure to proscribe real time limits for the granting or denial of Rave/Dance Hall permits and because of the overbreadth of the disabling criteria. While the impermissible disabling provisions are severable, the Ordinance as a whole is declared unconstitutional on the basis that it is an impermissible prior restraint.

---

[4]    Per N.Y.C. Admin. Code 20-360, not only may a license be denied on the basis of a "felony under the laws of this state", but also due to "any offense which is a misdemeanor involving the premises". While certain character aspects of the licensing process were challenged unsuccessfully in *Merco Properties, Inc. v. Guggenheimer*, 395 F. Supp. 1322 (S.D.N.Y. 1975), this issue may be ripe for reconsideration.

The Defendants are enjoined from further enforcement of this Ordinance."

Given the unique factual scenario presented in *Stanglin*, its holding should not be expanded into areas that would conflict with an enormous body of other First Amendment precedents. Given that: (a) the Cabaret Law concerns the rights of adults, (b) effectively bars the performance of entire genres of music, (c) applies to a wide range of expressive activity in all but a few locations in the City, and (d) was specifically targeted at expression and inter-racial association, the Court should differentiate *Stanglin* and invalidate the Cabaret Law due to its unique constitutional infirmities.

## E. The Intended and Actual Effect of the Cabaret Law is to Inhibit Protected Expression

In *Chaisson v. Dept. of Consumer Affairs*, 138 Misc. 394 (N.Y. Supreme Ct., N.Y. Co. 1988), the plaintiff musicians argued that, "the three-musician limitation imposed by the City of New York [via the Cabaret Law] has nearly eliminated certain types of music, such as Dixieland or Bluegrass music... [and] has also had a negative impact on jazz music." While the three-musician limitation did not explicitly target these genres of music, the Court agreed with the plaintiffs, and held that, "The city has the burden of showing that a regulatory scheme that is 'content' based is narrowly drawn to advance a compelling State interest. Traffic and congestion concerns, as the city has explained them, do not rise to the level of a compelling State interest sufficient to justify a 'content'-based restriction."[5] Just as the Cabaret Law's three-musician limitation effectively barred the performance of genres of music such as dixieland and bluegrass, its broad dancing prohibition continues to bar the performance of genres of music such as hip hop, salsa and merengue. [Amended Complaint at Para. "45"]

There is ample precedent for looking to a law's practical effect, rather than just its literal wording, to determine whether it represents an unconstitutional restraint upon freedom of expression under the First Amendment. In *Federal Election Commission v. Massachusetts Citizens For Life, Inc.*,

---

[5] The Court also noted that, "even 'content' neutral time, place and manner regulations are constitutional only if they are designed to serve a substantial government interest and if they leave open ample alternative channels of communication and are narrowly tailored."; citing *City of Renton v Playtime Theatres*, 475 U.S. 41. Thus, it appears the court applied strict scrutiny, but held that the Cabaret Law would also fail intermediate scrutiny analysis.

479 U.S. 238 (1986), the Supreme Court held that "[t]he fact that the statute's practical effect may be to discourage protected speech is sufficient to characterize [the statute] as an infringement on First Amendment activities." *Id.;* citing *Freedman v. Maryland,* 380 U.S. 51 (1965); *Speiser v. Randall*, 357 U.S. 513 (1958); *City of Baxter Springs v. Bryant*, 226 Kan. 383 (Kan., 1979) ("What the City cannot do directly it cannot do indirectly. Is public dancing inimical to the morals, the sanitation, the health, or the general welfare of the residents of Baxter Springs? We think not."); *Healy v. James,* 408 U.S. 169, 183 (1972) ("Freedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference.") The Supreme Court has repeatedly stated that a statute challenged under the First Amendment "must be tested by its operation and effect". *Near v. Minnesota*, 283 U.S. 697 (1931). *See also Schad v. Mount Ephraim*, 452 U.S. 61 (1981)

In *Arcara v. Cloud Books*, 478 U.S. 697 (1986), the Supreme Court provided a detailed explication of when the First Amendment should or should not be applied to conduct, stating:

> We have also applied First Amendment scrutiny to some statutes which, although directed at activity with no expressive component, impose a disproportionate burden upon those engaged in protected First Amendment activities. In *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983), we struck down a tax imposed on the sale of large quantities of newsprint and ink because the tax had the effect of singling out newspapers to shoulder its burden. We imposed a greater burden of justification on the State even though the tax was imposed upon a nonexpressive activity, since the burden of the tax inevitably fell disproportionately—in fact, almost exclusively—upon the shoulders of newspapers exercising the constitutionally protected freedom of the press...

