UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
MUCHMORE'S CAFE, LLC,                       Civil Action No. 14-cv-5668 RRM-RER

                Plaintiff,

  -against-

CITY OF NEW YORK,

                Defendant.
------------------------------------------------------X

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS AND REPLY
MEMORANDUM IN FURTHERSUPPORT OF PLAINTIFF'S
<u>MOTION FOR JUDGMENT ON THE PLEADINGS</u>**

# **TABLE OF CONTENTS**

Introduction                                                                                              1

Point I - Plaintiff has Constitutional Standing to Challenge the Cabaret Law            3

Point II - Dance Performers, Musical Performers and Other Performers
      Cannot be Required to Rely on the City's *Noblesse Oblige*                              5

Point III - The Cabaret Law Cannot Withstand Scrutiny Under the *O'Brien* Test        7

    A. The Cabaret Law is Subject to Either Strict or Intermediate Scrutiny
        Under the Test Announced in *United States v. O'Brien*                              7

    B. The Cabaret Law Cannot Survive Scrutiny Under the *O'Brien* Test               9

Point IV - *Stanglin's* Holding Does Not Apply to Adult Social Dancing                 11

Point V - The Cabaret Law Must Be Evaluated Based on its Actual Intent
      Rather than Implausible Post Hoc Rationalizaitons                                 12

Conclusion                                                                                                13

# **TABLE OF AUTHORITIES**

*414 Theater Corp. v. Murphy*,
    499 F.2d 1155 (2d Cir. 1974) ............................................................. 10

*Abusaid v. Hillsborough County Bd.*,
    637 F. Supp. 2d 1002 (M.D. Fla., 2007) ............................................ 2, 9

*Allen v. Wright*,
    468 U.S. 737 (1984) ............................................................................ 3

*Artuz v. Bennett*, 5
    31 U.S. 4 (2000) .................................................................................. 6

*Bigelow v. Virginia*,
    421 U.S. 809 (1975) ............................................................................ 4

*Boos v. Barry*
    485 U.S. 312 (1988) ............................................................................ 8

*Bowers v. Hardwick*
    478 U.S. 186 (1986) .......................................................................... 11

*Chiasson v. New York City Dept. of Consumer Affairs*
    505 N.Y.S.2d 499 (Sup. Ct. N.Y. Co. 1986) ...................................... 5

*Chiasson v. New York City Dept. of Consumer Affairs*
    524 N.Y.S.2d 649 (Sup. Ct. N.Y. Co. 1988) ...................................... 5

*City of Cleburne v. Cleburne Living Center*
    473 U.S. 432 (1985) .......................................................................... 12

*City of Lakewood v. Plain Dealer Publishing Co.*,
    486 U.S. 750 (1988) ............................................................................ 3

*City of Renton v. Playtime Theatres, Inc.*,
    475 U.S. 41, 51 (1986) ........................................................................ 9

*Craig v. Boren*,
    429 U.S. 190, 195 (1976) .................................................................... 4

*Dallas v. Stanglin*
    488 U.S. 815 (1989) ................................................................. 2, 8, 11

*Dombrowski v. Pfister*,
    380 U.S. 479 (1965)      3

*Eisenstadt v. Baird*,
    405 U.S. 438 (1972)      4

*Elam v. Bolling*
    53 F. Supp. 2d 854 (W.D. Va. 1999)      2, 9

*Elk Grove Unified School District v. Newdow*,
    542 U.S. 1 (2004)      3

*Freedman v. Maryland*,
    380 U.S. 51 (1965)      4

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215, 225 (1990)      4

*Lawrence v. Texas*
    539 U.S. 558 (2003)      11

*Loper v. New York City Police Dept.*,
    999 F.2d 699 (2nd Cir. 1993)      7

*McCullen v. Coakley*
    573 U.S. ___ (2014)      7

*Peek-A-Boo Lounge v. Manatee County*,
    337 F.3d 1251 (11th Cir. 2003)      13

*Shuttlesworth v. City of Birmingham, Ala.*
    394 U.S. 147 (1969)      10

*St. Joseph Abbey v. Castille*,
    712 F.3d 215 (5th Cir. 2013)      12

*Staub v. City of Baxley*,
    355 U.S. 313, 322 (1958)      10

*Texas v. Johnson*
    491 U.S. 397 (1989)      7

*Turner Broadcasting v. FCC,*
    520 U.S. 180 (1997)      7

*United States v. Carolene Prods. Co.*,
    304 U.S. 144,152 (1938)                                    12

