UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

MUCHMORE'S CAFÉ, LLC,

                              Plaintiff,

        v.

THE CITY OF NEW YORK,

                              Defendant.

Civ. Action No.: 14-cv-05668 (RRM)

---

## MEMORANDUM OF LAW OF *AMICI CURIAE* SOCIAL DANCERS

---

Jerry S. Goldman, Esq. (JG-8845)
Christopher L. Ayers, Esq. (CA-5091)
Nicholas R. Maxwell, Esq. (NM-9797)
**ANDERSON KILL P.C.**
1251 Avenue of the Americas
New York, NY  10020
Telephone:  212-278-1000

*Attorneys for Amici Curiae Social Dancers*

## TABLE OF CONTENTS

Page

ARGUMENT ................................................................................................................. 2

I.  Even If the Court Follows *Dallas v. Stanglin*'s Free Association Analysis, Social Dance Is Often an Inextricable Element of Free Musical Speech. .................................... 2

    **A.**  Social Dance Is an Inextricable Element of Protected Musical Expression. .......... 3

        1.  The City's Bright Line Between Social Dance and Musical Performance Ignores Existing Law Regarding Protected Nonspeech Conduct. .................................................................................. 3

        2.  The Genres in Which Amici Participate Would Not Exist But for the Rights of Listeners to Dance. ................................................................. 4

    **B.**  The Cabaret Law Crumbles Under the Limited Weight of Intermediate Scrutiny. ........................................................................................................ 6

        1.  The City's Original Interest in Discouraging Jazz and Interracial Mingling Is Not an "Important or Substantial Governmental Interest." ................................................................................................. 7

        2.  If the Court Accepts the City's "Public Welfare" Justification for the Cabaret Law, the Law Still Restricts Far More Protected Speech than Necessary to Achieve that Interest. ...................................... 7

II.  Scientific Research Demonstrates that Dance is a Mode of Expression (communication) in a Non-Performance Context. ............................................................ 9

    **A.**  Social Dance Expresses Emotion. ...................................................................... 10

        1.  Humans Have the Ability to Decode Emotion Through Social Dance. ................................................................................................ 11

        2.  Social Dance May Convey Particularized Messages. .............................. 12

        3.  Expression of Emotion Through Social Dance Leads to a Sense of Community -- Straight Edge Subculture. ................................................. 14

    **B.**  Social Dance Is Embedded In Our Society. ....................................................... 16

CONCLUSION ........................................................................................................... 20

i

## TABLE OF CASELAW

Page

**CASES**

*Alexander v. United States*,
    509 U.S. 544 (1993)......................................................................................................7

*Dallas v. Stanglin*,
    488 U.S. 815 (1989)......................................................................................................3

*Hang On, Inc. v. City of Arlington*,
    65 F.3d 1248 (5th Cir. 1995) ......................................................................................7

*Miller v. Civil City of S. Bend*,
    904 F.2d 1081 (7th Cir. 1990), *rev'd sub nom. Barnes v. Glen Theatre, Inc.*, 501 U.S.
    560 (1991)...............................................................................................................9, 10

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
    547 U.S. 47 (2006)......................................................................................................6

*South Florida Free Beaches, Inc. v. Miami*,
    734 F.2d 608 (11th Cir. 1984) ....................................................................................4

*Turner Broad. Sys. v. FCC*,
    520 U.S. 180 (1997)....................................................................................................6

*United States v. O'Brien*,
    391 U.S. 367 (1968).............................................................................................*passim*

*Vincenty v. Bloomberg*,
    476 F.3d 74 (2d Cir. 2007)......................................................................................7, 8

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)................................................................................................7, 8

> The city should not be in the business of deciding what goes on, whether there is dancing or not dancing. … We have dance police. This is craziness.
>
> - Former New York City Mayor Michael Bloomberg, speaking about the Cabaret Law in 2004.[1]

Eleven years have passed since the Mayor called for reform of the Cabaret Law, but Defendant the City of New York (the "City") has not heeded the call.  Instead, the City has knowingly left in place a capriciously enforced law indisputably borne of prejudice.  *Amici curiae* Ali Coleman, Luis Vargas, Megha Kalia, Natasha Blank and Tamara Burstein ("*amici*" or the "social dancers") participate in various different musical genres, each inherently and undisputedly triggering what Mayor Bill de Blasio has called the "irresistible urge to dance."[2]  Below, *amici* first demonstrate that social dance is, in certain circumstances, an inextricable nonspeech element of constitutionally protected musical speech.  Indeed, there are many musical genres, including the ones in which *amici* participate, that would cease to exist if listeners could not dance to them.

