UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

MUCHMORE'S CAFE, LLC,

        Plaintiff,

      - against -

THE CITY OF NEW YORK,

        Defendant.
-------------------------------------------------------------X

**MEMORANDUM AND ORDER**
14-CV-5668 (RRM) (RER)

ROSLYNN R. MAUSKOPF, United States District Judge.

      Plaintiff Muchmore's Cafe, LLC ("Muchmore's") brings this action against the City of

New York ("the City"), challenging the constitutionality of the New York City Cabaret Law,

N.Y.C. Admin. Code 20-359, *et seq.* (the "Cabaret Law") under the First and Fourteenth

Amendments to the United States Constitution. (Compl. (Doc. No. 1); Am. Compl. (Doc. No.

4).) Under the Cabaret Law, the City requires a license for dancing in bars and restaurants, as

well as, subject to certain exceptions, any other room, space, or place in the City that is open to

the public where dancing occurs. Presently before the Court are the parties' cross-motions for

judgment on the pleadings pursuant to Federal Rule of Civil Procedure ("Rule") 12(c). (Pl.'s

Mot. J. Pleadings (Doc. No. 14); Def.'s Cross Mot. J. Pleadings (Doc. No. 18).) For the reasons

discussed below, the cross-motions are denied, with the exception of the City's motion to dismiss

Muchmore's substantive due process claim, which is granted.

## BACKGROUND

      Muchmore's is a cafe and bar located in Williamsburg, Brooklyn that hosts many types

of live entertainment, including live music, stand-up comedy, theater, art openings, debates, and

lectures, in addition to serving food and drinks. (Am. Compl. at ¶¶ 42–43.) In 2013,

Muchmore's received a citation for violating the Cabaret Law for alleged unlawful dancing on its

premises.  (*Id.* at ¶ 45.)  Although the citation was dismissed due to a defect on the face of the summons, "it has caused Muchmore's to experience reasonable concern that it could be subject to penalties under the Cabaret Law in the future, even if it takes reasonable measures to avoid dancing on the part of its customers."  (*Id.*)

## I.  The Cabaret Law

The Cabaret Law provides in part:

> It shall be unlawful for any person to conduct, maintain or operate, or engage in the business of conducting, maintaining or operating, a public dance hall, cabaret or catering establishment unless the premises wherein the same is conducted, maintained or operated are licensed in the manner prescribed herein.

N.Y.C. Admin. Code § 20-360.

"Cabaret" is defined as:

> Any room, place or space in the city in which any musical entertainment, singing, dancing or other form of amusement is permitted in connection with the restaurant business or the business of directly or indirectly selling to the public food or drink, except eating or drinking places, which provide incidental musical entertainment, without dancing, either by mechanical devices, or by not more than three persons.

*Id.* at § 20-359.

The Cabaret Law also applies to "public dance halls," defined as:

> Any room, place or space in the city in which dancing is carried on and to which the public may gain admission, either with or without the payment of a fee.

*Id.*  In addition, the Cabaret Law applies to a wide variety of other City establishments.[1]

The Cabaret Law was passed in 1926 during the Harlem Renaissance and prohibition,

---

[1] A "membership corporation, club, association, or society which permits musical entertainment, singing, dancing or other form of amusement in premises wherein food or drink is directly or indirectly sold to its members, or their guests, or the public, shall be deemed to be conducting a cabaret …." N.Y.C. Admin. Code § 20-359.  "A steamship or boat moored or tied to a dock, pier or shore and which contains a dance hall or cabaret in use while so moored or tied, shall be required to obtain [a cabaret] license." *Id.*  The Cabaret Law is also applicable to "catering establishments," defined as "[a]ny room, place or space in the city, which is used, leased or hired out in the business of serving food or beverages for a particular function, occasion or event, to which the public is not invited or admitted and wherein music or entertainment is permitted." *Id.*  Religious, charitable, eleemosynary, educational, and certain other categories of institutions are exempt from the Cabaret Law's requirements. *Id.* at § 20-362.

when jazz in the City was predominantly played at speakeasies controlled by racketeers.  Paul

Chevigny, *Gigs: Jazz and the Cabaret Laws in New York City* 54–57 (1991); *see also New

York's Ill-Tuned Cabaret Law*, N.Y. TIMES, June 26, 1986 ("Cabaret licenses were first required

in 1926 to control 'wild' behavior at Prohibition speakeasies.").  In recommending approval of

the Cabaret Law in 1926, the Committee on Local Laws explained:

> These night clubs are simply dance halls, where food is served at exorbitant prices
> to the tune of jazz and tabloid entertainments.  A very frank opposition was
> voiced by one of the licensees, on the ground that when strangers came to New
> York City they wanted to "run wild."  Well, there has been altogether too much
> running "wild" in some of these night clubs and, in the judgment of your
> Committee, the "wild" stranger and the foolish native should have the check-rein
> applied a little bit. . . . Your Committee believes that these "wild" people should
> not be tumbling out of these resorts at six or seven o'clock in the morning to the
> scandal and annoyance of decent residents on their way to daily employment.

Recommendation No. 10, Proceedings of Board of Alderman and Municipal Assembly of City of

New York (Dec. 7, 1926), at 572.

The Cabaret Law has remained in force for nearly nine decades in largely the same form.

One major change to the statute was prompted by judicial action.  Until the 1980's, the Cabaret

Law limited the number of musicians that could play in a Cabaret to three and specified the types

of instruments that could be played in a Cabaret.  These provisions were held unconstitutional in

1986 and 1988, although the language relating to the three-musician rule remains in the Law to

this day.  *See Chiasson v. New York City Dep't of Consumer Affairs* (*Chiasson I*), 132 Misc. 2d

640 (N.Y. Sup. Ct. 1986) (striking down the Cabaret Law's prohibition on percussion, wind and

brass instruments being used to play incidental music in unlicensed clubs); *Chiasson v. New York

City Dep't of Consumer Affairs* (*Chiasson II*), 138 Misc. 2d 394 (N.Y. Sup. Ct. 1988) (striking

down the Cabaret Law's provision that limits the number of musicians to three).

Pursuant to zoning regulations, only establishments within certain zones of the City may

be issued licenses pursuant to the Cabaret Law. "Eating or drinking establishments . . . of any capacity with dancing" are categorized as "Use Group 12." N.Y.C. Zoning Resolution § 32-21. This group consists primarily of "fairly large entertainment facilities that: (1) have a wide service area and generate considerable pedestrian, automotive or truck traffic; and (2) are, therefore, appropriate only in secondary, major or central commercial areas." *Id.*

Applying for a license pursuant to the Cabaret Law is an extensive process. With limited exception, all applicants for licenses must be fingerprinted. N.Y.C. Admin. Code § 20-360. Applicants must also make numerous disclosures regarding, *inter alia*, ownership of the establishment, prior convictions for certain offenses, financial records, and compliance with health, fire, building, zoning, water, gas, and electricity safety requirements and standards. *Id.* at § 20-361. There is also a licensing fee with the amount to be paid determined by the size of the establishment. *Id.* at § 20-363.

Licensed cabarets and dance halls must comply with numerous security, surveillance, operational, and record keeping requirements. Unless the establishment operates primarily as a restaurant, all entrances and exits used by patrons must be equipped with digital video surveillance cameras and such cameras must comply with specific statutory provisions, including making surveillance recordings available "to the police department and other government agencies, acting in furtherance of a criminal investigation or a civil or administrative law enforcement purpose." *Id.* at § 20-360.2. In addition, licensed establishments are subject to periodic inspections to ensure compliance. *Id.* Premises licensed under the Cabaret Law must remain closed between 4 a.m. and 8 a.m., unless the establishment is frequented by minors, in which case it must be closed between 1 a.m. and 8 a.m. *Id.* at § 20-367. Cabarets and public dance halls are required to provide itemized lists of prices for food and drink on a printed menu

or on conspicuous signs. *Id.* at § 20-368. Those establishments that employ security guards must have those guards' registrations available during hours of operation, the guards on duty must carry their registrations on their persons, and the establishments must maintain a roster of the guards working at any given time. *Id.* at § 20-360.1.

According to the City, at the time that it answered the Amended Complaint, "[t]here [were] currently 118 cabaret licenses issued by the Department of Consumer Affairs of the City of New York ('DCA') and an additional 15 cabaret license renewal applications pending, as well as approximately 25,100 food service establishment licenses issued by the Department of Health and Mental Hygiene of the City of New York, many of which have not sought a DCA cabaret license." (Answer Am. Compl. (Doc. No. 8) at ¶ 24.)

## II. Muchmore's Claims

Muchmore's principally argues that the Cabaret Law is unconstitutional as it unduly abridges freedom of speech and freedom of assembly, is vague, and denies performers, prospective performers, and patrons of Muchmore's due process and equal protection under the law. (Am. Compl. at ¶¶ 53, 56.) Muchmore's claims that the sweep of the Law is so broad that it encompasses a wide range of conduct that is protected under the First Amendment. Principal among those activities that Muchmore's claims are protected are "dance performance" and "social dancing." Although the parties largely focus on dancing in their briefing, Muchmore's also points to other language in the statute that amplifies the Law's broad sweep, including the prohibition on "other form[s] of amusement," and the statute's applicability to covered establishments located in any "room, place or space" in the City. Muchmore's "requests that this Court issue an Order declaring the New York City Cabaret Law unconstitutional on its face and/or as applied, and to the extent it is found to be unconstitutional, enjoining its enforcement."

(*Id.* at 13 (ECF pagination).)

