**Alan D. Sugarman**
**Attorney At Law**

17 W. 70 Street
Suite 4
New York, NY 10023
212-873-1371
mobile 917-208-1516
fax 212-202-3524
sugarman@sugarlaw.com
www.sugarlaw.com

January 4, 2018

**By ECF**

Magistrate Judge Ramon E. Reyes, Jr.
United States District Court Eastern District of New York
225 Cadman Plaza East
Rm. N208
Brooklyn, New York 11201

Re:   Re: Muchmore's Cafe LLC v. City of New York
      14-cv-05668-RRM-RER
      Amicus Curiae Letter Brief

Your Honor:

I am an attorney admitted to practice in this court and a resident and taxpayer of the City of New York. I write regarding the December 19, 2017 letter from counsel for the parties (Doc. No. 31) concerning attorney's fees to Plaintiff Muchmore's Cafe, LLC for a litigation not litigated to conclusion.

Without a convincing Equal Protection claim under 42 U.S.C §1983, the availability of attorney's fees under 42 U.S.C §1988 is questionable.

Because the City in its prior filings did not identify that Muchmore had incorrectly described the original text of the 1926 Cabaret Law, a material error, it is important that the Court be fully informed before concluding that an Equal Protection claim is convincingly established.[1]

I ask the Court to require Muchmore to file a motion for attorney's fees as required by Fed. R. Civ. P. 54(d)(2)(A) and allow opposition under Rule 54(d)(2)(D).

Muchmore submitted to the Court false and misleading statements to support its 42 U.S.C §1983 Equal Protection claim. Without question, *Muchmore did mislead the Court as to the content of the original 1926 Cabaret Law text,* as shown in the Court's Memorandum and Order, at 4, September 29, 2016 (Doc. No. 27). Even assuming the validity of the

---

[1] Court's Memorandum and Order, September 29, 2016 (Doc. No. 27), at 20 "[T]he City does not even attempt to provide a clear understanding of the evolution of the Cabaret Law from its inception to today, or the harms it was designed to protect, then and, particularly, now."

Magistrate Judge Ramon E. Reyes, Jr.
January 4, 2018
Page of 2 of 9

questionable allegations, the Court refused to rule on the Equal Protection claim, "As such, the Court declines to dismiss Muchmore's equal protection claim at this time to allow for further briefing on the issues noted herein, briefing that is relevant to Muchmore's other constitutional challenges as well." *Id.,* at 40.

Muchmore should not be considered a prevailing party under 42 U.S.C §1983. Muchmore's submissions on this issue are insufficient to support the claim and, if not demonstrably false, are mere conjecture, and possibly would have been dismissed had the Court been informed of the weakness of the claim.

### Local Law 214

Muchmore, presumably, is claiming that it is a prevailing party because the litigation has been partially mooted by the adoption of Local Law 214 approved by the Mayor of the City of New York on November 27, 2017.[2] Although the Cabaret Law was in theory repealed, Local Law 214 maintains many requirements for security and video monitoring identified in Muchmore's Amended Complaint of October 27, 2014 (ECF 4).[3]

Not affected by Local Law 214 is New York City's Zoning Resolution which limits dancing to a small part of the City and is the major impediment to venues being allowed to host dancing. Also, not affected by Local Law 214 are fire and safety regulations and even regulations of the New York State Liquor Authority, which affect dancing venues.[4] Thus, this litigation did not achieve the effect of making regulations discriminating against dancing illegal.

### 42 U.S.C §1983 Equal Protection Claim

Muchmore's Equal Protection claim is supported by three elements:

- The claims that the *original* 1926 Cabaret Law text contained explicitly racist provisions.
- The claim that the racist origins are fully documented in numerous books on the subject of the Law's enactment.
- The claim that prefatory language to the enactment of the 1926 Cabaret Law is clear, satisfactory and convincing evidence that the 1926 Law was racist in intent.

---

[2] *A Local Law to Amend the Administrative Code of The City Of New York, in Relation to Security Cameras and Security Guards at Certain Eating or Drinking Establishments and Repealing Subchapter 20 of Title 20 of Such Code, Relating to Licensing Public Dance Halls, Cabarets and Catering Establishments.* 2017 N.Y.C. Local Law 214. (Exhibit A).

[3] These regulations remain in effect under Local Law 214, §2 as described in the Amended Complaint: Security (see Am. Compl. ¶10) and video surveillance (*id.* ¶11).