> we have subjected such restrictions to scrutiny only where it was conduct with a significant expressive element that drew the legal remedy in the first place, as in O'Brien, or where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity, as in *Minneapolis Star*...

In *Arcana,* the Court held that "the First Amendment is not implicated by the enforcement of a public health regulation of general application against the physical premises in which respondents happen to sell books", because the "sanction was directed at unlawful conduct having nothing to do with books or other expressive activity." *Id.* at 707. By contrast, the Cabaret Law is directly and explicitly targeted at "musical entertainment, singing, dancing and other form[s] of amusement", all of

which are protected under the First Amendment. Even as it applies to social dancing, it cannot be said to have "nothing to do with... expressive activity", as dancing and music are inextricably linked.

Where, as here, a law was intended to curb protected expression and/or to discriminate against protected categories of people, the Court must give consideration to this legislative intent and apply the appropriate level of scrutiny. *See Hunter v. Underwood*, 471 U.S. 222 (1985) (holding that felony disenfranchisement laws enacted with discriminatory intent violate the Equal Protection Clause); *Church of Lukumi Babalu Aye v. City of Hialeah,* 508 U.S 520 (1993) (law prohibiting killing an animal for purpose other than consumption held unconstitutional because it was targeted at religious expression). "[T]he scope of protection for speech generally depends on whether the restriction is imposed because of the content of the speech." *Univeral v. Corley,* 273 F. 3d 429, 450 (2nd Cir. 2001). "Regulations that focus on the direct impact of speech on its audience" should be treated as "content-based" restrictions. *Boos v. Barry,* 485 U.S. 312 (1988). For example, "The emotive impact of speech on its audience is not a 'secondary effect.'" *Id.* Similarly, dancing is not a "secondary effect" of the performance of dance-oriented music, but its direct and intended consequence.

"Content-based restrictions are viewed as presumptively invalid" and "must receive strict scrutiny". *U.S. v. Playboy,* 529 U.S. 803 (2000); *R. A. V.* v. *St. Paul* 505 U.S. 377 (1992). Under strict scrutiny, a content-based regulation may be upheld only if it is "necessary to serve a compelling state interest" and "narrowly drawn to achieve that end". *Boos v. Barry,* 485 U.S. 312 (1988); citing *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37 (1983); *Jews for Jesus*, 482 U.S. 569 (1987). The Cabaret Law has already been determined to be a content-based restriction by the Court in *Chaisson, supra,* and is too broad to be "necessary to serve a compelling governmental interest".

Even if the Court were to depart from the holding in *Chaisson* and find the Cabaret Law content-neutral, "[c]ontent neutral time, place and manner regulations are permissible so long as they are narrowly tailored to serve a substantial government interest and do not unreasonably limit

alternative avenues of expression". *Ward v. Rock Against Racism,* 491 U.S. 781 (1989); citing *U.S. v. O'Brien*, 391 U.S. 367 (1968). Moreover, "the method and extent of such regulation must be reasonable, that is, it must be the least intrusive upon the freedom of expression as is reasonably necessary to achieve a legitimate purpose of the regulation." *Id.* Particularly where other laws directly address any concerns the City could proffer, such as noise (the N.Y.C. Noise Code) or overcrowding (N.Y.C. Place of Assembly Certificate of Operation requirements), the Cabaret Law's prohibition of dancing is superfluous to any legitimate purpose rather than "narrowly tailored".

In *Ward v. Rock Against Racism,* 491 U.S. 71 (1989), the Court wrote:

Music is one of the oldest forms of human expression. From Plato's discourse in the Republic to the totalitarian state in our own times, rulers have known its capacity to appeal to the intellect and to the emotions, and have censored musical compositions to serve the needs of the state. *See* 2 *Dialogues of Plato, Republic*, bk. 3, pp. 231, 245-248 (B. Jowett transl., 4th ed. 1953) ("Our poets must sing in another and a nobler strain"); *Musical Freedom and Why Dictators Fear It*, N.Y. Times, Aug. 23, 1981, section 2, p. 1, col. 5; *Soviet Schizophrenia toward Stravinsky*, N.Y. Times, June 26, 1982, section 1, p. 25, col. 2; *Symphonic Voice from China Is Heard Again*, N.Y. Times, Oct. 11, 1987, section 2, p. 27, col. 1. The Constitution prohibits any like attempts in our own legal order. Music, as a form of expression and communication, is protected under the First Amendment.