*United States v. O'Brien*
    391 U.S. 367, 376 (1968)                                   7,  8,  13


*United States. v. Stevens*
    559 U.S. 460 (2010)                                        1, 5

*United States v. Windsor*,
    133 S. Ct. 2675, 2687 (2013)                               3

*Village of Willowbrook v. Olech,*
    528 U.S. 562 (2000)                                        12

*Ward v. Rock  Against Racism*
    491 U.S. 781 (1989)                                        8

*Warth v. Seldin*,
    422 U.S. 490 (1975)                                        3

*White River Amusement Pub v. Town of Hartford*,
    481 F.3d 16 (2nd Cir. 2007)                                12

**INTRODUCTION**

Dancing in all its forms is a central part of New York's cultural life. Indeed, tomorrow, the City will host its 9th Annual Dance Parade, in relation to which the Mayor of New York City ("the City") issued a Proclaimed stating, "no matter how old we are or where we're from, we have all experienced the irresistible urge to dance." Because the urge to dance is so irresistible, the 99% of bars and restaurants such as Muchmore's Cafe, LLC ("Muchmore's" or "Plaintiff") that lack Cabaret Licenses cannot host dance-oriented music without the direct consequence of people dancing and the Cabaret Law being violated. Not only does the Cabaret Law bar dancing in all but a handful of locations in the City, it purports to regulate "musical entertainment, singing, dancing or other [unspecified] form[s] of amusement". This sweepingly broad and distressingly vague language encompasses too much protected speech and provides to little clarity to be compatible with the First and Fourteenth Amendments to the U.S. Constitution.

In opposition to Plaintiff's motion, the City has offered a number of straw man arguments. First, while the intent behind the Cabaret Law's enactment at the height of the Harlem Renaissance in 1926 is well established from the historical record, the City cites generalized statutory language as to why "licensing by the department of consumer affairs is a necessary and proper mode of regulation with respect to certain trades, business and industries." [City's Memo at p. 17] Plaintiff does not challenge licensing in general, but the Cabaret Law specifically. This language address the authority of the Department of Consumer Affairs (which did not come into existence until 1969) to regulate "trades, businesses and industries" generally. It has no bearing on the discriminatory intent of the City's Board of Alderman in 1926, which the City does not deny, instead arguing only that "[w]hatever the intent was in including that language [targeting jazz instruments] in 1926 is now irrelevant." [City's Memo at p. 28] The City does not even attempt to offer a legitimate interest that the law promotes, much less a substantial interest that is narrowly tailored, as is required under *U.S. v. O'Brien 391 U.S. 367 (1968)*.

Second, the City mischaracterizes Plaintiff's argument concerning the Cabaret Law's "disparate impact" as: "the licensing requirement discriminates on the basis of race because *only* minority musicians are effected because they are the *only* musicians to play hip hop, salsa or merengue." [City's Memo at p. 27] (emphasis added). However, a law violates the Equal Protection Clause if it was motivated by a discriminatory purpose and has a "disparate" impact in application, and this "only" language has no basis in law. It should be unsurprising to the Court that, for example, Latin American forms of music such as salsa or tango are performed primarily by Latin American musicians, like Pedro Giraudo, whose Affidavit accompanies this reply.

Third, the City mischaracterizes Plaintiff's argument as requiring this Court to re-examine the holding from *Dallas v. Stanglin,* 488 U.S. 815 (1989). However, other Courts, as in *Abusaid v. Hillsborough County Bd*. 637 F. Supp. 2d 1002 (M.D. Fla., 2007) and *Elam v. Bolling* 53 F. Supp. 2d 854 (W.D. Va. 1999), have, without questioning the continuing force of *Stanglin*, differentiated it to strike down laws strikingly similar to the Cabaret Law. The City provides no compelling argument for differentiating either of these cases, and the cases it does cite do not address non-obscene dancing by adults to live music.