Second, *amici* demonstrate that social dance is an inherently expressive form of communication.  Empirical evidence demonstrates that social dance is expression sufficient to warrant First Amendment protection.  Social dancers express feelings, beliefs, judgments and more – all of which encompass some degree of recognizable emotion.  This emotion is reflected

---

[1] Sewell Chan, A New Effort to End the 'Dance Police,' NEW YORK TIMES, July 14, 2008, *available at* http://cityroom.blogs.nytimes.com/2008/07/14/a-new-effort-to-end-the-dance-police/?_r=0.

[2] New York City Dance Parade, Proclamations and Support Letters, http://danceparade.org/wp-content/uploads/2015/05/2015-DP-Proclamation-Mayor.jpg (last visited June 2, 2015).

in the physical movement of the body.  Thus, any person engaged in social dancing is using it to communicate emotion.

## ARGUMENT

**I.    EVEN IF THE COURT FOLLOWS *DALLAS V. STANGLIN*'S FREE <u>ASSOCIATION</u> ANALYSIS, SOCIAL DANCE IS OFTEN AN INEXTRICABLE ELEMENT OF FREE MUSICAL <u>SPEECH</u>.**

Many New York City business owners refuse to book performers from these genres because they know that social dance is an inextricable element of the genres.  By infringing social dancers' right to dance, the Cabaret Law prohibits a nonspeech element of musical performance speech that no one disputes is protected by the First Amendment.  The City's contrived line between dance and musical performance ignores the reality that dance is inherent to these musical genres, thus limiting the dancers' ability to express themselves infringes equally on the performers' freedom of expression.[3]

As a result, the Cabaret Law is subject to, and plainly fails to pass, the intermediate scrutiny framework first established in *United States v. O'Brien*, 391 U.S. 367 (1968).  As Plaintiff points out, the City failed to even mention *O'Brien* in its cross-motion, much less apply it to the Cabaret Law.  The City's discussion of *O'Brien* in its reply papers, City Reply at 5-6, repeats the contention that social dance is not speech, but fails to address the more nuanced point that social dance is a nonspeech element of musical performance.  Herein, *amici* explain why social dance is a nonspeech element of protected musical speech.  Based on that

---

[3] At the outset, *amici curiae* endorse the arguments set forth by Plaintiff Muchmore's Café, LLC, most notably that it has standing to challenge the Cabaret Law and that social dance itself is expression protected by the First Amendment.  *Amici* focus elsewhere in an effort to avoid burdening the Court with duplicative arguments.  Even if the Court does not agree that social dance is expression independently deserving First Amendment protection, *amici* respectfully contend that the Cabaret Law is constitutionally infirm anyway, for the reasons set forth herein.

2

status, *amici curiae* then demonstrate that the Cabaret Law cannot meet the high standard imposed upon it by *O'Brien*.

> **A.    Social Dance Is an Inextricable Element of Protected Musical Expression.**

Before reaching the *O'Brien* test, one must first establish that the nonspeech conduct in question is in fact an element of some sort of protected expression.  Social dance is not unrelated to musical performance—quite to the contrary, the genres of music to which *amici* dance would cease to exist if listeners could not dance.  By banning social dance in countless New York City establishments, the Cabaret Law heavily incentivizes business owners not to book musicians who perform musical genres that inherently involve dance.  Business owners, like anyone else familiar with genres like house or Bhangra, understand that the genres <u>necessarily</u> trigger social dancing that violates the Cabaret Law.  Therefore, even if social dance is not protected expression standing alone, it is clearly protected expression when undertaken in the context of indisputably protected musical speech.  The musicians playing the music and the listeners dancing to it are, in the case of the *amici*'s musical genres, one and the same.  The City's attempt to draw a line between live music and the dance upon which it relies fails to persuade.

> **1.    The City's Bright Line Between Social Dance and Musical Performance Ignores Existing Law Regarding Protected Nonspeech Conduct.**

*Amici* reiterate their agreement with Plaintiff's argument that *Dallas v. Stanglin*, 488 U.S. 815 (1989), does not bind this Court, and therefore social dance is <u>independently</u> protected by the First Amendment.  Even if the Court rejects Plaintiff's argument, however, the fact remains that social dance of the type banned by the Cabaret Law is an inextricable element of protected musical performance.  The Cabaret Law is thus subject to heightened constitutional

scrutiny under *O'Brien*, *infra*. The City's willful failure to engage with this point is indicative of the City's inability to distinguish *O'Brien* and its progeny.

Various types of conduct may be considered non-expressive in one context but expressive in another. Cases construing public nudity regulations, for example, are instructive. In *Tunick v. Safir*, the Second Circuit considered a permitting regulation that the City of New York used to prevent an acclaimed photographer from shooting photos of nude models in public. 209 F.3d 67, 69 (2d Cir. 2000). The Court, explaining that there were no demonstrated negative "secondary effects" of the nudity, considered the nudity to be part and parcel of the photographer's constitutionally protected artistic expression. *Id*. at 83-84. In other words, although nudity standing alone might not be protected expression, it is protected "when combined with some mode of expression which itself is entitled to First Amendment protection." *South Florida Free Beaches, Inc. v. Miami*, 734 F.2d 608, 610 (11th Cir. 1984) (quoting *Chapin v. Southampton*, 457 F. Supp. 1170, 1174 (E.D.N.Y. 1978)).