Muchmore's also claims that the Cabaret Law's prohibition on dancing effectively bars its right to play, and its patrons' right to hear, certain types of music in violation of the First Amendment. In particular, Muchmore's "avoids hosting dance-oriented genres of music, such as hip hop, salsa or merengue, and instead limits musical entertainment to folk music, rock music, experimental electronic music, jazz and other music forms that are not conducive to dancing" and also "avoids hosting disc jockeys or playing pre-recorded music that would tend to elicit dancing." (*Id.* at ¶ 44.)

Muchmore's currently prohibits dancing by patrons and "takes measures to avoid dancing on its premises, primarily by refusing to allow performances that involve dancing or would tend to elicit dancing on the part of its patrons." (*Id.*) Muchmore's "would host dance performance, would permit social dancing by its patrons, and would host forms of music that might lead to dancing, but for the prohibitions of the Cabaret Law." (*Id.* at ¶ 51.)

With respect to Muchmore's overbreadth challenge, the City concedes that dance performance is protected conduct under the First Amendment. (Def.'s Mem. Supp. Cross-Mot. J. Pleadings ("Def.'s Br.") (Doc. No. 18-1) at 7 n.5 ("dance performance is protected expression").) However, the City claims that the Cabaret Law does not apply to dance performance. (*Id.* ("the licensing requirement does not, and never did, apply to dance performance").) The City also asserts that social dancing by patrons does not enjoy protection under the First Amendment, relying on the holding in *City of Dallas v. Stanglin*, 490 U.S. 19 (1989). (*Id.* at 11–13.) The City also maintains that the Law's licensing of establishments with dancing does not unconstitutionally chill musical expression as any type of music can be played in establishments subject to the Cabaret Law; it is only establishments allowing listeners to dance

to the music that would violate the Law, and such dancing is not constitutionally protected. Finally, the City claims that Muchmore's lacks standing to bring its constitutional challenges on behalf of performers and prospective performers at Muchmore's, as well as its patrons. (Answer Am. Compl. at ¶ 62; Def.'s Br. at 4−5.)

Both parties have moved for judgment on the pleadings pursuant to Rule 12(c). (Pl.'s Mot. J. Pleadings; Def.'s Cross-Mot. J. Pleadings.) For the reasons set forth below, this Court finds that Muchmore's has standing to challenge the statute under the First Amendment, and has plausibly challenged the statute facially and as applied, on vagueness grounds, and with respect to the chilling effect that the prohibition on dancing may have on the playing of certain types of music. The Court further finds that these claims cannot be resolved as a matter of law on a motion to dismiss, and on the briefing submitted by the parties. With respect to Muchmore's standing to bring its equal protection challenge, an issue that the parties did not brief, the Court will defer ruling on the City's motion in this regard to allow the parties to so do. Finally, Muchmore's due process challenge does not survive this motion.

## STANDARD OF REVIEW

Judgment on the pleadings is appropriate only where all material facts are undisputed and "a judgment on the merits is possible merely by considering the contents of the pleadings." *Mennella v. Office of Court Admin.*, 938 F. Supp. 128, 131 (E.D.N.Y. 1996), *aff'd*, 164 F.3d 618 (2d Cir. 1998) (citing *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)). "The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 520 (2d Cir. 2006). In a challenge under Rule 12(c), the Court must accept as true the non-movant's allegations and draw all reasonable inferences in the non-

movant's favor.  *See id.* at 521; *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994).  The

Court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations

. . . a presumption of truthfulness." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir.

2007).  To survive a 12(c) motion, the allegations in a complaint must meet a standard of

"plausibility." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564 (2007).  A claim is facially

plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that [plaintiff is entitled to relief]." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Although the complaint need not contain "'detailed factual allegations,'" simple "[t]hreadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." *Id.* (quoting *Twombly*, 550 U.S. at 555).  But "[u]nless it appears beyond doubt that the

plaintiff can prove no set of facts in support of his or her claim which could entitle the plaintiff to

relief, the court cannot grant a defendant's motion for a judgment on the pleadings." *Mennella*,

938 F. Supp. at 131 (citing *Sheppard*, 18 F.3d at 150).

"On a 12(c) motion, the court considers the complaint, the answer, any written documents

attached to them, and any matter of which the court can take judicial notice for the factual

background of the case." *L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011).

In addition, the Court may review any document incorporated by reference in one of the

pleadings.  *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004).  The Court may also consider a

document not specifically incorporated by reference but on which the complaint heavily relies

and which is integral to the complaint.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153

(2d Cir. 2002).  If the Court is presented with material outside of the pleadings, it should exclude

the material in its consideration of the motion.  *See id.* at 154.

**DISCUSSION**

## I.    Standing for First Amendment Claims

The Court first turns its attention to two preliminary matters:  Muchmore's standing to bring its First Amendment claims and a request to intervene by five *amici* who represent performers and enthusiasts of various forms of music and dance.  The Court finds that Muchmore's has standing, and because Muchmore's can adequately assert the First Amendment issues involved, intervention by *amici* is not necessary at this time.

The parties agree that Muchmore's has standing to challenge the Cabaret Law on behalf of itself.  However, the City challenges Muchmore's standing to assert the rights of musicians, dancers, and customers because a plaintiff generally cannot base claims on injuries to non-parties, or non-parties' legal rights.  (Def.'s Br. at 4−5.)  Muchmore's responds that "[i]n the First Amendment arena, particular[ly] in overbreadth challenges, the courts permit plaintiffs to assert the rights of third parties not before the court in order to assure that free speech is not chilled by laws susceptible [to] 'sweeping and improper application.'"  (Pl.'s Reply Br. at 3 (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 486−87 (1965)).)  Muchmore's also states that "a tavern has standing to assert the constitutional rights of its patrons" because of the "financial impact on the establishment . . . [and] on the basis that the individuals affected are unlikely to assert their own rights in court." (Pl.'s Reply Br. at 4 (citing *Craig v. Boren*, 429 U.S. 190, 195 (1976); *Barrows v. Jackson*, 346 U.S. 249 (1953); *Eisenstadt v. Baird*, 405 U.S. 438, 446 (1972)).)[2]  The Court finds that Muchmore's has standing.

---

[2] Muchmore's attaches affidavits to its reply brief from an arts organization, a musician, event organizers, and a stand-up comedian to show that "the harms addressed in Plaintiff's papers are not merely hypothetical, and they are relevant to the City's efforts to avoid scrutiny of the substantive issues on standing grounds." (Pl.'s Reply Br. at 4.) Muchmore's does not rely on these affidavits in its reply brief, and although the Court has reviewed them, as they are outside of the pleadings, the Court did not consider them in determining the parties' motions.  (*See id.*)

Generally, a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955 (1984) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). "[H]owever, [] there are situations where competing considerations outweigh any prudential rationale against third-party standing." *Id.* at 956. For example, when practical considerations prevent a third party from asserting rights on its own behalf, the Supreme Court has found third-party standing to be appropriate. *Craig*, 429 U.S. at 193−94. In the First Amendment context, when there is "a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged." *Munson*, 467 U.S. at 956. "Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). Moreover, "[i]n determining whether a regulation is substantially overbroad, a court may examine possible application of the regulation in factual contexts other than those of the plaintiff in the instant case. *Corso v. Fischer*, 983 F. Supp. 2d 320, 335 (S.D.N.Y. 2013). "[O]verbreadth challenges are based upon the hypothetical application of the statute to third parties." *Farrell v. Burke*, 449 F.3d 470, 499 (2d Cir. 2006).

Muchmore's challenges to the Cabaret Law are precisely the type which accord it the benefit of these broader standing principles given society's concern that an overbroad law will chill the expression of third parties. *Munson*, 467 U.S. at 956; *Broadrick*, 413 U.S. at 612. In such cases, "[t]he crucial issues are whether [the plaintiff] satisfies the requirement of 'injury-in-fact,' and whether it can be expected satisfactorily to frame the issues in the case." *Munson*, 467

U.S. at 958; *Bigelow v. Virginia*, 421 U.S. 809, 816–17 (1975) ("Of course, in order to have standing, an individual must present more than [a]llegations of a subjective chill. There must be a claim of specific present objective harm or a threat of specific future harm." (internal quotation marks omitted) (alteration in original)). Muchmore's has received a citation under the Cabaret Law for alleged unlawful dancing on its premises. (Am. Compl. at ¶ 45.) This constitutes injury in fact, and Muchmore's can be expected to satisfactorily frame the issues in the case. Although Muchmore's is a cafe and bar, because it is challenging the Cabaret Law on overbreadth grounds, it can assert the rights of hypothetical third parties, including individuals and larger establishments not before the Court. *See Farrell*, 449 F.3d at 499. Thus, Muchmore's may challenge the Cabaret Law on the grounds that its "very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick*, 413 U.S. at 612; *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 66 (1981) ("Because appellants' claims are rooted in the First Amendment, they are entitled to rely on the impact of the ordinance on the expressive activities of others as well as their own.").

## II.  Amici

Ali Coleman, Luis Vargas, Megha Kalia, Natasha Blankand, and Tamara Burstein ("proposed *amici*") seek leave from this Court to appear as *amici curiae* in this case and attach their proposed *amici curiae* brief to their motion.[3] (Mot. Leave Appear *Amici Curiae* (Doc. No. 22); Ex. Proposed Br. *Amici Curiae* ("*Amici* Br.") (Doc. No. 22-1).) Proposed *amici* make two main arguments. First they state that, "social dance is, in certain circumstances, an inextricable

---

[3] Luis Vargas, a.k.a. Loftkidluis, and Ali Coleman are leaders of the New York City House Coalition, a group of more than 500 individuals and organizations devoted to furthering house music in New York City. Ms. Kalia leads the NYC Bhangra Dance company, a group which performs around the City. Ms. Blank creates music for a biweekly event called 'The Get Down,' a 'happy hour dance party'. . . hosted in establishments subject to the Cabaret Law. In addition to her commitment to social dance in many different contexts, Ms. Burstein has made performance dance her full time work. (*Amici* Br. at 4.)

nonspeech element of constitutionally protected musical speech. Indeed, there are many musical

genres, including the ones in which *amici* participate, that would cease to exist if listeners could

not dance to them." (*Amici* Br. at 1.) According to proposed *amici*, "[t]he musicians playing the

music and the listeners dancing to it are, in the case of the *amici*'s musical genres, one and the

same." (*Id.* at 3.) Second, proposed *amici* seek to "demonstrate that social dance is an

inherently expressive form of communication" and that "[e]mpirical evidence demonstrates that

social dance is expression sufficient to warrant First Amendment protection." (*Id.* at 1.) The

City opposes the motion for leave to appear. (Def.'s Mem. Law Resp. Mot. Leave Appear *Amici*

*Curiae* ("Def.'s Opp'n") (Doc. No. 25).)