[4] *See* discussion of zoning (id. ¶13), fire and safety regulations, and regulations of the Department of Building (*id.* ¶14). *See also* New York Consolidated Laws, Alcoholic Beverage Control Law, § 64-d.

Magistrate Judge Ramon E. Reyes, Jr.
January 4, 2018
Page of 3 of 9

These claims are false. The Court did note that the parties had not briefed the Court on the Equal Protection challenge and made no ruling. Court Mem. at 7. Yet the Court did discuss Muchmore's Equal Protection claim. *Id.* at 37-40. The Court observed: "Thus, one key to this inquiry is the history behind the Cabaret Law, an analysis that is lacking in the parties' briefing." *Id.* at 39.

There is nothing to suggest that the Equal Protection challenge would survive a motion to dismiss, and Muchmore cannot claim attorney's fees as to its Equal Protection challenge and thus cannot obtain attorney's fees under 42 U.S.C §1988.

### The Absence of Explicit Discriminatory Provisions in the 1926 Act

Muchmore racial claims are unsubstantiated and false, but as to the text of the 1926 Law, the Court was misled. Repeating one of Muchmore's claims, the Court stated:

> The Cabaret Law has remained in force for nearly nine decades in largely the same form. One major change to the statute was prompted by judicial action. *Until the 1980's, the Cabaret Law limited the number of musicians that could play in a Cabaret to three and specified the types of instruments that could be played in a Cabaret.*

Court Mem. at 3, (emphasis supplied). *See also id.* at 42, n. 13. The Court was in error in stating that the 1926 act contained provisions evidencing racist intent. Despite incorrect assertions by Muchmore, the Cabaret Law as enacted *did not include* a limitation of the types and number of musicians, and in no other way did the Cabaret Law as enacted in 1926 contain any explicit provisions that even arguably were racist in nature as shown in the text of the original 1926 Cabaret Law, attached as Exhibit B.[5]

The misstatements as to the text of the *original 1926 law* are pivotal to the Equal Protection claims – the erroneous claim that the original 1926 text was *explicitly* discriminatory is the only unambiguous documentation which might prove initial intent. The claim of explicit text helps support the interpretation of the legislative preamble discussed *infra*, which is of course at best ambiguous.

Muchmore made the following statements as to the original text of 1926 Law, which statements are not supported by the text of the 1926 Law and also contradict an extensive discussion of legislative history in *Chiasson I*.[6]

> "The Cabaret Law was passed in 1926, at the height of the Harlem Renaissance."[7] 'It *originally required* that all musicians

---

[5] The original bill may not be available on-line, but is easily obtainable from the New York City Municipal Archives. The attached copy of the 1926 Bill (Exhibit B) was obtained from the Municipal Archives at 31 Chambers Street, New York, New York after a ten-minute search by the law librarian.

[6] *See* the discussion at 132 Misc. 2d 642-643, *Chiasson v. New York City Dept. of Consumer Affairs*, 132 Misc. 2d 640, 505 N.Y.S.2d 499 (Sup. Ct. N.Y. Co. 1986). (*Chiasson I*).

Magistrate Judge Ramon E. Reyes, Jr.
January 4, 2018
Page of 4 of 9

> performing in New York City 'must be of good character'."[8] (emphasis supplied)

> "The discriminatory intent behind the Cabaret Law is further demonstrated through the Cabaret Law's *original language* prohibiting musical instruments commonly used in jazz music, including wind, brass and percussion instruments, and exempting instruments commonly used by white musicians, including piano, organ, accordion, guitar and stringed instruments."[9] (emphasis supplied)

> "The Cabaret Law was a direct response to the Harlem Renaissance, and its *original text* and legislative history make clear that it was targeted at black musicians and inter-racial association."[10] (emphasis supplied)

> "The *original text* of the law targeted wind, brass and percussion instruments, commonly used in jazz music, while permitting piano, organ, accordion, guitar and stringed instruments. See Chiasson v. New York City Dept. of Consumer Affairs, 505 N.Y.S.2d 499 (Sup. Ct. N.Y. Co. 1986). [Chiasson I]."[11] (emphasis supplied)

These unsupported claims are central to Muchmore's Equal Protection claims of *explicit* racism. The 1926 Act does not contain these provisions. Muchmore used these claims as to the original language as a factual basis to support broader claims that the law was explicitly racist such as:

> "The Cabaret Law was passed in 1926, at the height of the Harlem Renaissance. History leaves no room for ambiguity as to its purpose: to clamp down on inter-racial dancing and inter-racial mingling in Harlem jazz clubs."[12]

*Chiasson I* at 132 Misc. 2d 642-643 states that provisions as to number and type of instruments were not introduced into the Cabaret Law until 1971. There is nothing in the original text that targets black musicians and inter-racial association. There is nothing in

---

[7] Am. Compl. ¶16. Muchmore attempts to frame the issue to suggest a direct connection between the Harlem Renaissance and the 1926 Cabaret Law. 1926 was also in the middle of Prohibition, the Jazz Age, the Roaring Twenties, and the Charleston Craze. Jazz included Ragtime and Dixieland.
[8] *Id.* ¶16.
[9] *Id.* ¶19.
[10] Muchmore Mem. of Law at 20.
[11] *Id.* at 15.
*Chiasson I's* discussion of legislative history states clearly that these provisions were not added until 1971. *Chiasson I* at 132 Misc. 2d 642-643. Only someone musically uninformed could assert that even in 1971, the provisions were racially discriminatory, since by then "jazz" was performed by many musicians who were not African-American, and perhaps most jazz musicians were not African-American.
[12] Muchmore Mem. of Law at 1.

the original text that refers to moral character.[13] Thus, there is nothing to support the Equal Protection claim.

### Exaggerated and False Sourcing of Support for Muchmore's Racism Claims

Muchmore also made questionable assertions as to supporting authority in a lengthy footnote 9 to the authorities allegedly supporting the claim in Muchmore's Memorandum at 21: "The discriminatory intent behind the Cabaret Law is so well established that entire books have been written about it."

Only one of the books mentioned in the footnote 9 on page 21 could properly be described as an "entire book" written about the context and circumstances surrounding the enactment of the Cabaret Law *in 1926*, that of historian Professor Michael Lerner, author of *Dry Manhattan, Prohibition in New York City*. Cambridge, MA: Harvard University Press, 2007. Professor Lerner was a consultant for the Ken Burns PBS Documentary, *Prohibition*. His book is a major serious work supported by painstaking research from contemporaneous magazines, newspapers, and other sources. The book explores the contradictions of the time, when for example, objections to inter-racial mingling came from certain parts of the African-American community. The book explores the history of the Cabaret Law as proposed by Mayor Jimmy Walker.

Muchmore does not directly cite Lerner in footnote 9; rather, Muchmore cites to a Wall Street Journal article attributing a quotation to Professor Lerner and describing Lerner as the author of *Dry Prohibition*. The attributed quotation is in conflict with page after page of *Dry Prohibition*. Perhaps the lack of a pinpoint cite to *Dry Prohibition* was not an oversight; in Lerner's lengthy and well-documented treatment of Mayor Walker and the enactment of the Cabaret Law, Professor Lerner states:

> The cabaret law was Mayor Walker's way of regulating without regulating. It appeased Walker's critics who wanted stricter surveillance of clubs and cabarets, but it did nothing to dampen the spirit or quality of New York's nightlife; nor did it do much to strengthen Prohibition enforcement. The law was enforced sparingly, and Walker even suspended the curfew on New Year's Eve, 1926, arguing that he had no desire to be a "spoilsport." Liquor violations were in fact of little consequence in terms of maintaining a cabaret license. Most clubs that ran afoul of the cabaret law were punished with a paltry twenty-five -dollar fine, and in 1928, seventy-six cabarets had their licenses renewed by the

---

[13] Muchmore also improperly paraphrases *Chiasson I*: "In striking down this aspect of the law, the Chiasson Court also noted *the racially-tinged language* of the legislative history, which described the purpose of the Cabaret Law as follows..." (emphasis supplied). Muchmore Mem. at 10. But, *Chiasson I* nowhere uses the word "racially-tinged" and indeed the *Chiasson I* decision made no reference to racial discrimination. Moreover, *Chiasson I* clearly states: " [I]t appears that cabaret licensing was introduced in the city in 1926, as part of an effort to control speakeasies ..."