In *Ward*, the Court reviewed a New York City regulation requiring musicians and other performers making use of the Naumberg Acoustic Bandshell in Central Park to utilize sound technicians provided by the City to control the volume and sound mix so as not to disturb city nearby residents. The Second Circuit Court of Appeals held that the law violated the First Amendment because it was not the least restrictive means of accomplishing the City's objective, but the Supreme Court reversed, holding that the "narrow tailoring" requirement imposed by the *O'Brien* test for content-neutral time, manner and place restrictions requires only that the "means chosen are not substantially broader than necessary to achieve [the government's] interest". The Court held that "the city's substantial interest in limiting sound volume is served in a direct and effective way by the requirement that the city's sound technician control the mixing board", and that "[t]he guideline leaves open ample alternative channels of communication" and "has no effect on the quantity or content of that

expression". Here, however, the Cabaret Law's blanket ban on "musical entertainment, singing, dancing and other form[s] of amusement" in all but a handful of locations in the City is "substantially broader than necessary" to achieve any substantial governmental purpose. The Cabaret Law does not leave open "ample alternative channels of communication", nor does it have "no effect on the quantity or content of that expression".

Finally, even this intermediate standard would apply only if the Cabaret Law were content-neutral, which it is not. However, regardless of whether this Court chooses to review the Cabaret Law under strict or intermediate scrutiny, its sweeping breadth and lack of any relationship to a substantial governmental interest render it fundamentally incompatible with the First Amendment.

## F. The Cabaret Law Inhibits Freedom of Association

"[F]reedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *NAACP v. Alabama*, 357 U.S. 449 (1958). The Supreme Court has recognized a constitutionally-protected right of association in two separate lines of cases:

> In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment-speech, assembly, petition for the redress of grievances, and the exercise of religion.

*Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984).

In *Dallas v. Stanglin*, the Court addressed both forms of association rights, holding that, "dance-hall patrons, who may number 1,000 on any given night, are not engaged in the sort of 'intimate human relationships' referred to in *Roberts*." However, *Stanglin* was decided in the same era as *Bowers v. Hardwick,* 478 U.S. 186 (1986), before the Court expanded its protection of intimate human relationships in *Lawrence v. Texas,* 539 U.S. 558 (2003). As to the second form of association, it should

be recognized that the very existence of group support for an idea conveys a message. When white and black musicians and dancers joined together in Harlem jazz clubs in the 1920's, they defied prior conventions of racial segregation, and conveyed a particularized message of racial harmony and equality that was the very target of the Cabaret Law. Thus, while the associational rights of adults and children to dance together was not recognized in *Stanglin*, the associational rights of black and white musicians and patrons to create music and associate together is entitled of protection.

## G. The Cabaret Law Represents an Impermissible Prior Restraint Under the First Amendment

"[P]rior restraints on speech and publication are the most serious and least tolerable infringement on First Amendment rights." *Nebraska Press Assoc. v. Stuart,* 427 U.S. 539, 559 (1976). A law which subjects the exercise of a First Amendment freedom "to the prior restraint of a license, without narrow, objective and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 150 (1969). "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *N.Y. Times v. United States*, 403 U.S. 713, 714 (1971); *Freedman v. Maryland,* 380 U.S. 51 (1965).