The City does not point to a substantial interest behind the Cabaret Law, or argue that it is narrowly tailored, because such an argument would be implausible at best. *Dallas v. Stanglin* does not exist in a vacuum, and particularly where the facts involved are quite different, it must be considered within the broader framework of the First Amendment. Where the City has substantially constrained the First Amendment expression of its citizens solely out of a desire to harm jazz musicians and prevent inter-racial association, this legislative purpose cannot withstand the heightened scrutiny applicable under any meaningful First Amendment analysis.

# POINT I

## PLAINTIFF HAS CONSTITUTIONAL STANDING
## TO CHALLENGE THE CABARET LAW

The City's argument that Plaintiff lacks standing to assert its claims has no merit. A plaintiff need only satisfy three requirements in order for a federal court to have the power to consider its case under Article III of the Constitution. *See* U.S. Const. Art. III, § 2 (Case or Controversy Clause). First, there must be an actual or a threatened injury. Second, the injury or threatened injury must be fairly traceable to the defendant's conduct. Third, there must be a sufficient likelihood that a favorable decision on the merits will redress the injury. *See Allen v. Wright*, 468 U.S. 737, 751 (1984); *Warth v. Seldin*, 422 U.S. 490, 498–500 (1975).

Where the City goes astray is confusing prudential standing with constitutional standing. It is true that the Supreme Court has formulated certain "prudential" standing requirements limiting a plaintiff's ability to assert the rights of others not before the court. *See, e.g.*, *United States v. Windsor*, 133 S. Ct. 2675, 2687 (2013); *Elk Grove Unified School District v. Newdow*, 542 U.S. 1 (2004). However, the Supreme Court has recognized numerous situations where the prudential requirements do not apply. In the First Amendment arena, particular in overbreadth challenges, the courts permit plaintiffs to assert the rights of third parties not before the court in order to assure that free speech is not chilled by laws susceptible "sweeping and improper application". *See Dombrowski v. Pfister*, 380 U.S. 479, 486-87 (1965).

In the context of a licensing scheme, the Supreme Court has held that "one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988), "a facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Id.* "One who might have had a license for the asking may . . . call into question the whole scheme of

licensing."*Freedman v. Maryland*, 380 U.S. 51 (1965).

A plaintiff's "standing to challenge a statute on First Amendment grounds as facially overbroad does not depend upon whether his own activity is shown to be constitutionally privileged." *Bigelow v. Virginia*, 421 U.S. 809, 815-16 (1975); *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990). The Supreme Court has specifically held that a tavern has standing to assert the constitutional rights of its patrons. *See Craig v. Boren*, 429 U.S. 190, 195 (1976). Such standing is justified not only based upon the financial impact on the establishment, but on the basis that the individuals affected are unlikely to assert their own rights in court. *See Barrows v. Jackson*, 346 U.S. 249 (1953); *Eisenstadt v. Baird*, 405 U.S. 438, 446 (1972).

Accompanying this memorandum are Affidavits submitted by individuals whose rights to organize performances at Muchmore's are implicated by the Cabaret Law, including: (a) an arts organization that has produced dance performances at Muchmore's; (b) a Grammy award-winning tango musician who would organize a performance at Muchmore's but for the Cabaret Law, (c) an organizer of swing, big band other social dance events that would organize a performance at Muchmore's but for the Cabaret Law, (d) a debate organizer that has organized a series of political debates, panels and lectures at Muchmore's, and (e) a stand up comedian whose past and future performances at Muchmore's might be construed as unlawful "other form[s] of amusement" under the Cabaret Law. While these Affidavits are not relied upon in Plaintiff's Motion for Judgment on the Pleadings - Plaintiff maintains that the Cabaret Law's text is clear, and clearly violates the First and Fourteenth Amendments - they do show that the harms addressed in Plaintiff's papers are not merely hypothetical, and they are relevant to the City's efforts to avoid scrutiny of the substantive issues on standing grounds.