Like nudity, while social dancing might not be protected in certain circumstances, it is protected when functioning as an inherent element of artistic speech. As explained below, social dance is an inherent element of each of the musical genres in which *amici* participate.

2.    *The Genres in Which Amici Participate Would Not Exist But for the Rights of Listeners to Dance.*

Just as nudity is inherent to the protected artistic expression of the photographer in *Tunick*, *supra*, so too is rhythmic physical movement inherent in the varieties of live music to which *amici* dance (or would dance if not for the Cabaret Law).

***Loftkidluis*** and ***Ali Coleman***: Luis Vargas, a.k.a. Loftkidluis, and Ali Coleman are leaders of the New York City House Coalition, a group of more than 500 individuals and organizations devoted to furthering house music in New York City. House musicians spend

4

hours curating electronic music into a spiritual, ideological performance. Their ultimate goal is to convey a recognizable message to the audience dancing in front of them. The musicians and the dancers have what Mr. Vargas calls a "symbiotic relationship." Without social dance, house musicians cannot speak.

**Natasha Blank**: Ms. Blank creates music for a biweekly event called "The Get Down," a "happy hour dance party" starting at 7 p.m. and hosted in establishments subject to the Cabaret Law. The Get Down is designed to "bring together people from across classes and cultures." Ms. Blank painstakingly curates musical performances (and dances to performances curated by other musicians), "on the belief that dance is a basic form of self-expression rarely recognized for its paramount importance in the creation and maintenance of health, happiness, wellbeing and a feeling of genuine connection with other people." Every time she chooses a song to play, Ms. Blank asks herself "How is this sound going to invite [audience members] to break out of their usual way of moving and into new exciting and creative forms of expression?"

Without social dance, Ms. Blank, could not—and would have no reason to—speak through musical performance.

**Megha Kalia**: Ms. Kalia leads the NYC Bhangra Dance company, a group which performs around the City. Bhangra music hails from the Punjab state of India, and is based on a drum called the dohl. Bhangra musicians use the dohl to express a wide range of different emotions, most notably a desire to improve one's life and mood on a day-to-day basis. Without people to dance to the beat of the dohl, there would be no reason to drum on it, and thus no reason for Bhangra to exist.

**Tamara Burstein**: In addition to her commitment to social dance in many different contexts, Ms. Burstein has made performance dance her full time work. She is a

5

certified teacher of the 5Rhythms movement meditation practice who shares her knowledge at 5Rhythms workshops across the world. Most importantly, Ms. Burstein is, in her own words, "an uncontrollable dancer at all social functions"—including many at venues subject to the Cabaret Law. Without social dancers like Ms. Burstein, the various forms of musical expression to which she loves to dance would be rendered irrelevant.

**B.    The Cabaret Law Crumbles Under the Limited Weight of Intermediate Scrutiny.**

As set forth in the preceding section, social dance is an element of protected musical speech. While restrictions on social dance are in some circumstances valid, that is true only if the restriction in question passes intermediate scrutiny. A regulation meets intermediate scrutiny:

> if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*United States v. O'Brien*, 391 U.S. at 377. The *O'Brien* test requires that the restrictions "further an important or substantial governmental interest unrelated to the suppression of free speech" and not "burden substantially more speech than is necessary to further' those interests." *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 186 (1997) (quotations omitted).   If a law fails to meet any of the four successive stages of the *O'Brien* test, it is automatically unconstitutional. As explained below, the Cabaret Law fails to meet at least two of the four elements.[4]

---

[4] *Amici* do not suggest that the City went outside its power by passing a licensing statute, thus the first element is not contested. Contrary to the City's extended straw man argument, City Opp. Br. at 7, 17-18, licensing in the abstract is not the problem—licensing as specifically embodied by the Cabaret Law is the problem.

       1.     *The City's Original Interest in Discouraging Jazz and Interracial Mingling Is Not an "Important or Substantial Governmental Interest."*

No one, including the City in its briefing, disputes that the Cabaret Law originally came about as an insidious effort to limit interracial socializing and stymy the development of traditionally African-American musical genres. The fact that the City has a vague and theoretically non-discriminatory statement of legislative intent for licensing in general is irrelevant—what matters is whether the city has a legitimate rationale for the Cabaret Law, and it plainly does not. <u>See</u> Pl. Reply Br. at 9-10. Important governmental interests include, among many others, ensuring equal academic freedom, *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 58 (2006); preventing prostitution and sexual assault, *Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1255 (5th Cir. 1995); regulating the sale of obscene materials, *Alexander v. United States*, 509 U.S. 544, 556 (1993); and preventing vandalism, *Vincenty v. Bloomberg*, 476 F.3d 74, 85 (2d Cir. 2007). Discouraging the performance of music, even assuming for sake of argument that the City was discouraging all forms of music equally, surely does not deserve a place on that list.