"District Courts have broad discretion in deciding whether to accept *amicus* briefs."

*Jamaica Hosp. Med. Ctr., Inc. v. United Health Grp., Inc.*, 584 F. Supp. 2d 489, 497 (E.D.N.Y.

2008) (quoting *Concerned Area Residents for the Env't v. Southview Farm*, 834 F. Supp. 1410,

1413 (W.D.N.Y. 1993)). However, *amicus* briefs should only be accepted in certain

circumstances:

> An *amicus* brief should normally be allowed when a party is not represented
> competently or is not represented at all, when the *amicus* has an interest in some
> other case that may be affected by the decision in the present case (though not
> enough affected to entitle the *amicus* to intervene and become a party in the
> present case), or when the *amicus* has unique information or perspective that can
> help the court beyond the help that the lawyers for the parties are able to provide.
> Otherwise, leave to file an *amicus curiae* brief should be denied.

*Citizens against Casino Gambling in Erie Cty. v. Kempthorne*, 471 F. Supp. 2d 295, 311

(W.D.N.Y. 2007), *amended on reconsideration in part*, No. 06-CV-1S (WMS), 2007 WL

1200473 (W.D.N.Y. Apr. 20, 2007) (quoting *Ryan v. Commodity Futures Trading Comm'n*, 125

F.3d 1062–63 (7th Cir. 1997)).

Here, the Court finds that Muchmore's is competently represented and proposed *amici*

largely reiterate similar arguments as those in Muchmore's briefing. Thus, at this stage of the case, and given the brevity of their affidavits, proposed *amici* do not provide sufficient relevant, unique information on the motion. Moreover, proposed *amici* do not have an interest in another case that will be affected by the decision in this case. Thus, the Court does not consider the views of proposed *amici* in addressing the instant motion.

## III. First Amendment Analysis

### A. Overbreadth

The Court now turns to a central issue on this motion: Muchmore's facial challenge to the Cabaret Law's regulation of dancing. An ordinance may be facially invalid "either because it is unconstitutional in every conceivable application, or because it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally 'overbroad.'" *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984); *see Elam v. Bolling*, 53 F. Supp. 2d 854, 860, 863 (W.D. Va. 1999) (striking down ordinance that "does not merely regulate [nude dancing] nor does it regulate only 'recreational dancing,' but by its plain terms restricts all public dancing, whether a square dance, the lambada, pantomime or ballet"). In the First Amendment context, the Supreme Court has recognized that "a law may be invalidated as overbroad 'if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 480 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008)); *Broadrick*, 413 U.S. at 615 ("Where conduct and not merely speech is involved, . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."); *see also Adams v. Zelotes*, 606 F.3d 34, 38 (2d Cir. 2010) (citing *Stevens* for the overbreadth standard in the First Amendment context). "The Supreme Court has cautioned

that in considering facial challenges we must 'vigorously enforce[ ] the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Zelotes*, 606 F.3d at 38 (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)).

"In addressing . . . a facial overbreadth challenge, a court's first task is to ascertain whether the enactment reaches a substantial amount of constitutionally protected conduct." *Boos v. Barry*, 485 U.S. 312, 329 (1988). In doing so, a court must "construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Stevens*, 559 U.S. at 474 (quoting *Williams*, 553 U.S. at 293); *see also Zelotes*, 606 F.3d at 38.

In this regard, Muchmore's central argument is that the Cabaret Law applies both to dance performance and social dancing, both of which Muchmore's maintains are forms of protected expression under the First Amendment. As such, Muchmore's asserts that the Cabaret Law's breadth is unconstitutional. (Am. Compl. at ¶ 53; Pl.'s Mem. Law Supp. Mot. J. Pleadings ("Pl.'s Br.") (Doc. No. 15) at 3.)

The City concedes that "dance performance is protected expression" under the First Amendment. (Def.'s Br. at 6.) However, it claims that the licensing requirement is not and has never been triggered by dance performance. (*Id.* at 7 n.5.) Thus, the City carves out dance performance from the ambit of the statute. Instead, the City asserts that the licensing requirement "is only triggered by recreational dancing by the customers of Muchmore's." (*Id*. at 6.) Relying on the Supreme Court's decision in *Stanglin*, the City concludes that "recreational dancing" does not enjoy First Amendment protection.[4]

---

[4]In addition, the City argues that even if the patrons of plaintiff do recreationally dance, they are not violating the statute, as it is only plaintiff that is required to be licensed, not the patrons of the plaintiff's establishment." (Def.'s

On this motion, the Court is not prepared to embrace either of the City's arguments. First, this Court is not willing to adopt such a narrow reading of the Cabaret Law to exclude dance performance from its ambit, at least without a meaningful construction of the statute, something that the parties have not undertaken on this motion. As discussed below, a cursory examination of the language and history of the statute seems to belie the City's argument that dance performance does not fall within the broad sweep of the Cabaret Law. Second, the Court is not prepared to adopt the City's broad reading of *Stanglin* to conclude that all forms of "social dancing" fall outside the scope of First Amendment protection. As will be discussed more fully below, the meaning of the term "social dancing" is somewhat elusive. At its core, and as the parties seem to agree, "social dancing" encompasses *participatory* dancing *by patrons* of an establishment. But for purposes of the First Amendment analysis, there appears to be a wide variety of participatory dancing that falls within the rubric of "social dancing" – folk dancing and other forms of cultural, religious or ceremonial dancing to name a few – that, for the purpose of the First Amendment analysis, may be distinguishable from the type of unprotected "recreational dancing" at issue in *Stanglin*.[5] Once again, the parties do not undertake any meaningful analysis of *Stanglin*, or its precursors or progeny for that matter, to determine whether *any* form of "social dancing" is imbued with sufficient expressive and communicative elements to warrant First Amendment protection. *See Texas v. Johnson*, 491 U.S. 397, 404 (1981) (holding that whether

---

Br. at 25 ("Here, there is simply no constitutionally protected right of the patrons of plaintiff to recreationally dance and therefore, there can be no 'chilling' of a constitutionally protected right. Important as well, even if the patrons of plaintiff do recreationally dance, they are not violating the statute, as it is only plaintiff that is required to be licensed, not the patrons of the plaintiff's establishment.").) However, the fact that the Cabaret Law directly regulates establishments rather than customers does not mean that the City is therefore not chilling the expressive conduct of customers. Whether the direct restraint on customers is coming from an establishment or from the City, the resulting restriction on conduct – potentially protected expressive conduct – is the same.

[5] "Social dancing" is often used interchangeably with "recreational dancing," in regular parlance, in the parties' briefing, and in case law. As discussed below, without further analysis of *Stanglin*, the Court is not prepared to equate the two terms.

conduct is expressive and entitled to constitutional protection requires an inquiry into whether activity is "sufficiently imbued with the elements of communication to fall within the scope of the First and Fourteenth Amendments"). [6]

Exploration of these issues is critical to Muchmore's facial challenge. They will be discussed briefly below. However, the overbreadth doctrine is "strong medicine" that is to be used "sparingly and only as a last resort." *Broadrick*, 413 U.S. at 613. The Court cannot resolve the constitutionality of the Cabaret Law without additional development of the record, and further briefing on the issues raised herein.

### i. Dance Performance

As noted, a key issue is whether dance performance is covered by the Cabaret Law. The language of the Law itself is, of course, the proper starting point. The Cabaret Law requires licensing for both dance halls ("[a]ny room, place or space in the city in which dancing is carried on and to which the public may gain admission, either with or without the payment of a fee") and cabarets ("[a]ny room, place or space in the city in which any musical entertainment, singing, dancing or other form of amusement is permitted in connection with the restaurant business or the business of directly or indirectly selling to the public food or drink"). N.Y.C. Admin. Code § 20-359. "[E]ating or drinking places, which provide incidental musical entertainment, without

---

[6] To support its claim that the statute is overbroad, Muchmore's also raises the Law's applicability to "other form of amusement" and the fact that its prohibitions extend to cabarets, dance halls, and catering establishments in "any room, place or space in the city." "Other form of amusement" arguably may encompass the types of activities other than dancing hosted at Muchmore's, such as stand-up comedy, theater, art openings, debates, and lectures. (Am. Compl. at ¶ 42.) The City states that, "notwithstanding the term 'other form of amusement' which plaintiff also argues is vague, without dancing at an eating or drinking establishment, there is no licensing requirement." (Def.'s Br. at 24.) The City provides no legal basis for this assertion, and, on the record thus far, the Court finds no basis for it in the previous cases that have considered the Cabaret Law, the regulatory framework, or the legislative history. Likewise, the City's briefing fails to fully explain the difference between the "musical entertainment" that, from the plain meaning of the statute, may trigger the licensing requirements of the Cabaret Law, and the "incidental musical entertainment," without dancing, that does not trigger the Law. (*Id.* ("If there is no recreational dancing, then even if there is 'incidental music entertainment,['] then there is no licensing requirement.").) These issues are relevant for the Court's ultimate determination of Muchmore's overbreadth and vagueness claims.

dancing, either by mechanical devices, or not more than three persons," are exempted from the licensing requirement. *Id.*

Clearly, this language is broad, using only the term "dancing" throughout the statute to define the parameters of the conduct prohibited absent a license. It makes no distinction between dance performance and "social" or "recreational" dancing by patrons.