> Department of Licenses despite having complaints filed against them with the Police Department. In 1929 only one licensed cabaret in New York had its license revoked for liquor violations, while thirty-two had their licenses suspended, mostly for curfew violations.
>
> It has been argued that Walker's cabaret law was later used to regulate jazz clubs and, in particular, interracial dancing in Harlem clubs, but there is little evidence that this was the case during Walker's administration. Though Police Commissioner Joseph Warren and other city officials would express concern over racial mixing in nightclubs later during the Prohibition era, the cabaret law was enforced so sporadically and imprecisely under Walker that it served almost no purpose other than to encourage a modicum of self-restraint in the nightclub trade. In many regards, the law was Walker's way of taking back the regulation of city nightlife from the Bureau of Prohibition and allowing the city to set its own priorities rather than follow the federal agenda.

*Dry Prohibition* at 165-166.[14]

Muchmore's first citation in footnote 9 refutes Muchmore's Equal Protection claims. All other citations in the lengthy footnote are "*see also's*" and are equally not supportive of Muchmore's claims, sometimes referring to later periods, and not directly related to the actual 1926 enactment and the period before and after the enactment.

Of the so-called "entire books" about the discriminatory intent, only one other book mentions the 1926 enactment at all, in two or three pages of conjecture, written by the moving attorney in *Chiasson I* and *Chiasson II*, Paul Chevigny. Chevigny is not a historian of the culture, politics, dance, and music of the period and his book only provide a page or two in discussing the enactment of the law. Chevigny asserts that the Cabaret Law "must" have had racist origins, citing as the only support the quotation from the 1926 Committee (*See* Exhibit 2), without citing any contemporaneous sources as support for his conjecture.

None of the other books cited by Muchmore in footnote 9 could be described as a book about the origins of the Cabaret Law. Some statements themselves are not relevant and are taken out of context.

Thus, Muchmore's theory of racism at inception is grounded only upon the interpretation of the so-called "coded" language of the Committee supporting the 1926 Bill. Am. Compl. ¶17-¶18.[15]

---

[14] It seems probable that Professor Lerner was rejecting the conjectures of Chevigny, *supra*.
[15] The "coded" language text is included as a preface to the 1926 Text, Exhibit B.

Certainly, interpretation of language from ninety years ago in a different time and context is subject to pre-conceived notions of the reader and reasonable people can disagree as long as they are operating from the same set of facts. But interpretation in the isolation of the facts and context is of concern. If one believes the original text contained explicit discriminatory language, that would affect the interpretation of the "coded" language. If one is not aware of the background of the "running wild" phrase, that would affect the interpretation. Even today, the term "native New Yorker" has no racial connotations.

Muchmore neglects to provide the "code" for the Court to decode the language. The secret code is that "Running Wild" was the name of a famous 1923 Broadway revue which featured a song called "The Charleston" and sparked the Charleston Craze of 1925 and was essentially the theme song for the Flappers.[16] This was the Roaring Twenties. The song and dance were played and danced by white and African-Americans and there are innumerable film clips and photos as to this craze.[17]

The "coded" language makes no reference, directly or indirectly, to inter-racial dancing or inter-racial mixing and the adjective and noun "native" seems to apply both to visitors and residents of the City.[18]

The Cabaret Law seemed to have had little to no effect on the thriving Harlem clubs from 1926 through the 1930s. At the National Jazz Museum on 129th Street, there is a 1932 poster map of Harlem clubs boasting of 500 speakeasies in Harlem.[19]

The unsupported racial allegations are the heart of Muchmore's 2 U.S.C. 1983 claim:

> The City passed the Cabaret Law to keep African Americans and white people from socializing and dancing together in Harlem jazz clubs. It is a shameful vestige of laws used to keeps African Americans subordinated and separate even after the Civil War and the passage of the Fourteenth Amendment. This is precisely why

---

[16] *See* Richard Carlin and Kinshahas Conwell, *Ain't Nothing Like the Real Thing,* 2010 Smithsonian Institution, at 68. Exhibit C.

[17] A Google or YouTube search of "Charleston Craze 1926" or "Running Wild 1923" or the "Charleston 1926" will provide many examples of videos, recording, and photographs of people of all demographics dancing to the song made famous by the Running Wild revue.

[18] Muchmore might also point to a number of news article and blogs which make the claims of racist origin - almost all of which can be sourced to Muchmore's court filings, it seems. One blog posting is by Mr. Muchmore's law professor, who tracks the same misrepresentations and errors in the filings of Muchmore, and even adds a misquote of Professor Lerner, inaccurately attributing Lerner's description of the position of "Black Victorian" Edgar Grey opposing interracial mixing (*Dry Prohibition* at 213) to Professor Lerner. Sonya West, *A Constitutional Challenge to NYC's Ban on Dancing, (*June 30, 2015*)*, https://www.huffingtonpost.com/sonja-west/a-constitutional-challeng_b_7181186.html.