"The term prior restraint is used 'to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur.'" *Alexander v. United States*, 509 U.S. 444 (1993). "Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand." *Southeastern Promotions v. Conrad*, 420 U.S. 546, 559 (1975). By limiting free expression in all but 118 locations in the City, the Cabaret Law prevents a vast quantity of protected speech from occurring on a daily basis. "It is offensive - not only to the values protected by the First Amendment, but to the very notion of a free society - that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so." *Watchtower Bible and Tract Society v. Village of Stratton*,

536 U.S. 150 (2002).

Moreover, as with the licensing scheme addressed in *Elam v. Bolling, supra,* "In addition to this constitutional defect [concerning character requirements, discussed at FN 4], the Ordinance also violates the rule laid down in *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734,13 L.Ed.2d 649 (1965), that requires, 'by statute or authoritative judicial construction, that the censor [of protected expression] will, within a specified brief period, either issue a license, or go to court to restrain' the protected expression." *Id.* For the same reasons addressed in *Elam v. Bolling* and *Abusaid v. Hillsborough County*, the Cabaret Law constitutes an impermissible prior restraint under the First Amendment.

**H. The Cabaret Law is Unconstitutionally Vague**

Laws are unconstitutionally vague when, "men of common intelligence must... guess at [their] meaning". *Coates v. Cincinnati*, 402 U.S. 611 (1971) (striking down law forbidding "three or more persons to assemble... on any of the sidewalks... and there conduct themselves in a manner annoying to persons passing by"); *Papchristou v. Jacksonville*, 405 U.S. 156 (1972) (invalidating law prohibiting "wandering or strolling around from place to place without any lawful purpose or object"). Here, the Cabaret Law is unconstitutionally vague in a number of respects, including: (a) its failure to define "dancing", or differentiate "dancing" from similar activities such as swaying or head-nodding, (b) its vague prohibition of  "other form[s] of amusement" in connection with a restaurant business, (c) its exception of "incidental" musical entertainment, and (d) its requirement that licensees be of "good character". If a customer begins to sway back and forth, is the establishment required to immediately detect this conduct and intervene? Must the "dancing" be a specific, recognized dance, such as a square dance or the jitterbug, or is simply bobbing one's head rhythmically illegal? Many New York bars have gone so far as to post signs stating, "DANCING IS PROHIBITED", but it would be impossible to prevent any rhythmic movement on the part of a customer. This vagueness has a chilling effect on expression, requiring establishments to take extreme measures to ensure compliance, such as

prohibiting the performance of entire genres of music.

## I. The Cabaret Law is Unconstitutionally Overbroad

The overbreadth doctrine was summarized by the Supreme Court in *Virginia v. Hicks*, 539 U.S. 113 (2002):

> The First Amendment doctrine of overbreadth is an exception to our normal rule regarding the standards for facial challenges. *See Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984). The showing that a law punishes a "substantial" amount of protected free speech, "judged in relation to the statute's plainly legitimate sweep," *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973), suffices to invalidate all enforcement of that law, "until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression," *id.*, at 613. *See also Virginia v. Black*, 538 U.S. ___, ___ (2003); *New York v. Ferber*, 458 U.S. 747, 769, n. 24 (1982); *Dombrowski v. Pfister*, 380 U.S. 479, 491, and n. 7, 497 (1965).

> The danger of an overbroad law is its "invitation to discriminatory enforcement.'" *Coates v. Cincinatti*, 402 U.S. 611, 616 (1971). This has been precisely the result under the Cabaret Law. While the law is almost certainly being violated somewhere in the City of New York at any given moment[6], entire years have elapsed without any meaningful enforcement. In other years, the law has been applied arbitrarily and unpredictably to close down a number of establishments across the City of New York.[7]

As admitted by the City in its Answer at Para. "24", "there are currently 118 cabaret licenses issued by the Department of Consumer Affairs", out of "approximately 25,100 food service establishment[s]". Under the broad-ranging definitions provided in the Cabaret Law, dancing is illegal in virtually any other "room, place or space", and "musical entertainment, singing, dancing or other form[s] of amusement" are illegal in all of the City's other food service establishments, except for "incidental" musical entertainment, which is not defined. N.Y.C. Admin Code Sec. 20-359. Moreover, as admitted by the City in Para. "29" of its Answer, "eating and drinking establishments with dancing are categorized as Use Group 12 and Use Group 12 uses are permitted only in the following

---

[6]   At the Initial Conference, the Hon. Ramon E. Reyes commented that even he has danced in New York City food service establishments, and was not made aware by such establishments that such conduct might violate the Cabaret Law.