# POINT II

## DANCE PERFORMERS, MUSICAL PERFORMERS AND OTHER PERFORMERS CANNOT BE REQUIRED TO RELY ON THE CITY'S *NOBLENESS OBLIGE*

The Cabaret Law purports to regulate vast amounts of clearly protected First Amendment expression, including "musical entertainment, singing, dancing and other form[s] of amusement". The City attempts to remedy this clear constitutional deficiency by arguing that, in application, the Cabaret Law "is not triggered by performance dancing or the playing of music". (City's Memo at p. 5). The City conceded at the pre-motion conference that the Cabaret Law would be unconstitutional if applied to dance performance, and that musical performance is protected under the First Amendment, but argued that it is only being applied to prevent dancing by customers. However, the text of the law draws no distinction between social dancing and dance performance, and instead purports to apply to "musical entertainment, singing, dancing and other form[s] of amusement". The only authority the City has pointed to for a purported narrowing interpretation by the state courts is *Chiasson v. New York City Dept. of Consumer Affairs,* 505 N.Y.S.2d 499 (Sup. Ct. N.Y. Co. 1986) and 524 N.Y.S.2d 649 (Sup. Ct. N.Y. Co. 1988). However, that case did not address the rights of dance performers or non-musical entertainers, and a large portion of currently licensees are strip clubs that do not host social dancing. While the law is not consistently enforced, and is instead enforced randomly and arbitrarily, this selective enforcement cannot save it from the sweeping application of its plain text.

As the Supreme Court has emphasized, "the First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*." *United v. Stevens*, 559 U.S. 460 (2010). Courts will not "uphold an unconstitutional statute merely because the Government promised to use it responsibly." *Id.* "The Government's assurance that it will apply [a law] far more restrictively than its language provides is pertinent only as an implicit acknowledgment of the potential constitutional problems with a more natural reading." *Id.*

Indeed, the law involved in *Stevens* had a far more laudable purpose than the Cabaret Law, seeking to criminalize the commercial creation, sale, or possession of animal cruelty videos where a living animal was intentionally maimed, mutilated, tortured, wounded, or killed for entertainment. The purpose was to eliminate so-called "crush videos", which "often depict women slowly crushing animals to death . . . over '[t]he cries and squeals of the animals, obviously in great pain', in order to "appeal to persons with a very specific sexual fetish". *Id.* Notwithstanding this clearly laudable purpose, the Court held that it could sweep in too much protected expression, such as hunting videos, and found no merit in the government's assurance that it would be applied only where appropriate. Here, with the Cabaret Law's far less laudable purpose of preventing jazz performance and inter-racial mingling, the City's argument that it will not apply this unconstitutional law in an unconstitutional manner is completely without merit.

Finally, given that, at a minimum, substantial portions of the Cabaret Law clearly violate the First Amendment, even if the Court finds that other aspects do not, the entire edifice should be struck down. If the Court were simply to ignore the language of the statute purporting to regulate musical entertainment, singing, performance dancing and other forms of amusement, this would not be interpreting the statute, it would be rewriting it by taking out the language that plainly applies. "Whatever merits [the government's] policy arguments may have, it is not the province of [the courts] to rewrite the statute to accommodate them." *Artuz v. Bennett*, 531 U.S. 4, 10 (2000). "Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement." *Badaracco v. Commissioner*, 464 U.S. 386, 398 (1984) Here, where the City passed a clearly unconstitutional law for a clearly improper purpose, it may not rely on selective enforcement to prevent certain aspects of the law from being struck down.

# POINT III

## THE CABARET LAW CANNOT WITHSTAND SCRUTINY UNDER THE *O'BRIEN* TEST

**A.     The Cabaret Law is Subject to Either Strict or Intermediate Scrutiny Under the Test Announced in *United States v. O'Brien***

Under the test announced by the Supreme Court in *United States v. O'Brien*, 391 U.S. 367, 376 (1968), "a government regulation is sufficiently justified if [1] it is within the constitutional power of the Government; [2] ... it furthers an important or substantial governmental interest; [3] ... the governmental interest is unrelated to the suppression of free expression; and [4] ... the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." The *O'Brien* test applies where "'speech' and 'nonspeech' elements are combined in the same course of conduct", and the government aims to regulate the "nonspeech" element. The City purports that the Cabaret Law attempts only to regulate social dancing, a "nonspeech" element, but since dancing and the performance of dance-oriented genres of music are "combined in the same course of conduct", the First Amendment rights of musicians and live music establishments are clearly implicated.