For that reason alone, the Cabaret Law is unconstitutional.

       2.     *If the Court Accepts the City's "Public Welfare" Justification for the Cabaret Law, the Law Still Restricts Far More Protected Speech than Necessary to Achieve that Interest.*

Even assuming the City's vague justification for the Cabaret Law is sufficiently substantial—which is demonstrably not true—the law still sweeps in far more protected speech than necessary. A regulation subject to intermediate scrutiny is valid only if it "promotes a

---

As to the third requirement, that the substantial government interest be unrelated to the suppression of speech: Implicit in the fact that there is no substantial governmental interest for the Cabaret Law, *infra* § I.B.1, is the fact that the law targets protected speech, namely speech via musical performance. In other words, the fact that the law fails the second element of *O'Brien* necessarily means that it follows the third element as well.

substantial government interest <u>that would be achieved less effectively absent the regulation</u>."

*Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989) (quotation omitted) (emphasis added).

Here, the Cabaret Law could achieve its purported goals just as easily without so broadly

limiting the *amici*'s rights to free expression.

       In *O'Brien*, where the Court upheld a law banning the burning of draft cards, the

law did nothing more than that—ban the burning of draft cards.  In *United States v. Weslin*,

the aim of the Freedom of Access to Clinic Entrances Act was to prevent anyone from physically

obscuring access to reproductive services facilities.  156 F.3d 292, 296 (2d Cir. 1998).  In

practice, the law prohibited only actual physical obstruction, leaving protesters free to initiate

conversations, pass out handbills, hold signs, etc.  *Id*. at 298.  As a result, the law was

sufficiently narrowly tailored to pass muster under *O'Brien*.  *Id*.  In *Young v. New York City

Transit Authority*, the law at issue regulated panhandling on New York City subways in an effort

to eliminate incidents of physical harassment.  903 F.2d 146, 149 (2d Cir. 1990).  The law only

prohibited panhandling on New York City subways, because subways are cramped spaces in

which passengers could not avoid interacting with a panhandler, unlike city streets.  *Id*. at 150.

Since the law limited panhandlers' rights to speak only in this limited fashion, it was sufficiently

narrowly tailored under *O'Brien*.  *Id*. at 161.

       The scope of the Cabaret Law is vastly different than the laws in *O'Brien* and the

other cases cited above.  In order to protect the "public welfare," the meaning of which remains

unclear despite the City's briefing, the Cabaret Law inhibits a form of free expression with no

demonstrated ill effects on the public welfare.  Assuming the City is referring to things like

noise, fire safety, or any other legitimate governmental concern, those concerns can be—and

largely already are—fully addressed without inhibiting a form of free expression.  *See* Pl. Reply Br. at 13.

The Cabaret Law is more akin to the City regulation attempting to combat graffiti vandalism in *Vincenty*, 476 F.3d 74.  There, the Second Circuit invalidated a law criminalizing the possession of aerosol spray cans and broad tipped markers, the normal implements of graffiti, in certain circumstances.  *Id*. at 86-87.  The City's legitimate interest in preventing vandalism, the Court explained, was insufficiently reflected in a law that also criminalized possession of those implements for lawful purposes.  *Id*. at 87.  The Court explained that even though relatively few summonses were issued for violating the law, the law was still problematic, as "speakers may self-censor rather than risk the perils of trial."  *Id*.

Like the graffiti regulation in *Vincenty*, the Cabaret Law sweeps in far more expression than is necessary to achieve its goal.  In reality, the Cabaret Law could achieve its purposes without restricting <u>any</u> free expression, but it does not.  The City's failure to counter this point or present an alternative justification for the law says it all.

## II.    SCIENTIFIC RESEARCH DEMONSTRATES THAT DANCE IS A MODE OF EXPRESSION (COMMUNICATION) IN A NON-PERFORMANCE CONTEXT.

The First Amendment protects human communication, whether it is verbal or nonverbal, so long as it is sufficiently expressive to implicate freedom of speech.  Social dance, by its very nature, is an inherently expressive form of communication.  "[J]oining with others to dance for fun involves expressing one's personal style and associating with other dancers." Madison Gray, *Social dancing*, FIRST AMENDMENT CENTER (July 20, 2004), http://www.firstamendmentcenter.org/social-dancing.  It cannot be reasonably disputed that social dance is expression sufficient to warrant First Amendment protection.  Social dancers express feelings, beliefs, judgments and more – all of which encompass some degree of

recognizable emotion.  This emotion is reflected in the physical movement of the body.  Thus, any person engaged in social dancing is expressing emotion and is using dance as a venue through which to communicate it.  For this reason, the Cabaret Law, in its current state, deprives the public of a forum in which to contest improper governmental restraint "of an *inherently expressive* and *associative* activity" that is constitutionally protected.  *Id.* (emphasis added).