Reference to dictionaries does not do much to narrow the type of dancing targeted by the statute. The Oxford English Dictionary defines dancing as the action of the verb dance, which is defined, *inter alia*, as "to leap, skip, hop, or glide with measured steps and rhythmical movements of the body, usually to the accompaniment of music, either by oneself, or with a partner or in a set"; "[t]o leap, skip, spring, or move up and down, with continuously recurring movement, from excitement or strong emotion. Said also of the lively skipping or prancing of animals, and of the heart, the blood in the veins, etc."; and "[i]n former North American Indian tradition: to rejoice over by dancing round (a trophy, esp. a captured scalp)." Dance (verb) Definition, oed.com, http://www.oed.com/view/Entry/47117?rskey=pbtYHe&result=2&is Advanced=false#eid (last visited Sept. 1, 2016). The Oxford English Dictionary defines the noun dance as, *inter alia*, "A rhythmical skipping and stepping, with regular turnings and movements of the limbs and body, usually to the accompaniment of music; either as an expression of joy, exultation, and the like, or as an amusement or entertainment; the action or an act or round of dancing." Dance (noun) Definition, oed.com, http://www.oed.com/view/Entry/ 47116?rskey=MezIw4&result=1&isAdvanced=false#eid (last visited Sept. 1, 2016). Merriam Webster defines dance as "to engage in or perform a dance"; "to move or seem to move up and down or about in a quick or lively manner." Dance Definition, merriam-webster.com, http://www.merriam-webster.com/dictionary/dancing (last visited Sept. 1, 2016). These

definitions encompass a wide range of activities, including both performance and social dancing.

Moreover, while the statute defines a cabaret for purposes of identifying the establishments to which the statute will apply, the ordinary meaning of the term "cabaret" itself – "[a] restaurant or night-club in which entertainment is provided as an accompaniment to a meal; also the entertainment so provided, a floor-show" – implies an establishment focused on entertainment *directed at* an audience, rather than participatory activity *by* an audience.[7] Cabaret Definition, oed.com, http://www.oed.com/view/Entry/25710?rskey=HXzkxU&result= 1&isAdvanced=false#eid (last visited Sept. 1, 2016).

Application of the canon of *noscitur a sociis* – that an ambiguous term can be given a more precise meaning by the neighboring words with which it is associated – further sheds light on the type of dancing encompassed by the statute. Included along with dancing in the Cabaret Law's prohibitions is "any musical entertainment, singing, or other form of amusement." Musical entertainment plainly suggests the performance of music. Merriam-Webster.com, http://www.merriam-webster.com/dictionary/entertainment (last visited Sept. 1, 2016) (defining entertainment as "amusement or pleasure that comes from watching a performer, playing a game, etc."; "the act of amusing or entertaining people"). Singing, "to use your voice to make musical sounds in the form of a song or tune," suggests both singing as performance, such as opera, and otherwise, such as karaoke, or a singalong, Singing Definition, merriam-webster.com, http://www.merriam-webster.com/dictionary/singing (last visited Sept. 1, 2016). The term "other form of amusement" is particularly broad, providing little guidance as nearly anything could be considered amusing to someone. Amusement Definition, merriam-webster.com,

---

[7] Indeed, the 1966 Broadway musical *Cabaret* that has been revived numerous times and adapted into an Academy Award winning movie tells the story of a nightclub where dancing and singing entertainment is provided, reflecting the general understanding of the meaning of the term cabaret. *Tony Awards Cabaret*, tonyawards.com, http://www.tonyawards.com/en_US/nominees/shows/201312301388430405214.html (last visited Sept. 1, 2016).

http://www.merriam-webster.com/dictionary/amusement (last visited Sept. 1, 2016) (defining amusement as "something (such as an activity) that amuses or entertains someone"); *see also People v. Walter*, 106 Misc. 2d 359, 361 (N.Y. Crim. Ct. 1980) (finding that the phrase "any musical entertainment singing, dancing or other form of amusement" in the Cabaret Law "may include activities such as the playing of backgammon, chess or any electronic game").

In support of its argument that performance dance is carved out of the general term "dancing," the City relies on a statement of legislative intent promulgated in 1985 that indicates that the Law is designed

> for the protection and relief of the public from deceptive, unfair and unconscionable practices, for the maintenance of standards of integrity, honesty and fair dealing among persons and organizations engaging in licensed activities, for the protection of the health and safety of the people of New York city and for other purposes requisite to promoting the general welfare, licensing by the department of consumer affairs is a necessary and proper mode of regulation with respect to certain trades, businesses and industries.

N.Y.C. Admin. Code § 20-101.  Based on this language, the City concludes that the "articulated legislative intent reflects the intention that the definition of cabarets refers to dancing by consumers, i.e., recreational dancers."  (Def.'s Br. at 7.)  The City also reasons that New York State courts, "when reviewing a challenge to the licensing requirement, had neither reason nor inclination to address its applicability to dance performance, as it was so obvious that dance performance was outside the scope of the statute."  (*Id.* at 8.)

The City's arguments raise concerns for several reasons.  First, as discussed above, the plain language of the statute is hardly "obvious" in excluding dance performance from its ambit. Second, the City seems to argue that Muchmore's and other establishments should "[n]ot . . . worry, . . . [because] [t]he Executive Branch construes [the Cabaret Law] to reach only [recreational dancing]."  *Stevens*, 559 U.S. at 480.  This argument flies squarely in the face of the

very constitutional principles at issue here:

> The First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*.  We would not uphold an unconstitutional statue merely because the Government promised to use it responsibly.

*Id*. (citing *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 473 (2001); *see also United States v. Valle*, 807 F.3d 508, 528 (2d Cir. 2015) ("A court should not uphold a highly problematic interpretation of a statute merely because the Government promises to use it responsibly.")  Thus, the City's own assertion that the Cabaret Law does not and will not apply to dance performance is not enough to reassure the Court that it would be applied within the bounds of the constitution.  *See San Juan Liquors, Inc. v. Consol. City of Jacksonville, Fla.*, 480 F. Supp. 151, 154 (M.D. Fla. 1979) (finding that one of the dangers of an overbroad law, even one that addresses protected expression as well as some unprotected expression, is that its breadth is an "invitation to discriminatory enforcement").

The City notes in passing that the current statement of legislative intent is different than that expressed at the time the Cabaret Law was passed in 1926.  Indeed, the Cabaret Law has a rich history, but the City does not even attempt to provide a clear understanding of the evolution of the Cabaret Law from its inception to today, or the harms it was designed to protect, then and, particularly, now.  That analysis is critical to divining the sweep of the Cabaret Law.

Some final thoughts on statutory language and intent warrant mention.  The Cabaret Law applies to both to a public dance hall and a cabaret, among other venues.  Both are defined as "any room, place or space in the city" in which dancing occurs.  However, a public dance hall is a place where "dancing is *carried on*," while a cabaret is a place where "dancing . . . *is permitted* in connection with the restaurant business . . . except eating or drinking places which provide incidental musical entertainment, without dancing . . . ."  A plausible construction of the statute,

read in the context of its legislative purposes and against the backdrop of the plain meaning of the terms used, could lead to the conclusion that the provision relating to public dance halls was meant to protect the general welfare of the dancing public, while the provision relating to cabarets applies *only* to the *performance* of dance, music, and other entertainment.[8]

The City also does not explain why the Cabaret Law excludes dancing entirely from the definition of "catering establishment," a "room place or space in the city which is used, leased or hired out . . . for a particular function, occasion or event, to which the public is not invited or admitted and wherein music or entertainment is permitted." A catering hall is typically where one would expect guests to dance – at a wedding, a *quinceanera* – the Hispanic tradition of celebrating a girl's fifteenth birthday – or other celebration. If the statute is designed to protect consumers, as the City argues, this omission is particularly curious.

Finally, in construing the Cabaret Law, this Court must look at the decisions of other courts that have examined the Law and other relevant provisions of the City's Administrative Code in an effort to determine its scope and sweep. Courts have clearly found that the statute covers dance and other forms of entertainment and amusement that implicate protected expression. *Merco Props., Inc. v. Guggenheimer*, 395 F. Supp. 1322, 1328 (S.D.N.Y. 1975) (addressing a constitutional challenge to the Cabaret Law and finding that it "implicates first amendment rights to the extent that musical entertainment, singing, and dancing are considered communicative forms of expression"); *Festa v. New York City Dep't of Consumer Affairs*, 12 Misc. 3d 466, 468 (N.Y. Sup. Ct. 2006) (finding the Cabaret Law constitutional when applied to "uncompensated participatory social dancing by adults" as distinguished from "any type of

---

[8] The City has also noted that in 1989, the City Planning Commission recommended a change to both the zoning regulations and the Cabaret Law to reflect the fact that the City considers public dance halls to be the same as cabarets, that is, "eating or drinking establishments with dancing." (Def.'s Br. at 21.) While the zoning change was adopted, the change to the Cabaret law was not, though the Department of Consumer Affairs no longer issues licenses through the public dance hall provision of the Law.

performance, instruction, or remuneration"), *aff'd in part and modified in part*, 37 A.D.3d 343

(N.Y. App. Div. 2007), *appeal dismissed*, 9 N.Y.3d 858 (N.Y. 2007); *People v. Caroline's for

Comedy, Inc.*, 141 Misc. 2d 1061, 1062–63 (N.Y. Crim. Ct. 1988) (finding that "defendant's

assertion that [stand-up] comedy cannot fit within the definition of a cabaret because it is not

amusement similar to singing or dancing is clearly specious" and rejecting the defendant's

argument that stand-up comedy should be excluded from the definition of "similar amusement"

because the term was overbroad and should not be construed to include a form of protected

speech); *Kent's Lounge, Inc. v. City of N.Y.*, 104 A.D.2d 397, 398–99 (N.Y. App. Div. 1984)

(finding Cabaret Law constitutional when applied to "recreational" dancing and comparing

recreational dancing to the expressive dancing at issue in *Merco Properties*); *Club Winks v. City

of New York*, 99 Misc. 2d 787, 788, 791 (N.Y. Sup. Ct. 1979) (citing *Doran v. Salem Inn*, 422

U.S. 922 (1975); *Southeastern Promotions, Ltd. v. Conrad*, 410 U.S. 546 (1975)) (considering

cases of plaintiff lessees and operators of establishments "offering live dance entertainment as

well as food and drink" who were served summonses by inspectors of the New York City

Department of Consumer Affairs for operating unlicensed cabarets and finding that "live dance

entertainment . . . clearly is included within the protective umbrella of the First Amendment").