[19] E. Simms Campbell, A Nightclub Map of Harlem (1932). Exhibit D. The original of the map was purchased by Yale's Beinecke Library in 2016 for $100,000.00. *Yale's Beinecke Library Buys $100,000 Map of Prohibition-Era Harlem*, http://www.culturetype.com/2016/04/13/yales-beinecke-library-buys-100000-map-of-prohibition-era-harlem/; *A Guide to club hopping in Harlem circa 1932*, https://yalealumnimagazine.com/articles/4325-a-guide-to-club-hopping-in-harlem-circa-1932.

Magistrate Judge Ramon E. Reyes, Jr.
January 4, 2018
Page of 8 of 9

> Congress passed the Civil Rights Act of 1871, and with it, created the private right of action (now codified as 42 U.S.C. 1983) under which this action is brought.[20]

**Attorney's Fess Under 42 U.S.C. 1983 Are Not Appropriate**

Absent a proper motion and consideration of whether Muchmore is a prevailing party under its weak Equal Protection claim, the Court should not approve a settlement agreement incorporating such fees, nor should the City of New York fund such fees based upon 42 U.S.C. 1988.

The Court's Memorandum and Order repeatedly mentioned the need for further development of the facts by Muchmore, which Muchmore never developed.

*To be sure, proof of the history of the origins of the Cabaret Law is a matter that is unrelated to discovery* since the historical facts and context are outside of the control of the City (the Archives being open to all.)

As an additional comment, public discourse is degraded by making unsubstantiated claims of racism – it is all too fashionable today to weaponize claims to intimidate opponents. Here, filings with unsubstantiated claims in this action were relied upon by many publications and commentators, as if they were true, even though not litigated to conclusion in this Court. Unfortunately, the Court, through no fault of its own, erred in relying upon Muchmore and repeating the incorrect statement as to the contents of the original text. These incorrect statements have now entered the realm of popular "history."

The casual casting of racial charges devalues the meaning of racism. The racial aspects in this litigation, have been expanded to the point that opponents of the Cabaret Law charged that anyone supporting the Cabaret Law (on the grounds perhaps of noise and congestion) was "complicit" in racism.[21]

                                                Sincerely,

---

[20] Muchmore Mem. at 12.

[21] Transcript of the Minutes of the Committee on Consumer Affairs, New York City Council, June 19, 2017, Statement of Frankie Dekay, page 13, lines 9-13 ("Any law founded in such explicit racist language of this nature has no place in our society, and to argue otherwise posits you as complicit in this country's history of racism.") followed by statement of Mr. Andrew Muchmore (principal of Plaintiff) at page 19, thanking Ms. DeKay and repeating the falsehoods that "the law specifically prohibited instruments used in jazz." and "[t]he racial motivation behind the law is well documented." Page 25, lines 10-11.
http://legistar.council.nyc.gov/View.ashx?M=F&ID=5316935&GUID=41F1062B-FC32-4A12-846E-65CEB3BB052C. The initial hearing was held prior to the introduction of 1652-2017 which became Local Law 217. http://legistar.council.nyc.gov/LegislationDetail.aspx?ID=3086319&GUID=6FDA3305-06B3-47B3-9DF6-21B605C5A8EE&Options=&Search=.

Magistrate Judge Ramon E. Reyes, Jr.
January 4, 2018
Page of 9 of 9

                                                                                                    Alan D. Sugarman

cc:    Andrew Myers Muchmore, amuchmore@muchmorelaw.com
        Christopher L, Ayers cayers@andersonkill.com
        Jerry S. Goldman jgoldman@andersonkill.com
        Maximilian D, Travis, mtravis@muchmorelaw.com
        Nicholas Robert Maxwell, nmaxwell@andersonkill.com
        Ave Maria Brennan, abrennan@law.nyc.gov

Exhibits
        Exhibit A – 2017 Local Law 214
        Exhibit B – 1926 Cabaret Law as Enacted
        Exhibit C – Runnin' Wild from Smithsonian  Published Book
        Exhibit D – A Night Club Map of Harlem, 1932, E. Simms Campbell