[7]   *See generally* Laam Hae, *The Gentrification of Nightlife and the Right to the City: Regulating Spaces of Social Dancing in New York* (2012)

Commercial Districts: C4 ("General Commercial"), C6 ("General Central Commercial"), C7 ("Commercial Amusement") and C8 ("General Service")." A quick review of the City's zoning map will demonstrate that this renders most bars and restaurants ineligible to even apply for a license.

The Supreme Court has justified the overbreadth doctrine on the basis that the "First Amendment needs breathing space." *Schad v. Borough of Mt. Ephram*, supra, citing *Broadwick v. Oklahoma*, 413 U.S. 610, 611. Here, since the the text of the Cabaret Law is so broad, an establishment risks being shut down if it allows the performance of dance-oriented musical genres, which might be regularly tolerated in other establishments, as a result of the whim of a given police officer or a single neighbor making repeated "311" calls.[8] Even if an establishment takes extreme measures such as barring the performance of dance-oriented music and posting "DANCING IS PROHIBITED" signs, it must still operate in constant fear that it could be put out of business for factors beyond its control, such as a few customers dancing outside the view of a bartender. As a result, its unreasonable breadth has a "chilling effect" that stifles constitutionally protected expression.

In *Board of Airport Commissioners v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987)*,* the Court struck down an overbroad a resolution purporting to ban all "First Amendment activities" at Los Angeles International Airport ("LAX") on the basis that it attempted to create a "First Amendment Free Zone" throughout LAX. *Id.* Here, by barring "musical entertainment, singing, dancing or other form of amusement", the Cabaret Law seeks to create a "First Amendment Free Zone" of all New York City.

---

[8]   It should be noted that the City's "311" telephone complaint system is largely anonymous, treating 100 calls from a single neighbor like one call from 100 neighbors, and an excessive number of "311" calls is one of the largest factors leading to the non-renewal of an establishment's license. This leaves establishment owners particularly vulnerable to arbitrary enforcement solely as a result of being located near a single unreasonable neighbor, who might be unsatisfied with reasonable sound abatement and crowd control measures due to generalized anxieties about gentrification, the racial make-up of an establishment's customers, general irascibility, etc.

<u>**THE CABARET LAW VIOLATES THE EQUAL PROTECTION CLAUSE**</u>

**A. The Cabaret Law was Motivated by a Discriminatory Intent and has a Disparate Impact**

"The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229 (1976). However, a law will not be found unconstitutional "solely because it has a racially disproportionate impact." *Id.* "This is not to say that the necessary discriminatory racial purpose must be express or appear on the face of the statute, or that a law's disproportionate impact is irrelevant in cases involving Constitution-based claims of racial discrimination... Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts". *Id.* Thus, where a law has a racially disproportionate impact and was motivated by an invidious discriminatory purpose, it must be struck down under the Equal Protection Clause. In determining whether a law was motivated by a discriminatory purpose, the courts look to, "the historical background of the [legislative] decision... particularly if it reveals a series of official actions taken for invidious purposes", "the specific sequence of events leading up to the challenged decision", "departures from normal procedure", and "the legislative or administrative history... especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977).

The Cabaret Law was passed in 1926, at the height of the Harlem Renaissance. *See* Alain Locke's 1925 anthology, *Harlem, Mecca of the New Negro*; *see also Opportunity: A Journal of Negro Life,* first published in 1923, which organized large parties between 1925 and 1927 that both black artists and white patrons attended. The Harlem Renaissance is most remembered for its ushering in of the Jazz Age, where black musicians such as Fats Waller, Cab Calloway and Duke Ellington played at a growing number of Harlem jazz and dance clubs such as the Cotton Club (opened in 1923), the Savoy

Ballroom (opened in 1926) and Connie's Inn (opened in 1923). Some of these clubs, including the Cotton Club, admitted only white patrons, but hosted black musicians. Others, such as the Savoy, allowed black and white patrons to dance and socialize together.

The Cabaret Law was a direct response to the Harlem Renaissance, and its original text and legislative history make clear that it was targeted at black musicians and inter-racial association. The original text of the law targeted wind, brass and percussion instruments, commonly used in jazz music, while permitting piano, organ, accordion, guitar and stringed instruments. *See Chiasson v. New York City Dept. of Consumer Affairs*, 505 N.Y.S.2d 499 (Sup. Ct. N.Y. Co. 1986). In striking down this aspect of the law, the *Chiasson* Court also noted the racially-tinged language of the legislative history, which described the purpose of the Cabaret Law as follows:

> ... there has been altogether too much running 'wild' in some of these night clubs and, in the judgment of your committee, the 'wild' stranger and the foolish native should have the check-rein applied a little bit.