The *O'Brien* test has been consistently applied by the Supreme Court and Second Circuit, and requires the application of intermediate scrutiny in the case of content-neutral time, manner and place restrictions targeting the "secondary effects" of speech, or strict scrutiny in the case of content-based regulations or laws targeted at expression. *See McCullen v. Coakley*, 573 U.S. ___, 134 S. Ct. 2518 (2014) (striking down law requiring protesters to maintain a fixed distance from abortion clinics); *Turner Broadcasting v. FCC*, 520 U.S. 180 (1997) (striking down "must carry" provisions in cable company regulations); *Texas v. Johnson*, 491 U.S. 397 (1989) (applying strict scrutiny to law against flag burning); *Loper v. New York City Police Dept.*, 999 F.2d 699, 703 (2nd Cir. 1993) (pan-handling regulation struck down under *O'Brien*).

Even assuming, *arguendo*, that social dancing by adults is entitled to no First Amendment protection, there are still vast amounts of protected expression restrained by the Cabaret Law, most significantly, the rights of musical performers and live music venues to host musical genres of their choice. Social dancing and the performance of dance-oriented genres of music are so inextricably linked that, in the context of a live music performance (unlike the context of *Stanglin*), dancing cannot be considered a "secondary effect", but should instead be considered "the direct impact of speech on its audience", subjecting the Cabaret Law to strict scrutiny. *Boos v. Barry,* 485 U.S. 312 (1988).

However, even if the Cabaret Law were considered a "[c]ontent neutral time, place and manner regulation", it is permissible only so long as it is "narrowly tailored to serve a substantial government interest" and does not "unreasonably limit alternative avenues of expression". *Ward v. Rock Against Racism,* 491 U.S. 781 (1989); citing *O'Brien.* Here, the Cabaret Law leaves very few avenues for expression for tango, salsa, hip hop or electronic dance music, and the sweeping language of the Cabaret Law indicates no effort at narrow tailoring.

The City's Memorandum of Law does not even mention *O'Brien*, and makes no effort to explain how the Cabaret Law could comport with *O'Brien* and its progeny. While this might seem shocking at first, it is actually completely unsurprising, as no plausible argument could made that the Cabaret Law could withstand either strict scrutiny or intermediate scrutiny. Instead, the City's argument begins and ends with *Dallas v. Stanglin*, where no live musical performances took place, no expression or racial groups were targeted, and the Court found only that the challenged ordinance did not "unconstitutionally restrict minors' right of association by restricting entry to class E dancehalls to persons aged 14 through 18, their parents, and employees of hall". While Plaintiff does question the propriety and applicability of *Stanglin* in light of other precedents, it is not difficult to understand why the Court did not want to recognize a constitutional right for middle aged men to predate upon adolescent girls in teen dance clubs. Thus, even where courts have not questioned *Stanglin*'s

application as to social dancers, they have differentiated it in factual scenarios such as this involving the "promotion, production, and presentation of some measure of expressive dances or musical or other expressive performances sufficient to implicate First Amendment concerns", *Abusaid v. Hillsborough County Bd*., 637 F. Supp. 2d 1002 (M.D. Fla., 2007); or where the challenged ordinance, "by its plain terms restricts all public dancing, whether a square dance, the lambada, pantomime or ballet." *Elam v. Bolling,* 53 F. Supp. 2d 854 (W.D. Va. 1999). In such instances, where the challenged "[o]rdinance is unconstitutional on its face", the courts have struck down the challenged law down in its entirety rather than trying to re-write it. *Id.*

### B. The Cabaret Law Cannot Survive Scrutiny Under the O'Brien Test

The Cabaret law does not further any important or substantial governmental interests. The initial purpose of the law, an assertion that has not been challenged by the City, was to give City officials the power to prohibit inter-racial dancing and inter-racial mingling in Harlem jazz clubs, and even the message that such intermingling would have conveyed, without explicitly saying so in the law. A more pernicious purpose for a law in our society is hard to fathom. *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51 (1986) (applying *O'Brien* and holding that "to demonstrate that an ordinance furthers a substantial government interest, a municipality must show *that in enacting the legislation*, it relied on some evidence "reasonably believed to be relevant" to the problem of negative secondary effects.") (emphasis added).