A.    **Social Dance Expresses Emotion.**

Expression typically constitutes speech when a thought, sensation, or emotion is expressed to another individual.  *Miller v. Civil City of S. Bend*, 904 F.2d 1081, 1092 (7th Cir. 1990) (Posner, J., concurring) *rev'd sub nom. Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991). Dance, in both its social and recreational forms, is an art form.  In its majority opinion, the Seventh Circuit defined dance as "the ***art*** of moving the body in a rhythmical way, usually to music, to express an ***emotion*** or ***idea***, to ***narrate*** a story, or simply to take delight in the movement itself." *Miller*, 904 F.2d at 1085 (emphasis added).  Shanna LaFleur once said, "[i]t takes an athlete to dance, but an artist to be a dancer."  *See Ballroom Dancing*, BEYOND DANCING (July 30, 2014), http://beyonddancingsarasota.com/latin-ballroom-instruction/dancing-is-it-a-sport-or-an-art; *see also* Christina Devereaux, *Why Should We Dance?*, PSYCHOLOGY TODAY (May 16, 2013), https://www.psychologytoday.com/blog/meaning-in-motion/201305/why-should-we-dance ("[D]ance in itself is innately an expressive art form, not just a physical release of body tension alone.").  Social dance "often displays the collective expression of genuine emotion, including exuberance or celebration."  Wright, 34 Loy. U. Chi. L.J. at 471.

For example, an analysis of the relationship between expression of emotions and movement characteristics through the use of kinematic data suggests that "dancers c[an] express certain emotions using characteristics in certain body action and body part[s] and [] observers

10

c[an] accurately perceive such emotions." *See* Misako Sawada, Kazuhiro Suda, & Motonobu Ishii, *Expression of Emotions in Dance*, 97.3 PERCEPTUAL & MOTOR SKILLS 697, 707 (2003), PubMed PMID 14738329 (There is a clear association between certain expressive emotions and different movement characteristics in dance. Further, this study indicates that "specific movement characteristics convey[] certain emotions, and movement characteristics influence[] dance expression.").[5] "[T]he results of th[is] [] study indicate that dancers can express different emotions by altering movement characteristics[,] even when they use simple body actions[]" in their dancing. *Id.* (alteration in original). Thus, both professional dancers and individuals dancing in a social capacity express their emotions through dance and the emotions being conveyed are recognized by observers.

       1.       *Humans Have the Ability to Decode Emotion Through Social Dance.*

Dance, one of the most ancient forms of cultural expressions, generally requires full body movement. Edith Van Dyck et al., *Recognizing Induced Emotions of Happiness and Sadness from Dance Movement*, 9.2. PLoS ONE 1 (2014), PubMed PMCID: PMC3933670 (citations omitted). "Theories of embodied cognition suggest that perceiving, experiencing, and thinking about emotions involves embodiment, or interaction between the emotional state of a person and his or her body. Charles Darwin himself introduced the idea that both humans and animals are capable of communicating emotions through motor behavior (especially posture)." *Id.* (citations omitted).

Significantly, similar to an individual's ability to acknowledge another's feelings, attitudes, and intentions through facial expressions, there is scientific evidence demonstrating

---

[5] This publication, as well as the various others in this brief that do not cite directly to an Internet website, is not available online without incurring a usage fee. Rather than file these documents publicly as exhibits to this brief, *amici* will hand deliver full copies of the publications in question, upon request of the Court or the City.

that individuals have the capacity to effectively identify and understand emotions expressed through bodily movement. *Id.* This is especially true regarding particular parts of the body such as an individual's the trunk, arms, and hands. *Id.* (citations omitted). "[D]ance is believed to facilitate the expression of several different emotions in a non-verbal way." *Id.* (citations omitted). And, individuals have the ability to decode emotions that are expressed through dance. *Id.* (stating that "both children and adults have been proved to master the ability to decode emotions from full body movements."). "The ability to successfully decode emotions from dance movement is already present from early childhood onwards, as children as young as about five years old have proved to be able to recognize emotional meaning from dance." *Id.* Research has also shown that individuals are "capable of decoding the intensity of [such] emotions expressed by dancers… moving [] to music." *Id.* (alteration in original) (citations omitted). This is particularly true when the observer can see the participant's full body without obstruction. *Id.* (citations omitted). Thus, it cannot be reasonably disputed that individuals communicate through dance expression.