    In light of this discussion, it is difficult to embrace the City's argument that "dancing" in

the Cabaret Law does not encompass dance performance.[9]  Of course, it is undisputed that dance

performance enjoys constitutional protection.  Thus, to the extent that that the Cabaret Law's

sweep includes some constitutionally protected expressive conduct, the Court would be required

to give the law a narrowing interpretation, if possible, to allow the Court to avoid the

constitutional questions raised by Muchmore's.  *Elam*, 53 F. Supp. 2d at 860; *see* discussion,

---

[9] These cases also belie the City's statement that the Cabaret Law has never been applied to dance performance.  In addition, Muchmore's statement, if true, that "a large portion of current[] licensees are strip clubs" may further support this conclusion.  (Pl.'s Reply Br. at 5.)

*infra*.

However, there is more to the inquiry here. A key question remains: that is, does the First Amendment protect any form of participatory social dancing, thus potentially broadening the constitutional sweep of the Cabaret Law for purposes of Muchmore's facial challenge? The City says no, arguing that *Stanglin* is dispositive. On this motion, the Court has not been persuaded.

### ii. Social Dancing

The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech. *See Virginia v. Black*, 538 U.S. 343, 358 (2003). To determine whether conduct is expressive and entitled to constitutional protection requires an inquiry into whether activity is "sufficiently imbued with the elements of communication to fall within the scope of the First and Fourteenth Amendments." *Johnson*, 491 U.S. at 404 (burning flag in protest held to be expressive conduct protected under the First Amendment). To determine "whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play," a court must analyze "whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Id.* (quoting *Spence v. Washington*, 418 U.S. 405, 410–11 (1974)). "[A]n activity need not necessarily embody a narrow, succinctly articulable message[.] [B]ut the reviewing court must find, at the very least, an intent to convey a particularized message along with a great likelihood that the message will be understood by those viewing it." *Zalewska v. Cty. of Sullivan*, 316 F.3d 314, 319 (2d Cir. 2003) (citations and quotation marks omitted). "[A] narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably

shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995) (internal citation omitted) (quoting *Spence*, 418 U.S. at 411).

However, "the fact that something is in some way communicative does not automatically afford it constitutional protection. For purposes of the First Amendment, the Supreme Court has repeatedly rejected the view that 'an apparently limitless variety of conduct can be labeled speech whenever the person engaging in the conduct intends thereby to express an idea.'" *Zalewska*, 316 F.3d at 319 (citing *United States v. O'Brien*, 391 U.S. 367, 376 (1968).) Indeed, many types of activities with some expressive elements are not afforded constitutional protection under the First Amendment. *See, e.g.*, *Stevens*, 559 U.S. at 468 (stating that the First Amendment "permit[s] restrictions" on some types of speech, including obscenity, defamation, fraud, incitement, and "speech integral to criminal conduct"); *Zalewska*, 316 F.3d at 320 ("Although appellant's activity is expressive, it does not constitute the type of expressive conduct which would allow her to invoke the First Amendment in challenging the county's regulation because the ordinary viewer would glean no particularized message from appellant's wearing of a skirt rather than pants as part of her uniform.").

Therefore, a court determining whether "an activity [i]s sufficiently imbued with elements of communication to fall within the scope of the First . . . Amendment[]," must examine the "nature" of the activity "combined with the factual context and environment in which it was undertaken." *Spence*, 418 U.S. at 409–10; *see Lebowitz v. City of New York*, 606 F. App'x 17, 17 (2d Cir. 2015) (summary order) ("We agree with the [Occupy Wall Street protestor] plaintiffs that their act of lying down in Zuccotti Park under the circumstances presented likely demonstrated '[a]n intent to convey a particularized message . . . and [ ] the

likelihood was great that the message would be understood by those who viewed it,' such that they engaged in protected expressive conduct." (quoting *Johnson*, 491 U.S. at 404)); *Zalewska*, 316 F.3d at 320 ("Essential to deciding whether an activity carries a perceptible message entitled to protection is an examination of the context in which the activity was conducted. The Supreme Court has been careful to distinguish between communicative activity with a clear contextual message, such as the wearing of a black armband in protest during the Vietnam War, compared with other types of activity, like choosing what to wear in the ordinary course of employment." (internal citation omitted)).

Dance performance has been recognized as conduct that is protected under the First Amendment. In 1975, the Supreme Court wrote that some dancing, such as "'Ballet Africains,'" is of "'unquestionable artistic and socially redeeming significance.'" *Doran*, 422 U.S. at 933 (quoting *Salem Inn, Inc. v. Frank*, 364 F. Supp. 478, 483 (E.D.N.Y. 1973)); *see also Willis v. Town of Marshall*, 426 F.3d 251, 257 (4th Cir. 2005) ("There is no doubt that, under some circumstances, dancing will amount to expressive conduct protected by the First Amendment. For example, most forms of dance, whether ballet or striptease, when performed for the benefit of an audience, are considered expressive conduct protected by the First Amendment."); *San Juan Liquors, Inc.*, 480 F. Supp. at 153 ("dance can be a method of expression protected by the First Amendment"). In 1991, the Supreme Court found that totally nude "go-go dancing" at a bar and lounge and "live nude and seminude danc[ing]" at an adult entertainment theater and bookstore were "expressive conduct within the outer perimeters of the First Amendment, though . . . only marginally so." *Barnes v. Glen Theater*, 501 U.S. 560, 566 (1991); *see also Charette v. Town of Oyster Bay*, 159 F.3d 749, 753 (2d Cir. 1998) ("Nonobscene nude dancing performed as entertainment has expressive content that is protected by the First Amendment."). The Court has

written that entertainment more generally "is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works fall within the First Amendment guarantee." *Borough of Mount Ephraim*, 452 U.S. at 65.

At the other end of the spectrum from dance performance, for purposes of this discussion, is the "recreational dancing" at issue in *Stanglin*. There, the operators of the Twilight Skating Rink, in compliance with an ordinance "restricting admission to certain dance halls to persons between the ages of 14 and 18," divided the rink into two sections. *Stanglin*, 490 U.S. at 20, 22. "On one side of the pylons, persons between the ages of 14 and 18 dance[d], while on the other side, persons of all ages skate[d] to the same music – usually soul and 'funk' music played by a disc jockey." *Id.* at 22. The rink's operator challenged the ordinance imposing age limits on admission to certain dance halls, arguing that it, *inter alia*, infringed upon the rights of persons between the ages of 14 and 18 to associate with people outside of that age range. *Id.* The Court held that the First Amendment does not protect the right of "persons between the ages of 14 and 18 to associate with persons outside that age group" for the purpose of "recreational dancing." *Id.* at 20–21, 25.

The focus of the Court's holding in *Stanglin* was the right of expressive association, which derives from the right to engage in protected First Amendment activities. *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18 (1984). The Court explained,

> Our decisions have referred to constitutionally protected "freedom of association" in two distinct senses. In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees

freedom of association of this kind as an indispensable means of preserving other individual liberties.

*Roberts*, 468 U.S. at 617–18.  Relying on this rationale, the *Stanglin* Court found that "dance-hall patrons, who may number 1,000 on any given night, are not engaged in the sort of 'intimate human relationships' referred to in *Roberts*."  *Stanglin*, 490 U.S. at 24.  The patrons dancing in *Stanglin* were not members of any organized association and were largely strangers to one another.  *Id.* at 24–25.  The Court explained that the opportunities for minors and adults to dance with one another "might be described as 'associational' in common parlance, but they simply do not involve the sort of expressive association that the First Amendment has been held to protect . . . . There is no suggestion that these patrons 'take positions on public questions' or perform . . . other similar activities."  *Id.*  The Court concluded with an often-quoted passage:

> It is possible to find some kernel of expression in almost every activity a person undertakes – for example, walking down the street or meeting one's friends at a shopping mall – but such a kernel is not sufficient to bring the activity within the protection of the First Amendment.  We think the activity of these dancehall patrons – coming together to engage in recreational dancing – is not protected by the First Amendment.

*Id.* at 25.