It should be clear to this Court, as it was to the Court in *Chaisson*, that a law passed in 1926, at the peak of the Harlem Renaissance, targeting instruments used in jazz music, and justified by a desire to apply the "check-rein" to "wild stranger[s]" and "foolish native[s]", is not motivated by a substantial governmental interest, but by an invidious discriminatory purpose. Where a law is motivated by such a purpose and has a disproportionate impact, it cannot withstand scrutiny merely because it fails to draw a discriminatory distinction on its face. *Washington v. Davis*, 426 U.S. 229 (1976).

The Supreme Court has not hesitated to strike down facially neutral laws that have a disparate impact and were based on a discriminatory motive. *See Harper v. Virginia*, 383 U.S. 663 (1966) (prohibiting poll taxes) and *Hunter v. Underwood*, 471 U.S. 222 (1985) (eliminating the right to vote upon commission of a misdemeanor). "Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind the enactment of a law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter*, *supra,* citing *Mt.*

*Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274 (1977). The discriminatory intent behind the Cabaret Law is so well established that entire books have been written about it.[9] As to its disparate impact, the Court may take judicial notice of the numerous genres of traditionally African American and Latin American music, such as hip hop, jazz, bounce, merengue, salsa, tango and ragaeton, which are disparately impacted by the Cabaret Law's dancing prohibition.

**B.      The Distinctions Drawn by the Cabaret Law Do Not Serve a Compelling State Interest**

Moreover, where a law "involves the exercise of fundamental rights protected by the First Amendment", the classification it draws must serve "a compelling state interest". The implications of this rule were addressed by this Court under very similar circumstances in *Salem Inn, Inc. v. Frank*, 381 F. Supp. 859 (E.D.N.Y. 1974), *aff'd*. 522 F.2d 1045 (2nd Cir. 1975), *aff'd*. 422 U.S. 922 (1975):

> The application of the ordinance only to bars, lounges, coffee shops, discotheques, etc., and not to theaters, opera houses and concert halls is also challenged on equal protection grounds. Since the location classification here involves the exercise of fundamental rights protected by the First Amendment, the classification must again serve a "compelling state interest" to withstand such an attack. *Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322,22 L.Ed.2d 600 (1969); *Skinner v. Oklahoma*, 316 U.S. 535,62 S.Ct. 1110, 86 L.Ed. 1655 (1942); *O'Neill v. Dent, supra*. While restrictions applied only to places serving alcoholic beverages have been upheld in certain circumstances involving the Twenty-First Amendment. *California v. LaRue*, *supra*; *Paladino v. City of Omaha*, 471 F.2d 812 (8th Cir. 1972); *Salem v. Liquor Control Comm*., 298 N.E.2d 138, 34 Ohio St.2d 244 (1973), the ordinance here applies its restrictions to coffee shops, restaurants and even dance halls and discotheques. It is difficult to determine what compelling state interest could be served by an ordinance which would bar a production of "Hair" at a cabaret and allow nude dancing in a burlesque theater.

---

[9]    *See* Adam Janos, *For Nightclubs, Life is No Cabaret Without a License*, Wall St. J., Sept. 29, 2014, at A17 ("According to historian Michael A. Lerner, the law was 'really a response to interracial mixing.' During Prohibition, 'the police didn't care so much about drinking. What they cared about was white women dancing with black men,' said Mr. Lerner, who wrote *Dry Manhattan: Prohibition in New York City*.); *see also* Laam Hae, *The Gentrification of Nightlife and the Right to the City: Regulating Spaces of Social Dancing in New York* (2012), p. 27 ("the NYC cabaret zoning laws in the pre-1985 era that isolated the location of black and Latino live music venues had their roots in long-standing militancy against the expressive cultures of racial others, and the fear of inter-racial mingling."); *see also* Paul Chevigny, *Gigs: Jazz and the Cabaret Laws in New York City* (2004), p. 40 ("The ordinance must have been directed at the black music and dance that was performed in the Harlem clubs, as well as the social mixing of races that was part of 'running wild,' because in 1926, the 'jazz' about which the alderman complained was being played mostly in Harlem. The alderman were legislating in the shadow of the view, then widely held throughout the country, that the origin of jazz music and dance in black culture was a source of moral degradation."); *see also* Gena Caboni-Tabery, *Jazz, Basketball, and Black Culture in 1930s America* (2008), p. 8 ("African American 'third places' were places of contestation (of racism) as much as celebration (of race). But with regard to black-white relations in the 1930s, African American night clubs and dance halls functioned as national 'third places', democratic islands of neutrality where ordinary social restrictions - such as segregation - were occasionally and temporarily laid aside.")