The City attempts to avoid this obvious point by relying on an unrelated code section entitled "Legislative Intent" which refers to all licensing provisions in general: "The council finds that... for the protection of the health and safety of the people of New York City and for other purposes requisite to promoting the general welfare, licensing by the department of consumer affairs is a necessary and proper mode of regulation with respect to certain trades, business, and industries." [City's Memo at 17] It should be noted that the Department of Consumer Affairs did not come into existence until more than

9

forty years after the Cabaret Law was enacted, so even ignoring the utter generality of this statement, it has no bearing on the City's intent when the Cabaret Law was passed.

The Supreme Court has long held that such generalized purposes are far too vague and ambiguous to justify a law that burdens speech or protected expression. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 149 (1969) (reversing convictions entered under ordinance that allowed city commissioners to grant or deny parade license based on their ideas of "public welfare, peace, safety, health, decency, good order, morals or convenience"); *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958) (holding that a "general welfare" standard is too indefinite); *414 Theater Corp. v. Murphy*, 499 F.2d 1155-59 (2d Cir. 1974) ("welfare and benefit of the people of and visitors to the city" standard too indefinite). Indeed, if such broad and vague interests were allowed to justify government regulations, the test set forth in *O'Brien* would become meaningless. The government could always say a law promotes the "general welfare." Moreover, without a clearly defined government interest, the Court is unable to determine whether the law is narrowly tailored to achieve its purpose without chilling protected expression. Given the substantial amount of protected speech, music, dance, debate, comedy, theater and "other form[s] of amusement" that fall within the Cabaret Law's explicit reach, a generalized statement that the licensing of "businesses" promotes the "general welfare" is palpably insufficient.

# POINT IV

## *STANGLIN*'S HOLDING DOES NOT APPLY TO ADULT SOCIAL DANCING

The City relies on *Dallas v. Stanglin* in support of its argument that the Cabaret Law survives constitutional scrutiny and repeatedly argues that social dancing is not protected expression. However, to assume that *Stanglin* applies to *all* social dancing regardless of the context ignores the Court's narrow grant of certiorari. *Stanglin* merely held that the city of Dallas could restrict minors' right of association under the First Amendment by prohibiting entry to certain dancehalls to children aged fourteen through eighteen, their parents, and employees of the dancehall. The motive of the law was plainly and explicitly to protect children from predatory adults. Not surprisingly, the Court refused to extend First Amendment protection to the social dancing of adults with children.

However, adults dancing with each other often convey a sexual or intimate message, and particularly in light of the Court's holding in *Lawrence v. Texas,* 539 U.S. 558 (2003), should be considered "intimate conduct" protected by the Fourteenth Amendment or "intimate association" under the First Amendment, notwithstanding the *Stanglin* court's statement to the contrary fourteen years earlier in the era of *Bowers v. Hardwick* 478 U.S. 186 (1986), when such conduct and association was unprotected. If consensual sexual acts between adults are now protected by the Fourteenth Amendment, it would be paradoxical that a far more modest act leading up to that result would not be protected. The fundamental distinction between the law at issue in *Stanglin* and the Cabaret Law is obvious: the former prohibited adults from dancing with children, while the Cabaret Law infringes on the right of adults to dance with each other. Moreover, Stanglin did not involve musical performance, and pre-dated the Court's expansion of protection of intimate conduct in *Lawrence v. Texas*. Given these differences, *Stanglin* should be limited to its facts.

# POINT V

## THE CABARET LAW MUST BE EVALUATED BASED ON ITS ACTUAL INTENT RATHER THAN IMPLAUSIBLE POST HOC RATIONALIZATIONS

The Fourteenth Amendment prohibits state and local governments from using the police power for private or illegitimate purposes. Put simply, the Fourteenth Amendment requires government power to be used for legitimate government purposes. *See, e.g.*, *Village of Willowbrook v. Olech,* 528 U.S. 562 (2000) (holding that a ordinance motivated solely by a spiteful effort to "get" the Plaintiff for a previous lawsuit against the village violated the Equal Protection Clause).

The Court need not, indeed should not, turn a blind eye to the racist history of the Cabaret Law or its impact. *See United States v. Carolene Prods. Co.*, 304 U.S. 144,152 (1938) ("[T]he existence of facts supporting the legislative judgment is to be presumed... unless in light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators."); *see also St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir. 2013) (stating that "a hypothetical rationale, even *post hoc*, cannot be fantasy," and urging that the correct "analysis does not proceed with abstraction", but must be "informed by the setting and history of the challenged rule"); *City of Cleburne v. Cleburne Living Center, Inc.* 473 U.S. 432 (1985) ("'The question is whether it is rational to treat the mentally retarded differently. It is true that they suffer disability not shared by others; but why this difference warrants a density regulation that others need not observe is not at all apparent.")