### 2. Social Dance May Convey Particularized Messages.

Emotions are expressed in social dance through controlled movements. As stated by Psychology Today, people can recognize others' emotions "when they are expressed through the moving body and dance." Peter Lovatt, *23 Feelings in Dance*, PSYCHOLOGY TODAY (July 24, 2010), https://www.psychologytoday.com/blog/dance-psychology/201007/23-feelings-in-dance. Indeed, "many carefully controlled experimental studies [] have sought to find the core elements of movements that communicate different emotions…." *Id.* For example, brain scan studies show the various parts "of the brain that light up when people watch expressions of emotions." *Id.* Additional studies establish that "people can recognise [sic] iconic emotions and feelings expressed through dance and some people try to make sense of abstract dance pieces

12

within an emotion-based narrative framework." *Id.* (alteration in original).  Nothing has been found to suggest that individuals only recognize such emotion when watching performance dance and not a social dance.

Dance is also a means of disseminating the unspeakable.  *See* K. Eli & R. Kay, *Choreographing Lived Experience*, Medical Humanities 1, 5 (2015), PubMed PMID: 25564480, *available at*  http://mh.bmj.com.ezproxy.cul.columbia.edu/content/early/2015/01/05/medhum-2014-010602.long.  It provides the substratum central to sketching, defining, and interpreting "elements of experience[s] they f[i]nd difficult to capture in [verbal] speech alone."  *Id.* at 5 (alteration in original).

For example, a study on individuals with eating disorders using dance as a form of expression demonstrated that it is the "'logic' of movement that allow[s] [participants] to convey their experience[s]." *Id.* at 4 (alteration in original). While some study participants choreographed their dances, others left their dances more open to free, unrestrained movement. *Id.*  A participant named Alicia, for example, left her dance "open-ended enough to allow for the expression of experience that might otherwise need to be clarified and made cogent in [verbal] speech." *Id.* (alteration in original). "[D]ance allowed her to articulate eating-disordered experiences in feeling and motion, yet keep them raw and unencumbered by explanations."  *Id.* Another participant noted that "she was emotionally controlled whenever she spoke about her eating disorder."  Through dancing, however, [the participant] said she could both feel and express the lived experience of her eating disorder, which, for her, constituted her 'genuine' reality and 'genuine' self, otherwise obscured by words."  *Id.*  Moreover, a majority of the participants felt similarly in that dance "enable[ed] the expression of those aspects of the eating-disordered experience which would have otherwise remained unarticulated."  *See id.* (alteration

13

in original) ("The unspeakable moments of eating disorder were related not to events, but to sensations—sensations which were part of eating-disordered embodiment, and which the participants felt were inaccessible to non-eating-disordered others, and inexpressible through language."). This study even showed that dancing as an individual encouraged reflective verbal expression of the sensory dimensions of eating disorder experiences. *Id.* Thus, speaking through social dance in a nonverbal manner enabled participants to further their verbal expression of the experience. Dance serves as a medium through which one can express him or herself and communicate where verbal speech and language fails.

3.      *Expression of Emotion Through Social Dance Leads to a Sense of Community -- Straight Edge Subculture.*

The synchrony that results from an environment filled with music and dance is not fortuitous. Paul Reddish, Ronald Fischer & Joseph Bulbulia, *Let's Dance Together*, 8.8 PLoS ONE 1 (2013), PubMed PMID: 23951106. Rather, the synchrony is a calculated, conjoint effort. *Id.* Research shows that "[i]n collective music and dance, [dancers] intentionally modify the timing of their rhythmic movement to entrain to the behaviour of others with the knowledge that others also share the goal of entrainment. This sharing of psychological states enabling collaborative behaviours is termed ***shared intentionality***." *Id. (alteration in original).* The coordinated behavior in social dance allows participants to eclipse self-interests, thereby generating "an even more powerful cooperative response than synchronous interaction in isolation from collective goals." *Id.* at 11 (noting that "in group synchrony, [] low-level action and perception systems combine with higher level intentional systems to evoke especially powerful cooperative responses[]"). Further, a greater level of cooperation is evidenced where there is collective synchrony. *Id.* This "could explain the universality and retention of music

14

and dance across all known human societies, present and past, despite associated energy, resource, and opportunity costs." *Id.* (citations omitted).

One example of this synchrony is seen in the life-style based social movement called Straight Edge ("Straight Edge," "Straightedge," "sXe," or the "subculture"). MICHAEL LANCE, IDENTITY MAINTENANCE THROUGH EMOTIONAL RELEASE AND REJUVENATION 1 (UMI Dissertations Publishing 2007). While there are three main tenets of the sXe subculture, the following two are of the utmost importance: (1) do not do drugs and (2) do not drink alcohol. *Id.* at 2 (sXe is a subculture that "that encourages positive choices for the betterment of oneself (and society)"). Members of the sXe subculture tend to attend shows with live music and dance in a violent manner as a form of expression. *See id.* at 36. A study conducted on the subculture revealed that many sXe members appreciate "the feeling of experiencing music live and feeling the instruments being played. Some, ***particularly*** those who ***dance***, claim[] that they support[] their scene by attending shows. These activities, together with the sensory experience of live music, create energy in the crowd that contributes to perceived unity and sense of overall community...." *Id.* (alteration in original) (emphasis added).