The City reads *Stanglin* to hold that social dancing enjoys no First Amendment protection.  Some courts have adopted that view.  *See, e.g.*, *D.G. Rest. Corp. v. City of Myrtle Beach*, 953 F.2d 140, 144 (4th Cir. 1991) ("It has been held that recreational dancing, although containing a 'kernel' of expression, is not conduct which is sufficiently communicative to bring it within the protection of the First Amendment." (quoting *Stanglin*, 490 U.S. at 144)).  However, others view *Stanglin* more narrowly, noting that the Court's holding focused on the issue of associational rights between minors and adults.  *See Elam*, 53 F. Supp. 2d at 858–59 ("The issue of an adult's right under the First Amendment to engage in recreational dancing was not squarely before the Court in [*Stanglin*].");  *Abusaid v. Hillsborough Cty. Bd. of Cty. Comm'rs*, 637 F.

Supp. 2d 1002, 1022 (M.D. Fla. 2007) (citing *Stanglin* for the proposition that "the coming together of citizens of the County for recreational dancing purposes at Plaintiff's club does not constitute the type of association that receives First Amendment protection" (internal citation and quotation marks omitted)).

Moreover, the *Stanglin* Court was careful to narrowly delineate the type of dancing involved there – dancing in a roller skating rink between minors and adults, most of whom were strangers to one another and who happened to be among the hundreds of patrons of the same business establishment willing to pay the fee to gain entry. In holding that the First Amendment does not protect "the activity of *these dance-hall patrons* – coming together to engage in *recreational dancing*" – the Court did not decide whether other forms of participatory social dancing warranted constitutional protection. *Stanglin*, 490 U.S. at 25 (emphasis added).

Other courts that have addressed whether the First Amendment extends to dancing have been careful to circumscribe their rulings to either clearly protected forms of dance performance, or the type of social dancing unprotected after *Stanglin* – that is "recreational dancing" or what the litigants in one case accurately described as "dancing . . . just like you'd find at any Holiday Inn or any club, nothing special, just people dancing." *Elam*, 53 F. Supp. 2d at 858.

For example, in *Willis*, the Fourth Circuit found that a recreational dancer's conduct was not protected by the First Amendment as "she was simply dancing for her own enjoyment." *Willis*, 426 F.3d at 257. The court explained that "[i]n every group of recreational dancers, there likely will be some whose dancing is sufficiently good or unusual as to gain an audience among the other dancers. If that is all it took to convert recreational dancing into protected speech, it seems likely that the outcome in *Stanglin* would have been different." *Id.* at 259 n.2. In *Abusaid*, the court distinguished recreational dancing from other types of dancing that possess

expressive elements "sufficient to implicate First Amendment concerns." *Abusaid*, 637 F. Supp. 2d at 1022. And in an important New York state case addressing the constitutionality of the Cabaret Law as applied to social dancing, *Festa*, the New York County Supreme Court similarly distinguished the dancing at issue in that case – "uncompensated participatory social dancing by adults" – from "any type of performance, instruction, or remuneration." *Festa*, 12 Misc. 3d at 468. Relying on *Stanglin* and finding that the dancing at issue was not protected, the court carefully explained: "to be clear, plaintiffs are not claiming that the social dancing that they engage in is primarily intended to inspire musicians and choreographers, to assert a cultural identity, or to engage in a ritual with an intended purpose, such as making rain or promoting fertility. On the contrary, by social dancing, plaintiffs refer to dancing done for aesthetic and communicative pleasure of the dancers, with incidental benefit to those watching." *Id.* at 473–74 (internal quotation marks omitted).

The touchstone in each of these cases is, necessarily, whether the type of dancing involved is imbued with expressive and communicative elements sufficient to distinguish conduct that has only a "kernel of expression" from expressive conduct that warrants First Amendment protection. Courts that have found "recreational dancing" to fall outside of the scope of constitutional protection have carefully circumscribed the type of dancing at issue and have found one or both of these elements lacking.

Because the term "dancing" is not limited in the Cabaret Law, it arguably regulates a wide range of activities: not only purely performative dancing and *Stanglin*-type "recreational dancing," but also many forms of participatory dancing that arguably fall somewhere in between, for example, folk dancing and other forms of ethnic or cultural dancing that arguably implicate protected expression. *See Elam*, 53 F. Supp. 2d at 859 ("Some other forms of dance

are likewise deserving of First Amendment protection because of the degree of their communicative element."); *Salem Inn, Inc. v. Frank*, 381 F. Supp. 859, 863 (E.D.N.Y. 1974) (finding that "all dancing is not per se a mode of expression protected by the First Amendment [, but] [f]ew could reasonably deny that ballet and certain ethnic folk dances communicate stories and ideas").

Dancing plays an important role in our society and in many others around the world. Dancing expresses joy and binds communities. It can be an intimate moment between a couple. *Elam*, 53 F. Supp. 2d at 859 n.7 ("dancing between adults often has a definite communicative element, such as expression directed to attract a mate in a bar or a discotheque"). It can capture a moment of celebration for a group bound together by a common interest, culture, or feeling. Dancers taking part in recreational folk dancing reflecting their culture convey a particularized message of cultural pride; a message that the environment and circumstances of the dancing can help make clear. *See, e.g.*, Folk Dance Fridays at the Hungarian House, http://www.uppereast.com/folk-dancing (last visited Sept. 6, 2016) ("The nature of folk dancing is inherent in building and developing community."). Dancing that would simply be "nothing special, just people dancing" can arguably be transformed into expressive conduct by a message that the dancers intend to convey and the circumstances in which the dancing occurs. A dance to celebrate Gay Pride can certainly convey a message through its revelatory dancers, one instantly recognizable by the community at large. *See Gay Students Org. v. Bonner*, 509 F.2d 652, 660 (1st Cir. 1974) (finding that "expression, assembly and petition constitute significant aspects of the [Gay Students Organization]'s conduct"); *see also McMillen v. Itawamba Cty. Sch. Dist.*, 702 F. Supp. 2d 699, 704 (N.D. Miss. 2010) (holding that the denial of a student's request to bring her same-sex date to the school prom because, *inter alia*, to allow them to "slow dance together .

. . could push people's buttons" violates the First Amendment); *Fricke v. Lynch*, 491 F. Supp. 381, 384–85 (D.R.I. 1980) (attending school dance with same sex date "would be a political statement. While mere communicative intent may not always transform conduct into speech, . . . this exact type of conduct as a vehicle for transmitting this very message can be considered protected speech.").

The Court will not attempt to review every type of dancing and pinpoint exactly where each may fall on a spectrum of expressive or non-expressive conduct. *See Elam*, 53 F. Supp. 2d at 860 n.9 ("This court notes that fashioning a bright line rule as to what types of dancing are deserving of First Amendment protection and what types are not so deserving may involve a[n] . . . elusive line."). Moreover, dancing in some contexts may implicate the type of associational rights at issue in *Stanglin*. But the Court is not prepared to simply dismiss as unprotected all forms of participatory social dancing by reference to *Stanglin*, as the City does here, without the parties' analysis of the Law as it relates to expressive conduct. That is not to say that all or any forms of social dancing are protected. Rather, on this motion, the Court is unwilling to consider prescribing the "strong medicine" that accompanies the overbreadth doctrine without due regard for *all* of the issues that doing so would entail. That requires more from the parties here.

### iii. The Constitutionality of the Cabaret Law under the First Amendment

There is one last area that requires also further analysis from the parties. To the extent that the Cabaret Law sweeps in protected expression, either by encompassing dance performance, or protected participatory dancing, or both, the Court must "'ascertain whether a construction of the [ordinance] is fairly possible by which the [constitutional] question may be avoided.'" *Elam*, 53 F. Supp. 2d at 860 (quoting *United States v. Grace*, 461 U.S. 171, 175–76

(1983)); *see also Vermont Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 386 (2d Cir. 2000)

("The question, then, is whether a narrowing construction can be applied to either set of

provisions to rescue it from facial invalidity on the First Amendment grounds."). However, a

court "may impose a limiting construction on a statute only if it is 'readily susceptible' to such a

construction." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 884 (1997); *Vermont Right to

Life Comm., Inc.*, 221 F.3d at 386. A court shall not "rewrite a . . . law to conform it to

constitutional requirements, for doing so would constitute a serious invasion of the legislative

domain." *Stevens*, 559 U.S. at 481 (internal citations and quotation marks omitted).

    Until the scope of the statute is addressed, the Court cannot reach this issue, and given

that the Cabaret Law covers all forms of dancing and other forms of amusement in any room,

place or space in the City, such a narrowing interpretation may not be possible.

    In such cases, "when 'speech' and 'nonspeech' elements are combined in the same course

of conduct, a sufficiently important governmental interest in regulating the nonspeech element

can justify incidental limitations on First Amendment freedoms." *O'Brien*, 391 U.S. at 376.

Thus, "a government regulation is sufficiently justified [1] if it is within the constitutional power

of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the

governmental interest is unrelated to the suppression of free expression; and [4] if the incidental

restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance

of that interest." *Id.* at 376−77. To the extent that a licensing scheme "g[i]ve[s] public officials

the power to deny use of a forum in advance of actual expression," it operates as a prior restraint.

*See Beal v. Stern*, 184 F.3d 117, 124 (2d Cir. 1999) (quoting *Southeastern Promotions, Ltd.*, 420

U.S. at 553). "While 'prior restraints are not unconstitutional *per se* . . . [a]ny system of prior

restraint . . . comes to this Court bearing a heavy presumption against its constitutional validity.'"

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990) (quoting *Southeastern Promotions, Ltd.*, 420 U.S. at 558).

Certainly, the government has an interest and right under its police power to regulate certain conduct. *See Salem Inn, Inc.*, 364 F. Supp. at 863. However, where a statue is directed at expressive conduct which affects First Amendment rights, the government must show that the regulation furthers an important or substantial governmental interest and that the interest is unrelated to the suppression of free expression. *O'Brien*, 391 U.S. at 376–77; *Spence*, 418 U.S. at 411 (stating that a court must "examine with particular care the interests advanced by [the government]" where "the activity occur[s] on private property, rather than in an environment over which the State by necessity must have certain supervisory powers unrelated to expression.").