Thus, we are constrained to hold once again, and we might add reluctantly, that the attempt of the Town of North Hempstead to prohibit "topless" dancing through Chapter 11 of its Code is on its face violative of plaintiffs' rights under the First Amendment since it includes within its prohibition constitutionally protected expression and also that it violates their rights under the Equal Protection Clause of the Fourteenth Amendment.

As was the case in *Salem Inn*, the Cabaret Law involves the exercise of fundamental rights under the First Amendment, and draws distinctions that are not supported by a compelling state interest, including the distinction between "eating and drinking establishment[s]" and other "room[s], place[s] or space[s] in the city"; the distinction between eating and drinking establishments in C1, C2 and C3 zoning districts and those in other zoning districts, and the distinction between eating and drinking establishments that permit dancing and those that do not. These distinctions are arbitrary and fail to advance any compelling state interest. In addition to this Court's decision in *Salem Inn,* the Supreme Court of New York struck down a cabaret licensing scheme enacted by the City of Long Beach on similar grounds in *Kemo, Inc. v. City of Long Beach*, 261 N.Y.S.2d 922 (N.Y. Sup. Ct., 1965). As in these two cases, since the distinctions drawn by the Cabaret Law do not advance a compelling state interest, they violate the Equal Protection Clause of the Fourteenth Amendment.

## POINT III

### THE CABARET LAW SHOULD BE FOUND UNCONSTITUTIONAL UNDER THE DOCTRINE OF SUBSTANTIVE DUE PROCESS

In addition to the infirmities discussed above, the Cabaret Law should also be invalidated under the doctrine of substantive due process, which has been used to strike down arbitrary legislation where the enumerated protections in the Bill of Rights proved unavailing. The authority for recognition of rights beyond those enumerated in the Bill of Rights is provided by the Ninth Amendment, which provides that, "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people". When the Bill of Rights was first proposed, many Federalists argued that it could give the false impression that any powers not forbidden to the government were

allowed. In Federalist 84, Alexander Hamilton argued, "Why declare that things shall not be done which there is no power to do?" In introducing the Ninth Amendment in1789, James Madison stated, "It has been objected also against a Bill of Rights, that, by enumerating particular exceptions to the grant of power, it would disparage those rights which were not placed in that enumeration..." This conception of inherent limitations upon governmental power was echoed in the Declaration of Independence's assertion that men "are endowed by their Creator with certain unalienable Rights", and reflected by the Supreme Court in its decisions as early as 1798 in *Calder v. Bull,* 3 U.S. 386 (1798):

> I cannot subscribe to the omnipotence of a State Legislature, or that it is absolute and without control; although its authority should not be expressly restrained by the Constitution, or fundamental law, of the State… An Act of the Legislature (for I cannot call it a law) contrary to the great first principles of the social compact, cannot be considered a rightful exercise of the legislative authority.

As the framers of the Constitution recognized, and as was recognized by every major political philosophers from Aristotle[10] to Locke[11] and Montesque[12], without protections against majoritarian over-reaching, a democratic form of government could quickly devolve into demagoguery. This concern is well expressed in a quote often (but uncertainly) attributed to Benjamin Franklin, that "democracy is two wolves and a sheep debating on what's for dinner." As stated more recently by the Supreme Court, "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare... desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Romer v. Evans*, 517 U.S. 620 (1996) *see also U.S. Dept. of Agriculture v. Moreno*, 413 U.S. 528 (1973) ("The legislative history that does exist, however, indicates that that amendment was intended to prevent so-called 'hippies' and 'hippie communes' from participating in the food stamp program"); *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985) ("mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a

---

[10]  *See* Aristotle, *The Politics*, Book IV, Part IV
[11]  *See* John Locke, *Second Treatise on Govt.,* § 123 (1689)
[12]  *See* Montesquieu, *The Spirit of the Laws*, Book VIII, Sec. 2 (1748)

zoning proceeding, are not permissible bases for treating a home for the mentally retarded differently from apartment houses, multiple dwelling, and the like"). Thus, an arbitrary law that cannot be plausibly explained by anything other than the City's bare desire to harm black musicians, should rightly be viewed by this Court with great suspicion.