The City passed the Cabaret Law to keep African Americans and white people from socializing and dancing together in Harlem jazz clubs. It is a shameful vestige of laws used to keeps African Americans subordinated and separate even after the Civil War and the passage of the Fourteenth Amendment. This is precisely why Congress passed the Civil Rights Act of 1871, and with it, created the private right of action (now codified as 42 U.S.C. 1983) under which this action is brought. Put simply, a law passed on the basis of such animus, and which cannot be plausibly supported on any

legitimate ground, cannot stand.

In light of the well established history of the Cabaret Law, the Court should give no credence to the City's generalized statements that it was enacted to promote health and welfare in some vague and theoretical sense. To the extent the City might be concerned about noise, its interests are protected in a rational manner under the NYC Noise Code. To the extent it might have concerns about overcrowding, these are addressed by the Building Code, Fire Code and requirements for Place of Assembly Certificates of Operation. As a matter of basic logic, establishments that permit patron dancing do not pose any special threats the health or safety of their patrons or neighbors that are different from those posed by establishments of comparable capacity and noise levels. The City has not pointed to any rash of Lindy Hop injuries in the 1920's that spurred it to regulate dancing, and the actual circumstances leading up to its enactment are well known. *See White River Amusement Pub v. Town of Hartford*, 481 F.3d 163, 171 (2nd Cir. 2007) (holding that an indecency ordinance prohibiting nude and semi-nude female dancing around food and beverages was unconstitutional under *O'Brien* because Hartford could not show that it relied on relevant evidence of negative secondary effects in enacting the ordinance); *see also Peek-A-Boo Lounge v. Manatee County*, 337 F.3d 1251, 1268 & n.16 (11th Cir.2003) (collecting cases requiring pre-enactment evidence to support the alleged government interest).

## CONCLUSION

Today, the Cabaret Law is considered to be one of the silliest laws on the books. *See* Candace Wheeler, "Five of the Dumbest Laws in New York City (Besides the No-Brunch Law)," *Village Voice* (June 13, 2015). Comparisons to the movie "Footloose" are commonplace, and many are astounded to learn such a law exists. As almost everyone seems to recognize, there is something absurd about a government making it unlawful for people to dance in any establishment that does not have a license, particularly where less than 1% of eating and drinking establishments have one. However, the absurdity of the Cabaret Law is no laughing matter, as it prevents a vast amount of protected speech from ever

taking place. It places far too much power into the hands of the government, which can then allow officials to decide when and how to apply the law. It allows officials to target clubs, venues and owners that they do not like for illegitimate purposes. Finally, it creates an onerous burden on owners that are already subject to numerous other legislative provisions that protect against any legitimate governmental concern.

If the Court recognizes that the Cabaret Law was motivated by a desire to curb expression, or functions as a content-based restriction on expression, it must apply strict scrutiny. If not, under the *O'Brien* test, intermediate scrutiny is the applicable standard, and the City must show that the law serves an important or substantial governmental interest, and any incidental restrictions on First Amendment freedoms is no greater than necessary. Instead, the City merely ignores this standard, as it is well aware of arbitrary nature of the law and its embarrassing history. A law that is so injurious to the First Amendment rights of millions of New Yorkers should not be allowed to stand on the basis of vague and implausible rationalizations that post-date its enactment by decades and bear no relation to its true and obvious intent. It would be difficult to conceive of a law more arbitrary than the Cabaret Law. If such arbitrary laws are allowed to stand - even where motivated by racial animus and a desire to inhibit the free expression of a targeted group - the guarantees of liberty provided in the Constitution would be deprived of their vitality and reduced to meaningless platitudes .

Dated: Brooklyn, New York
      May 15, 2015

                                      **LAW OFFICE OF ANDREW MUCHMORE**
                                      Counsel for Plaintiff

                                      By:     /s/ Andrew Muchmore
                                             Andrew Muchmore
                                      217 Havemeyer Street, 4th Floor
                                      Brooklyn, New York 11211
                                      (917) 932-0299