Dancing "add[s] another level of experience to attending a show. People dance because it's fun, yet there are reasons for why it is fun." *Id.* at 37. For instance, those who dance at these live shows "report that when they love the music, it makes them want to (or 'have to') dance." *Id.* It is human nature to dance in any establishment – whether public or private – when music is playing because "[i]ndividuals feel compelled through [] music, to dance." *Id.* (alteration in original). For instance, feeling compelled to dance tends to occur "where people assess that it is socially acceptable to dance and fe[el] moved by the music to do so." *Id.* Social dance may be used by participants "as an outlet for built up angst and tension allowing for

15

emotional expression (release) and a chance to forget about one's everyday circumstances through a physical outlet." *Id.* It provides a venue where individuals can "express [themselves] with a group of other guys doing the exact same thing as" them. *Id.* As an sXe member said, "[w]hen you move around for the band it shows the[] [band] that you are enjoying the music." *Id.* Indeed, members of the Straightedge community develop memories of their dancing experiences that offer a "feeling [that] stays with [them]." *Id.* One sXe member explained that "it's very energizing to attend shows and dance. It somehow gives me strength. To be in a group of people that all enjoy the same music, somehow the feeling of not being alone, the memories of the concert that stay with me… all that is giving me strength." *Id.*

Straightedge dancing is a vehicle through which an individual may express emotion. *Id.* It is "expressive dancing" because the expression is "a result of intense dancing and socially-supported cathartic release…." *Id.* "The more potential dancers present [at the venue], the greater the possibility for collective excitement and social contagion." *Id.* (alteration in original). Further, even those who "do not necessarily identify" dancing at a show as a type of cathartic release can still participate and have fun with companions. *Id.* Thus, sXe social dancing fosters a sense of community that extends to both those who are dance participants and those simply observing or enjoying the music. *See, e.g., id.* at 57.

**B.     Social Dance Is Embedded In Our Society.**

Social dance is embodiment. *See* Betty Block & Judith Lee Kissell, *The Dance: Essence of Embodiment*, 22.1 THEORETICAL MEDICINE & BIOETHICS 5 (2001), PubMed PMID: 11334379.

> The notion of embodiment is a fully and totally human notion. That is, being ***embodied*** implies being ***embedded*** as well – embedded in a society, a culture, a language. While embodiment is in one sense a refutation of the Cartesian mind/body polarity, it is more than that. We are not merely embodied as individuals. Our

16

culture, our language and our art tell us that our way of being-in-the-world means being with others. To be human entails existing in a world of symbolization and meaning that is essentially tied to the material, the physical, the kinetic, the spatial, the temporal. Dance captures all of these ideas."

*Id.* at 8.  Movement and dance are embodiment, and this view has been expressed by Hungarian dance theorist, Rudolf Laban, when he said that he "believed in the spiritual and emotional importance of dance for 'the person on the street.'"  *Id.* at 9 (citations omitted).  Social dance is embodiment in the sense that it embraces "what it is to know the world and to express our own presence here in the only way human beings can." *See id.* at 14 ("Dance captures perfectly the physical universe in which we live and which we must spend our days mastering – that of gravity, of space, of time.  Dance takes our ability to take proprietorship over our universe through movement, and makes of it agency, or effort to be fully human.").  Society recognizes the potential of utilizing social dance as embodiment, evidenced in widespread dance therapy, ("Dance Movement Therapy" or "DMT") which uses social dance as "'a healing art,' a way for natural movements to emerge…."  *See id.* at 13 (citations omitted) ("'Just as someone who has never seen the color yellow has no way of conceiving what the color is like, people bound into specific body controls cannot experience the vivacity of physical freedom until they break those controls.'").