The City does not engage in a robust analysis of its legitimate interest in justifying the Cabaret Law's restriction on dancing. This is understandable given that it takes the position that the statute does not cover protected dance performance, and that social dancing in all of its forms is not protected expression under *Stanglin*. The City simply notes that the Cabaret Law is justified by the City's interest in promoting public health, safety, and general welfare. *See* N.Y.C. Admin. Code § 20-101. (Def.'s Br. at 17–18.) These interests are unrelated to the suppression of free expression. And as noted above, the purpose of the Cabaret Law has not been fully explored on this motion.

Thus, Muchmore's has plausibly pled that the restriction on First Amendment activities in establishments regulated by the Cabaret Law is far greater than is essential to further these interests. As Muchmore's maintains, rather than addressing the perceived threats from dancing in certain establishments directly, the City requires a license for all types of dancing in all

establishments in the City open to the public or that serve food or drinks (with certain exceptions). *See Salem Inn, Inc.*, 364 F. Supp. at 864 ("Instead of dealing with the specific conditions, the ordinance focuses on an activity which can contain protected expression and which has not been shown to be the source of the problem."). The City will need to address these arguments and explain why the restrictions imposed by the Cabaret Law, rather than methods which may be less intrusive upon First Amendment rights, are necessary to guard against the harms that the Law was designed to address.[10]

\*\*\*

Because this case is before the Court on the parties' motions for judgment on the pleadings, the parties have not engaged in the type of analysis necessary to construe the statute and address the legislature's interests in regulating dancing. Nor have they adequately addressed whether, as a legal matter, social dancing in any form is imbued with sufficient expressive and communicative aspects to make it distinguishable from the "recreational dancing" involved in *Stanglin*. Similarly, they have not sufficiently developed the facts to demonstrate that the Cabaret Law's impact on First Amendment freedoms is not greater than necessary to further the City's substantial interests. The overbreadth doctrine is to be used "sparingly and only as a last resort." *Broadrick*, 413 U.S. at 613. On this record, the Court cannot declare the Cabaret Law unconstitutional without providing the parties the opportunity to further develop the factual and legal issues raised herein.[11] As such, the parties' cross-motions on Muchmore's First

---

[10] Indeed, even the Department of Consumer Affairs has questioned the mechanism by which the City addresses the harms associated with dancing. In 2003, the then commissioner of the Department of Consumer Affairs, "[d]eclar[ed] her intention of putting 'the dance police' out of business . . . [by] scrapping the old cabaret licenses. In their place, she said, the city should issue new 'nightlife licenses' that would allow it to regulate the unwanted side effects of nightlife that people really care about: noise, disorderly crowds and filthy sidewalks." Michael Cooper, *Cabaret Law, Decades Old, Faces Repeal*, N.Y. TIMES, Nov. 20, 2003.

[11] The pleadings here are sufficient to raise a plausible claim that the statute is unconstitutional as applied to Muchmore's. Muchmore's challenge focuses on various types of dancing that it would host but for the Law's

Amendment challenges to the Cabaret Law are denied.

## IV.    Vagueness

Muchmore's also raises a vagueness challenge:  "[b]y failing to define 'dancing' in a way that would allow a reasonable person to distinguish between unlawful dancing and ostensibly lawful conduct such as swaying or head nodding, the Cabaret Law is unconstitutionally vague." (Am. Compl. at ¶ 32.)[12]  According to Muchmore's, "[t]his vagueness has a chilling effect on expression, requiring establishments to take extreme measures to ensure compliance, such as prohibiting the performance of entire genres of music."  (Pl.'s Br. at 16–17; Am. Compl. at ¶ 44.)

The City responds that "[a]s the word 'dancing' is sufficiently clear to provide notice to an eating and drinking establishment of what activity by its patrons (here recreational dancing) triggers the requirement for it to be licensed as a cabaret, the statutory scheme is not unconstitutionally vague and therefore does not violate plaintiff's due process rights."  (Def.'s Br. at 3; Answer Am. Compl. at ¶ 32.)

"A statute can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement."  *Farrell*, 449 F.3d at 485 (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).

_____

prohibition on dancing, and notes that it also hosts other activities such as stand-up comedy, theater, art openings, debates, and lectures, which arguably fall under the Law's definition of "other forms of amusement."  (Am. Compl. at ¶ 42.)  Further factual development of the record in this regard is necessary to resolve Muchmore's as applied challenge.  *See Elam*, 53 F. Supp. 2d at 858.

[12] As with its overbreadth challenge, Muchmore's also points to the prohibition against "other form[s] of amusement" in its pleadings to support its claim that the Law is vague.  However, Muchmore's briefing raises other challenges not found in its pleadings, including its exception of 'incidental' musical entertainment, and its requirement that licensees be of 'good character.'"  (Pl.'s Br. at 16 (alteration in original).)  The additional contentions asserted in Muchmore's briefing are outside of the scope of the pleadings, and are therefore not considered at this time.  If Muchmore's intends to challenge the Cabaret Law on these additional grounds on summary judgment, it may seek leave to amend its complaint to include these claims.

As with a facial challenge for overbreadth, "[w]hen considering a facial challenge to the . . . vagueness of a statute as measured against the first amendment, 'a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.'" *Dorman v. Satti*, 862 F.2d 432, 436 (2d Cir. 1988) (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982)); *Farrell*, 449 F.3d at 496.

Here, Muchmore's has adequately pled that the term dancing in the Cabaret Law is unconstitutionally vague. First, a reasonable person might have difficulty distinguishing between dancing that would trigger the Cabaret Law and dancing or other conduct that would not. As discussed in connection with Muchmore's overbreadth challenge, it is not obvious whether the Law covers dance performance, social dancing, or both, and a more fulsome analysis of the language and legislative history of the statute are necessary in order to determine whether the Law reaches constitutionally protected conduct.

Moreover, whether the other forms of movement that Muchmore's cites would lead to a violation is not out of the realm of possibilities. Several articles discussing the Cabaret Law suggest that the Law's licensing requirement for dancing may be triggered by "three or more people moving in synchronized fashion." *See, e.g.*, Danny Wirtz, *NYC: No Dancing Allowed – Discussing the Cabaret Laws*, FADER, Aug. 9, 2001 ("The law states that an establishment must be licensed if . . . there is three or more people moving in synchronized fashion."); Ed Boland Jr., *F.Y.I.*, N.Y. TIMES, June 1, 2003 ("the laws state that an establishment must have a cabaret license if three or more patrons are moving in synchronized fashion"); *Dancing and Protesting in the Streets*, NY PRESS (nypress.com), Aug. 2, 2006 ("The law initially limited licenses to establishments serving food or drink featuring three or more musicians or three or more people 'moving in synchronized fashion.'"). This definition of dancing is not in the cited sections of the

Cabaret Law itself and is not discussed in the parties' briefing. To the extent promulgated in the City's regulatory framework or informally adopted by the City in guiding its enforcement activities, this definition of dancing would bear on the vagueness inquiry, both on the reasonable interpretation of the term "dancing" as well as whether the Law encourages arbitrary enforcement.

Thus, it does not appear "beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which could entitle the plaintiff to relief." *Mennella*, 938 F. Supp. at 131 (citing *Sheppard*, 18 F.3d at 150). As such, Muchmore's vagueness challenge survives this motion.

## V.    Equal Protection

Next, Muchmore's contends that the Cabaret Law violates the Equal Protection Clause of the Fourteenth Amendment because it was passed with the intent to discriminate against African Americans, and continues to have a racially discriminatory impact on minority musicians to this day. (Am. Compl. at ¶ 33.) Here too, further development of the history of the statute is necessary for the Court to decide this issue.

Muchmore's pleads that "[t]o the extent that racial discrimination was a substantial or motivating factor behind the enactment of the Cabaret Law, and it continues to have a racially discriminatory impact to this day, it denies equal protection under the law." (Am. Compl. at ¶ 33.) It explains, that "[i]n the context of the 1926 approval of the Cabaret Law, the . . . statements and public records from the time of the Cabaret Law's enactment, are indicative of the racially discriminatory intent behind the enactment of the Cabaret Law, specifically, a desire to curb inter-racial mingling and inter-racial dancing in 1920's Harlem jazz clubs and elsewhere throughout the City of New York." (*Id.* at ¶ 18.) Muchmore's continues,

> [t]he discriminatory intent behind the Cabaret Law is further demonstrated
> through the Cabaret Law's original language prohibiting musical instruments
> commonly used in jazz music . . . and exempting instruments commonly use[d] by
> white musicians. . . . To this day, the Cabaret Law continues to have a racially
> discriminatory impact, in that genres of music which are primarily performed by
> minority musicians, such as hip hop, salsa or merengue, are effectively rendered
> unlawful in more than 99% of the eating or drinking establishment in the City of
> New York, while genres of music that are primarily performed by white
> musicians, such as classical, rock or opera, are not similarly impacted.

(*Id.* at ¶¶ 19–20.)  According to Muchmore's, "[i]t should be clear to this Court, as it was to the

Court in *Chiasson*, that a law passed in 1926, at the peak of the Harlem Renaissance, targeting

instruments used in jazz music, and justified by a desire to apply the 'check-rein' to 'wild

stranger[s]' and 'foolish native[s][,]' is not motivated by a substantial governmental interest, but

by an invidious discriminatory purpose."  (Pl.'s Br. at 20.)