While the need and authority for the recognition of unenumerated rights has long been known, the Supreme Court has been fairly criticized for failing to provide clear guide posts as to when such rights should be recognized. Its conservative wing has proposed a "historical traditions" test, which could enshrine historical prejudices into constitutional jurisprudence, as in *Bowers v. Hardwick,* 478 U.S. 186 (1986) or *Dred Scott v. Sandford*, 60 U.S. 393 (1857). Its liberal wing has discussed "penumbras" of the enumerated rights, as in *Griswold v. Connecticut*, 381 U.S. 479 (1965), and "transcendent dimensions" of individual liberty, as in *Lawrence v. Texas,* 539 U.S. 558 (2003), without providing a clear limiting principal. In practice, the Supreme Court has used substantive due process to strike down laws that arbitrarily restricts individual liberty without advancing a legitimate governmental interest. *See Lawrence v. Texas,* 539 U.S. 558 (2003) (striking down laws against sodomy); *Griswold v. Connecticut*, 381 U.S. 479 (1965) (striking down law restricting access to contraceptives); *Loving v. Virginia*, 388 U.S. 1 (1967) (striking law against inter-racial marriage). Rather than relying solely on complex analyses of the fundamentality of a proposed right, or rigid levels of scrutiny, the courts should, at a minimum, apply rational basis testing more vigorously. As stated by the Supreme Court in *West Coast Hotels v. Parish*, 300 U.S. 379 (1937), just as it was bowing to court-packing pressure from President Roosevelt, "Liberty implies the absence of arbitrary restraint".

It would be hard to conceive of a law more arbitrary than the Cabaret Law, or a law more sweeping in its restraints of free expression. The Supreme Court recognized in *Lawrence v. Texas* that:

> Liberty presumes an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct... This, as a general rule, should counsel against attempts by the State, or a court, to define the meaning of the relationship or to set its boundaries absent injury to a

person or abuse of an institution the law protects. It suffices for us to acknowledge that adults may choose to enter upon this relationship in the confines of their homes and their own private lives and still retain their dignity as free persons.

While this holding would clearly protect two adults participating in consensual sex in their home, if the same two adults were to dance in their own home, in the context of a party "to which the public may gain admission", the Cabaret Law would render their conduct unlawful. No rule of law could support such a distinction. Adults engaging in intimate conduct without impacting others should be free of such unwarranted intrusion by the state into their personal lives. The Cabaret Law amounts to such an invasive, far-reaching prohibition of an indeterminate variety of expression, association and intimate conduct that it cannot be squared with the guarantee of liberty in the Due Process Clause.

## CONCLUSION

The Cabaret Law is a content-based restriction on free expression, and should be subject to strict scrutiny. However, even under a lesser degree of scrutiny, its arbitrary nature and lack of relation to any legitimate governmental interest render it impossible to explain by anything other than a desire by the 1926 Board of Alderman to harm African American musicians and clubs with mixed race audiences. It's broad text prohibits everything from musical entertainment to singing, dancing and "other form[s] of amusement". It is so vague that men must guess at its meaning, and hope that they will not be singled out for enforcement. It is a vestige of a bygone era of American history, where "separate, but equal" was the law, and inter-racial association made legislators uneasy. Thus, it is requested that this Court declare the Cabaret Law unconstitutional, and enjoin its further enforcement.

Dated: Brooklyn, New York
     March 27, 2015                   **LAW OFFICE OF ANDREW MUCHMORE**
                                    Counsel for Plaintiff

                                    By:___/s/ Andrew Muchmore_____
                                        Andrew Muchmore (AM 7852)
                                    217 Havemeyer Street, 4th Floor
                                    Brooklyn, New York 11211
                                    (917) 932-0299