       Dance is a means of expression that transcends standard linguistic and cultural barriers. "Therapeutic dance and movement activities with young people experiencing difficulties with expression and communication may provide a dynamic format for them to experiment creatively around a range of issues related to their personal and social development." *Beyond Words*, 22 SUPPORT FOR LEARNING 78, 83 (2007).  However, its affects do not stop there and instead even extend to the elderly. *See infra* p.23. Studies show a wide range of benefits directly associated with social dance, such as improved physical and emotional health as well as

17

improvement in the overall wellbeing of participants. *See, e.g.*, Madeleine E. Hackney & Gammon M. Earhart, *Social Partnered Dance for People With Serious & Persistent Mental Illness*, 198.1 J. of Nervous & Mental Disease 76 (2010) [*Social Partnered Dance*]; Z. Pelc, *Therapeutic Values of Dance Movement & its Influence on Psychomotor Development of Deaf Persons as a Form of Socialization & Integration With the Environment*, 55 LEK WIAD 845, 845-49, PubMed PMID: 17474610 (wherein a study revealed evidence showing that social dance as a form of DMT improves the psychomotor development of those who are deaf by helping participants socialize and better integrate with their environments.). "[H]abitual social dancing[,] [specifically,] is associated with superior balance, postural stability, and gait function in dancers compared with age-matched nondancers…." *Social Partnered Dance*, J. NERVOUS & MENTAL DISEASE at 76 (alteration in original) (citations omitted).

For example, Dance Movement Therapy ("DMT") has been used by clinicians for many years for individuals suffering from Serious Mental Illness ("SMI"). *See Social Partnered Dance*, J. NERVOUS & MENTAL DISEASE at 76 (SMI is serious and persistent mental illness, such as schizophrenia, schizoaffective, and affective disorders). It is fact that "[d]ance…can improve balance and quality of life in neurologically impaired older populations." *Id.* (alteration in original) (citations omitted). Studies show, moreover, that social dance has significant positive effects on those with SMI, specifically. *Id.* at 77-78 (noting that participants "significantly improved in functional mobility and showed tendencies toward improvement on standard clinical measures of endurance, balance confidence, depression, and anxiety[]"). Participants with SMI who engage in social dance as a form of therapy may reduce both depression and anxiety. *Id.* (citations omitted). Accordingly, "[s]ocial dance may promote adherence in those with SMI

while incorporating key elements of successful exercise programs: motivation, cardiovascular and functional mobility challenge." *Id.* (alteration in original).

Social dance also increases participants' "feelings of psychological well-being…[and] sense of belonging." *See* Carine Lewis et al., *Mood Changes Following Social Dance Sessions in People With Parkinson's Disease*, J. HEALTH PSYCHOLOGY 1, 2, 6 (2014), PubMed PMID: 24752558 (citations omitted). For example, recent studies of elderly people both with and without Parkinson's Disease ("PD") shows "that taking part in weekly dance classes can subsequently improve mood in the elderly, with and without PD." *Id.* Studies show that those who exercise see improvement in "physical function[], balance, strength, and health-related quality of life." *Id.* (citations omitted); s*ee also* S. Woolf, *WA16 If My Body is Ill, Who Am I? Pain Relief Through Expression of Whole Self*, 5 BMJ SUPPORTIVE & PALLIATIVE CARE 1 (2015), PubMed PMID: 25960528 (Studies conducted on individuals under palliative care demonstrate that participating in social dance helped those individuals "grieve over th[eir] losses of self[] and [] re-integrate with their estranged bodies" in a way that allowed them to express their actual selves as "integrated complete pe[ople]."); Liisa Palo-Bengtsson & Sirkka-Lissa Ekman, *Emotional Response to Social Dancing & Walks in Persons With Dementia*, 17.3 AM. J. OF ALZHEIMER'S DISEASE & OTHER DEMENTIAS 149, 149, PubMed PMID: 12083344 ("Dancing, more so than walks, created mutuality and communion, which in turn created several [positive] emotional reactions."); Jan-Christoph Kattenstroth et al., *Six Months of Dance Intervention Enhances Postural, Sensorimotor, & Cognitive Performance in Elderly Without Affecting Cardio-Respiratory Functions*, 5 FRONTIERS IN AGING NEUROSCIENCE 1, 1-2 (2013), PubMed PMID: 23447455 ("Dancing is an activity that emerged from a need for social interaction and non-verbal communication, and it is a universal human expression consistent across generations,

19

cultures, and social classes throughout the world."); Ana Cruz-Ferreira et al., *Creative Dance Improves Physical Fitness & Life Satisfaction in Older Women*, Research on Aging 1, 10-14 (2015), PubMed PMID: 25651595 (Studies show that older women who partake in social, creative dancing have "enhanced physical fitness (strength and flexibility of lower limbs, aerobic endurance, motor agility/dynamic balance, and body composition) and life satisfaction.").

## **CONCLUSION**

For these reasons and the reasons set forth in Plaintiff's submissions to the Court, *amici curiae* respectfully request that the Court rule the Cabaret Law unconstitutional.

Dated: June 9, 2015

/s/

Jerry S. Goldman, Esq. (JG-8845)
Christopher L. Ayers, Esq. (CA-5091)
Nicholas R. Maxwell, Esq. (NM-9797)
**ANDERSON KILL P.C.**
1251 Avenue of the Americas
New York, NY  10020
Telephone:  212-278-1000

*Attorneys for Amici Curiae Social Dancers*

20