    The City differentiates the original intent of the licensing scheme from the current

licensing requirement, writing that "[t]he very language in the legislative history upon which

plaintiff relies regarding types of instruments as 'evidence' of discriminatory intent has been

judicially carved out of the licensing scheme.  Whatever the intent was in including that language

in 1926 is now irrelevant."  (Def.'s Br. at 28.)  The City writes, "the statutory scheme as

modified by relevant case law does not regulate either the type of music performed (or played) or

the type or number of instruments played at an eating and drinking establishment.  Therefore,

whether the music is performed, or the instruments are played, by 'minority musicians' or 'white

musicians' is irrelevant."  (*Id.* at 4.)  The City concludes that "[i]nsofar a[s] the statutory

licensing scheme is only triggered by dancing at an eating and drinking establishment and not

triggered by the playing of music, these allegations do not assert a viable Equal Protection

claim."  (*Id.*)

    "The Equal Protection Clause of the Fourteenth Amendment commands that no State

shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Its central purpose "is the prevention of official conduct discriminating on the basis of race." *Washington*, 426 U.S. at 239. However, a law will not be deemed unconstitutional "[s]olely because it has a racially disproportionate impact." *Id.* Thus, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. "[A] subsequent legislative re-enactment can eliminate the taint from a law that was originally enacted with discriminatory intent," *Hayden v. Peterson*, 594 F.3d 150, 166−67 (2d Cir. 2010) (quoting *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1223 (11th Cir. 2005) (en banc)), but an original discriminatory legislative intent cannot be judicially carved out of the licensing scheme. *Hunter v. Underwood*, 471 U.S. 222, 232−33 (1985) ("Some of the more blatantly discriminatory selections . . . have been struck down by the courts . . . . Without deciding whether [the statute] would be valid if enacted today without any impermissible motivation, we simply observe that its original enactment was motivated by a desire to discriminate . . . and the section continues to this day to have that effect."). Thus, one key to this inquiry is the history behind the Cabaret Law, an analysis that is lacking in the parties' briefing.

There is one aspect of Muchmore's equal protection claim that raises an additional concern. Muchmore's argues that the Cabaret Law has a discriminatory impact today because genres of music primarily performed by minority musicians are "effectively rendered unlawful"

in the majority of the City's eating and drinking establishments, while genres of music primarily performed by white musicians are not so affected. (Pl.'s Br. at ¶ 20.) It is unclear whether Muchmore's has standing to challenge the Cabaret Law on this basis. In the First Amendment context, as discussed above, standing is broadened to prevent against the chilling of free speech. *Broadrick*, 413 U.S. at 612; *Borough of Mount Ephraim*, 452 U.S. at 66. Muchmore's has pointed to no such broadening in the Fourteenth Amendment context. In fact, "[t]he rule against generalized grievances applies with as much force in the equal protection context as in any other." *United States v. Hays*, 515 U.S. 737, 742–43 (1995). "[E]ven if a governmental actor is discriminating on the basis of race, the resulting injury accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct." *Id.* at 743–44 (internal quotation marks omitted). Thus to bring an Equal Protection Claim, Muchmore's must show that (1) it has suffered an injury in fact; (2) there is "a causal connection between the injury and the conduct complained of"; and (3) that it "is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted). Here too, the parties have not addressed this issue.

As such, the Court declines to dismiss Muchmore's equal protection claim at this time to allow for further briefing on the issues noted herein, briefing that is relevant to Muchmore's other constitutional challenges as well.

## VI. Chilling Effect on Musical Expression

Muchmore's also contends that the Cabaret Law's prohibition on dancing effectively bars the playing of certain types of music. (Am. Compl. at ¶¶ 20, 44.) Muchmore's pleads that the Cabaret Law has the effect of chilling protected musical expression by preventing certain types

of music from being played in establishments that do not have cabaret licenses and that Muchmore's itself does not play or host certain genres of music for fear of violating the Cabaret Law.  (Am. Compl. at ¶ 44.)  Muchmore's explains, "[s]ocial dancing and the performance of dance-oriented genres of music are so inextricably linked that, in the context of a live music performance (unlike the context of *Stanglin*), dancing cannot be considered a 'secondary effect[,'] but should instead be considered 'the direct impact of speech on its audience[,'] subjecting the Cabaret Law to strict scrutiny."  (Pl.'s Reply Br. at 8 (quoting *Boos*, 485 U.S. at 320–21).)  Muchmore's thus asks the Court to look to the "practical effect" of the Cabaret Law "rather than just its literal wording, to determine whether it represents an unconstitutional restraint upon freedom of expression under the First Amendment."  (Pl.'s Br. at 10.)

The City responds that the Cabaret Law's licensing requirement is not a prior restraint of protected activity or speech because recreational dancing, the activity being licensed, is not protected expression.  (Def.'s Br. at 14; Answer Am. Compl. at ¶ 30.)  In addition, the City states that "the claim that musicians cannot play the type of music that might lead to dancing does not rise to a violation of their constitutional rights or that of any patron of Muchmore's (to the extent such a claim is pleaded)."  (Def.'s Br. at 15.)

Musical expression is protected by the First Amendment.  *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989) ("Music, as a form of expression and communication, is protected under the First Amendment.").  The City asserts that the Cabaret Law, post-*Chiasson*, does not explicitly regulate the type of music that can be played in a cabaret.  However, "[i]t is a deep tradition in First Amendment law that government may not escape scrutiny of its attempts to suppress speech merely by label[]ing its action as neutral regulation; it is the operation and effect of government action, not its form, that matters."  *G. & A. Books, Inc. v. Stern*, 604 F.

Supp. 898, 901 (S.D.N.Y. 1985), *aff'd sub nom. In re G. & A. Books, Inc.*, 770 F.2d 288 (2d Cir.

1985). A statute that is challenged under the First Amendment "must be tested by its operation

and effect." *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 708 (1931).

Here, as this is a motion to dismiss, the Court must take all of the factual allegations in

the complaint to be true and draw all reasonable inferences in Muchmore's favor. In so doing,

the Court finds plausible on its face Muchmore's claim that licensing for social dancing

effectively restrains establishments that serve food and drink from playing certain types of

music. *Iqbal*, 556 U.S. at 678; *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). It is plausible

that playing certain types of music will cause people to dance and that to avoid having dancing

on the premises, establishments will avoid playing these types of music. However, as the

Supreme Court has noted, "we have not traditionally subjected every criminal and civil sanction

imposed through legal process to [heightened] scrutiny simply because each particular remedy

will have some effect on the First Amendment activities of those subject to sanction." *Arcara v.

Cloud Books, Inc.*, 478 U.S. 697, 706–07 (1986). Here, too, further development of the factual

record is necessary to determine the effect of the Cabaret Law on musical expression in the

City.[13]

**VII. Substantive Due Process**

"To plead a substantive due process claim, a plaintiff must allege facts establishing (1) a

cognizable property interest (2) that was invaded in an arbitrary and irrational manner." *Rankel

v. Town of Somers*, 999 F. Supp. 2d 527, 546 (S.D.N.Y. 2014) (citing *O'Mara v. Town of*

---

[13] Muchmore's also contends that the Cabaret Law is a content-based prior restraint on protected First Amendment expression" as it requires a license for the "playing or performance of genres of music that might lead to dancing." (Am. Compl. at ¶ 30.) *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46–47 (1986) (explaining that "regulations enacted for the purpose of restraining speech on the basis of its content presumptively violate the First Amendment"). As previously noted, when the Cabaret Law was originally enacted, it required licensing of establishments that played certain types of music, with or without dancing. The Court does not address this claim at this time as the record will be further developed to assist the Court in resolving the Cabaret Law's overall effect on musical performance.

*Wappinger*, 485 F.3d 693, 700 (2d Cir. 2007)).  Muchmore's Amended Complaint includes due process violations under the Fourteenth Amendment in its two "Cause of Action" sections relating to dance performance and social dancing.  (Am. Compl. at ¶¶ 53, 56.)  However, the Amended Complaint does not detail the type of due process claim that Muchmore's brings, or include a statement of facts supporting any such allegation.  *See Rankel*, 999 F. Supp. 2d at 546–47 ("Plaintiff's allegations are insufficient to state a substantive due process claim.  As an initial matter, it is unclear on which property interest Plaintiff bases his claim. . . . But assuming that Plaintiff had a property interest, he fails to state a substantive due process claim because he has not alleged that the Town and its conspirators engaged in conduct that is 'so egregious, so outrageous' as to shock the conscience.").

Elsewhere in the Amended Complaint, Muchmore's alleges

> [s]ince the election of Rudolph Giuliani, the Cabaret Law has been enforced haphazardly, unpredictably, unequally and arbitrarily, affording police officers broad discretion to crack down on specific eating or drinking establishments without warning for activities that are generally tolerated in similarly situated establishments across the City of New York.

(Am. Compl. at ¶ 23.)  This contention is not tied in any way to the due process claim. Moreover, the allegations in Muchmore's Amended Complaint are different than the substantive due process arguments that Muchmore's makes in its briefing.  (Pl.'s Br. at 25 ("The Cabaret Law amounts to such an invasive, far-reaching prohibition of an indeterminate variety of expression, association and intimate conduct that it cannot be squared with the guarantee of the Due Process Clause.").)

Rule 8(a)(2) requires that a pleading for a claim for relief include "a short and plain statement of the claim showing that the pleader is entitled to relief."  From reading the pleadings, the Court cannot determine the basis for Muchmore's due process claim, and thus, this claim

fails to meet the Rule 8 standard.

## CONCLUSION

For the reasons stated herein, the parties' cross-motions for judgment on the pleadings are denied, with the exception of the City's motion to dismiss Muchmore's substantive due process claim, which is granted.

SO ORDERED.

Dated: Brooklyn, New York
      September 29, 2016

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge